ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (147029)
LAURA ANDRACCHIO (187773)
CHRISTOPHER R. KINNON (316850)
ASHLEY G. PYLE (364175)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
landracchio@rgrdlaw.com
ckinnon@rgrdlaw.com
apyle@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re RxSIGHT, INC. SECURITIES LITIGATION | Case No. 8:25-cv-01596-FWS-KES |
| | CLASS ACTION |
| This Document Relates To: | AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| ALL ACTIONS. | |
| | DEMAND FOR JURY TRIAL |

4936-6684-5824.v2

# TABLE OF CONTENTS

**Page**

I.   JURISDICTION AND VENUE ........................................................ 1

II.  SUMMARY OF THE ACTION ...................................................... 1

III. PARTIES ........................................................................................ 5

IV.  OVERVIEW .................................................................................... 7

    A.   Cataract Surgery and Premium Intraocular Lenses ................... 7

    B.   The RxSight System and Business Model ................................. 8

    C.   Defendants Materially Misrepresented the Benefits and Adoption of the Rxsight System ............................................... 10

        1.   Defendants Misrepresented that LALs Eliminated the Need for Glasses Without Negative Side Effects ........................................................................... 10

        2.   Defendants Misrepresented the Benefits that the RxSight System Offered to Surgeons ........................... 11

        3.   Defendants Misrepresented Adoption of the RxSight System ................................................................ 12

    D.   Defendants Took Advantage of RxSight's Artificially Inflated Stock Price by Completing a Secondary Offering and Selling Their Own Shares ................................................. 13

    E.   The Truth Is Revealed Between July 2024 and July 2025, Causing RxSight's Stock Price to Plummet and Wiping Out Its Market Capitalization ..................................................... 14

V.   DEFENDANTS' MISLEADING STATEMENTS ........................ 17

    A.   November 2023 Through March 2024 Statements .................. 17

    B.   May and June 2024 Statements ............................................... 21

    C.   July 2024 Disclosure and August 2024 Through September 2024 Statements...................................................... 26

    D.   November 2024 Disclosure and Statements............................. 31

    E.   January 2025 Through February 2025 Disclosure and Statements................................................................................. 35

    F.   April 2025 Disclosure and Statements .................................... 38

    G.   May 2025 Statements ............................................................... 43

4936-6684-5824.v2

**Page**

H. July 8, 2025: Defendants Reveal the Truth About Declining Adoption of RxSight's Technology and Again Cut 2025 Guidance ................................................................ 47

VI. LOSS CAUSATION ......................................................................... 48

    A. July 10, 2024 Corrective Disclosure ......................................... 49

    B. November 7, 2024 Corrective Disclosure ................................. 49

    C. January 12, 2025 Corrective Disclosure................................... 50

    D. April 3, 2025 Corrective Disclosure......................................... 50

    E. July 8, 2025 Corrective Disclosure ......................................... 51

VII. DEFENDANTS FAILED TO DISCLOSE "KNOWN TRENDS" AND OTHER MATERIAL INFORMATION IN VIOLATION OF ITEM 303 OF REGULATION S-K...................................................... 53

VIII. ADDITIONAL SCIENTER ALLEGATIONS ................................. 54

    A. The Individual Defendants' Actual Knowledge....................... 54

    B. The Allegations Concern RxSight's Core Operations ............. 57

    C. The Individual Defendants Held Themselves Out as Knowledgeable ......................................................................... 58

    D. The Individual Defendants Received Briefings ....................... 58

    E. The Individual Defendants Executed SOX Certifications ....... 58

    F. The Individual Defendants Directed Public Statements........... 58

    G. Defendants Kurtz and Thunen and Other Company Insiders Pocketed Millions from Insider Trades at the Top of the Market .................................................................... 59

    H. Defendants Helped the Company Reap $115 Million from a Secondary Offering at the Top of the Market............... 60

IX. THE PRESUMPTION OF RELIANCE APPLIES ...................................... 60

X. CLASS ACTION ALLEGATIONS ............................................................ 61

COUNT I ................................................................................................ 63

COUNT II............................................................................................... 64

- ii -

1

2                                                                              **Page**

3
PRAYER FOR RELIEF ........................................................................... 65

JURY DEMAND.................................................................................. 66
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4936-6684-5824.v2

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §78aa) because the claims arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC") (17 C.F.R. §240.10b-5).

2.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because RxSight, Inc. ("RxSight" or the "Company") maintained its corporate headquarters in this District at all relevant times.  Additionally, many of the acts charged herein, including the preparation and dissemination of materially misleading information, occurred in substantial part in this District.

3.    In connection with the acts alleged herein, Defendants,[1] directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and/or facilities of the national securities exchanges.

## II.    SUMMARY OF THE ACTION

4.    This is a class action brought on behalf of purchasers of RxSight common stock between November 9, 2023 and July 8, 2025, inclusive (the "Class Period"), against RxSight, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") for violations of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

5.    Lead Plaintiff Michigan Laborers' Pension Fund ("Plaintiff") makes the following allegations based upon personal knowledge as to Plaintiff and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of the SEC filings of RxSight, the Company's press releases and conference calls, transcripts

---

[1]    "Defendants" refer collectively to RxSight, Ron Kurtz ("Kurtz"), and Shelley Thunen ("Thunen").

1  of healthcare conferences, analyst reports, media reports and other publicly disclosed
2  information about the Company, and interviews with factual sources, including,
3  without limitation, individuals formerly employed by the Company and RxSight
4  customers.  Plaintiff believes that substantial additional evidentiary support will exist
5  for the allegations set forth herein after a reasonable opportunity for discovery.

6      6.    RxSight is a medical technology company that develops and sells
7  products to treat cataracts and improve vision following cataract surgery.  RxSight's
8  principal product is the RxSight Light Adjustable Lens system  ("RxSight System"),
9  which comprises an intraocular, monofocal light adjustable lens ("LAL" and "LAL+,"
10  together "LALs") and a light delivery device ("LDD").  The Company claims that its
11  proprietary technology is designed to address the shortcomings of existing premium
12  intraocular lens ("IOL") technologies and provide a solution that enables a treating
13  physician to customize and optimize a patient's visual acuity after surgery.  According
14  to the Company, the RxSight System enables a doctor to implant LALs during a
15  standard cataract procedure, determine the refractive error with patient input after
16  healing is complete, and then use the LDD to reshape the implanted LAL to achieve
17  the patient's desired vision outcomes without the need for glasses across a wide range
18  of vision, including near vision.  LALs are considered "premium" IOLs and therefore
19  are not covered by Medicare or insurance, and cost several thousand dollars per eye.

20      7.    Throughout the Class Period, Defendants repeatedly made misleading
21  public statements in conference calls, healthcare conferences, press releases, and SEC
22  filings concerning the efficacy and adoption of RxSight's technology.  For example,
23  Defendants told investors that LALs delivered perfect distance and near vision
24  without the need for glasses and without unwanted side effects like glare or halos, that
25  adoption of the RxSight System and utilization of LALs were growing and that newer
26  customer cohorts were adopting faster than prior cohorts.  In truth, but unknown to
27  investors, most patients still needed glasses to read after RxSight's LALs were
28  implanted and adjusted, many patients experienced waxy vision, glares and/or halos,

- 2 -

and LALs were in practice mostly limited to use by LASIK surgeons and for LASIK patients. LALs therefore offered marginal and even no improvement over conventional products for near sight (costing as much as $18,000 more), while requiring increased workloads, time commitments, and capital burdens for doctors far beyond non-premium IOLs, which were free through insurance. As a result, adoption and utilization were in fact slowing and stagnating throughout the Class Period.

8.     Defendants, however, extended favorable and lucrative LAL sale incentives to surgeons and clinics to conceal RxSight's slowing adoption, demand, and utilization – challenges RxSight disclosed at the end of the Class Period as existing during the "past few quarters," contemporaneous with Defendants' positive statements to the contrary.

9.     Defendants' misrepresentations caused RxSight's stock price to be artificially inflated, rising from under $24 per share at the beginning of the Class Period to over $64 per share by May 2024, in just six months.

10.     On May 8, 2024, Defendants capitalized on the Company's artificially inflated stock price by selling more than 2 million shares in a secondary public offering at $56 per share, raising $115 million, when the Company's stock price was at its most inflated and before the truth was revealed.

11.     Company insiders also capitalized on the fraud, reaping over $60 million in stock sales during the Class Period. Defendants Kurtz and Thunen in particular maintained RxSight's inflated stock price just long enough to sell more than $16 million of their own RxSight shares at artificially inflated prices as high as $60 per share between December 2023 and October 2024. Other senior executives and directors sold over $44 million of Company stock during the Class Period.

12.     Unaware of these adverse facts, investors purchased RxSight common stock at artificially inflated prices throughout the Class Period.

13.     The truth about the slowing adoption and utilization of RxSight's technology gradually emerged in a series of partial disclosures that commenced

4936-6684-5824.v2

shortly after the May 2024 public offering, from July 10, 2024 through July 8, 2025. RxSight's stock price continued during that time to trade at artificially inflated prices because Defendants misleadingly blamed the Company's declining performance on external factors such as "seasonality" and consumer sentiment, continuing to misrepresent the RxSight System and its adoption.

14.     The first disclosure on July 10, 2024 revealed that cataract surgeons surveyed by Wells Fargo Securities, LLC ("Wells Fargo") said that LALs did not provide superior outcomes compared to other IOLs, were not worth the substantially increased cost, and required too much added time in postoperative adjustments.  On this news, RxSight's stock price declined by nearly 13% that day.

15.     On November 7, 2024, the Company reported an 8% decline in utilization from 2Q24 to 3Q24, essentially flat LDD placements, and a sequential LAL revenue increase of only 1.4%, which Defendants misleadingly blamed on seasonality and other external factors.  RxSight's stock price declined by nearly 7% on this news.

16.     On January 12, 2025, Defendants reported declining 4Q24 LDD sales growth of 8% year over year, compared to 18% year-over-year growth in 3Q24, which heightened investor concerns about decelerating adoption and caused RxSight's stock price to decline by over 8%.

17.     On April 2-3, 2025, Defendants reported that 1Q25 LDD and LAL sales had declined and that utilization had declined for the first time since 2021. Defendants also reduced RxSight's annual 2025 revenue guidance and admitted that cohorts were not growing as quickly as before.  On this news, RxSight's stock price dropped almost 42%, but it continued to trade at artificially inflated prices because Defendants misrepresented that the declines were "transitory" effects of a "weakened premium IOL market" overall and "changes in consumer sentiment."

18.     Finally, on July 8, 2025, RxSight reduced 2025 annual guidance for the second time, reported that LDD sales had plummeted more than nearly 45% in 2Q25, and disclosed that LAL sales had fallen from 1Q25.  Defendants also disclosed

- 4 -

longstanding "adoption gaps" and "challenges," admitting for the first time that newer customers had been adopting more slowly "over the last few quarters" and required more support, and that older cohorts' utilization of LALs had been flat and declining for at least a year.  As a result, RxSight revealed that it was implementing a "commercial pivot" to overhaul field support and drive utilization in all cohorts.  On this news, RxSight's stock price declined nearly 48% the next day.

19.    By the end of the Class Period, RxSight had lost $1.87 billion of its market capitalization since the completion of the May 2024 public offering.

20.    Following the Class Period, RxSight's performance continued to decline. On November 5, 2025, RxSight reported that 3Q25 revenues were 14% lower than 3Q24 revenues, and 3Q25 LDD sales had decreased 68% over 3Q24.

## III.    PARTIES

21.    As set forth in the certifications filed on September 22, 2025 (ECF 24-3 – 24-4), Plaintiff purchased RxSight common stock during the Class Period and suffered damages due to Defendants' misconduct.

22.    Defendant RxSight is a Delaware corporation with its principal executive offices at all relevant times located at 100 Columbia, Aliso Viejo, California 92656. The Company's common stock trades on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "RXST."

23.    Defendant Ron Kurtz co-founded RxSight and has served as its President and CEO and on RxSight's Board of Directors (the "Board") since 2016.  As CEO, Kurtz spoke on RxSight's behalf in releases, conference calls, and SEC filings. Pursuant to §906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX"), 18 U.S.C. §1350, Kurtz certified the Company's Forms 10-Q filed with the SEC on November 9, 2023, May 6, 2024, August 5, 2024, November 7, 2024, and May 7, 2025, and the Forms 10-K filed with the SEC on February 28, 2024 and February 25, 2025.

4936-6684-5824.v2

24.    Defendant Shelley Thunen has served as RxSight's CFO since February 2017 through July 2024 and as Co-President and CFO since August 2024.  In these roles, Thunen spoke on RxSight's behalf in releases, conference calls, and SEC filings.  Pursuant to §906 of Sarbanes-Oxley, 18 U.S.C. §1350, defendant Thunen certified the Company's Forms 10-Q filed with the SEC on November 9, 2023, May 6, 2024, August 5, 2024, November 7, 2024, and May 7, 2025, and the Forms 10-K filed with the SEC on February 28, 2024 and February 25, 2025.

25.    Defendants Kurtz and Thunen are collectively referred to herein as the "Individual Defendants."

26.    During the Class Period, each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential and proprietary information concerning the Company, its operations, business prospects, and overall financial condition.  By reason of their positions within the Company, the Individual Defendants obtained, had access to, and/or were in possession of material, adverse, nonpublic information concerning RxSight via internal corporate documents and communications with other corporate officers and employees, attendance at management and/or Board meetings (and committees thereof), and via the reports, presentations, and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

27.    As senior executive officers and controlling persons of a publicly traded company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, business, financial statements, and financial metrics, and to correct any previously issued

- 6 -

statements that had become materially misleading or untrue, so that the market price of RxSight common stock would be based upon truthful and accurate information. Defendants' materially false and misleading misrepresentations during the Class Period violated these specific requirements and obligations.

28.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## IV.    OVERVIEW

### A.    Cataract Surgery and Premium Intraocular Lenses

29.    A cataract is the clouding of the eye's natural lens that can lead to blindness if left untreated.  Approximately half of all individuals develop cataracts by age 60, usually in both eyes, and prevalence increases with age.

30.    Cataract surgery involves removing the eye's natural cloudy lens and replacing it by implanting a clear IOL.  Approximately 4.7 million cataract surgeries were performed in the United States in 2023, and 5.1 million in 2024.

31.    IOLs are classified as either "conventional" or "premium," differing by the type of correction the lens provides, the cost of the lens and procedure, and insurance coverage.  Conventional IOLs are "monofocal," providing vision at a single, predefined distance, but not correcting other problems often affecting cataract patients such as astigmatism and presbyopia.  Nearly all patients receiving conventional IOLs

- 7 -

require glasses following surgery to achieve the best distance, intermediate, and near vision. Conventional IOLs and surgery to implant them are typically covered by Medicare or insurance, costing the patient nothing, and represent the majority of cataract surgeries performed in the United States.

32. Premium IOLs are intended to achieve superior results compared to conventional IOLs by providing one or more of the following benefits: vision at multiple distances including far, intermediate, and near ("multifocal"), correction of other conditions such as astigmatism and presbyopia, and reducing or eliminating the need for glasses. Premium IOL patients pay an incremental fee of $1,000-$4,000 that is not covered by Medicare or insurance. A well-known drawback of premium multifocal lenses, aside from the cost, is that they often produce side effects such as halos or glares, leading to patient dissatisfaction. Premium IOL surgeries represent about one-fifth of cataract surgeries performed in the United States.

**B.    The RxSight System and Business Model**

33. RxSight's principal product is the RxSight System, which comprises an LAL or LAL+ and an LDD. The RxSight System enables doctors to adjust visual acuity after surgery. Traditional IOLs, by contrast, cannot be adjusted after surgery, so if patients are dissatisfied with their vision after the procedure, they will require glasses or undergo a secondary procedure such as LASIK to correct their vision.

34. To use the RxSight System, a doctor first performs a standard cataract procedure to implant an LAL within a patient's eye. Two to four weeks following the surgery, the patient returns to the doctor's office and receives a diagnostic eye exam to determine the appropriate lens prescription. Using ultra-violet light generated by an LDD, the doctor customizes or "adjusts" the shape of the implanted LAL within the patient's eye to optimize the patient's vision. Adjustments are rarely completed or optimized in one session, and patients may return to receive up to three adjustments to the LAL. Following the adjustments, and in the event that no change to the LAL is

- 8 -

required, the LAL is "locked-in," which prevents the LAL from being further adjusted. Lock-ins require up to two additional visits.

35.    The FDA approved the RxSight System in 2017 following completion of a Phase III clinical study in which 391 patients had an LAL implanted in one eye, and 193 patients had a conventional monofocal control IOL implanted in one eye. The Phase III study was designed to test the effectiveness of LALs for uncorrected distance vision, not near vision, and in a controlled environment in which subjects were carefully selected.

36.    RxSight began commercializing the RxSight System in the United States in 2019, marketing it for "blended" vision, whereby both eyes are corrected, each for a different distance.

37.    RxSight's securities began trading publicly in August 2021 following an initial public offering at $16 per share.

38.    RxSight's business follows a "razor/razor-blade" model: grow the installed base of LDDs in ophthalmology practices and surgery centers, and then drive recurring, high-margin LAL procedures, or "utilization." In this regard, the RxSight System differs from other IOL technology in that it requires a surgeon or practice to make a capital investment in an LDD and then undergo hours of training on the device to be able to successfully adjust LALs for patient specifications.

39.    Customer "adoption" and "utilization" of the RxSight System were central to the Company's business model. "Adoption" meant that a customer such as a clinic or ophthalmology practice had purchased an LDD, its staff had undergone all training and other education and preparation needed to begin offering LAL procedures to patients, and had commenced providing them or "utilizing" the technology. Successful adoption of the RxSight System depends, among other things, on RxSight's adequate training and education of surgeons and personnel in their practices, requiring substantial field support from RxSight. Once the RxSight System is adopted by a practice, ongoing field support from RxSight account managers, sales

- 9 -

1   representatives, clinical application specialists, and technical service personnel is

2   critical to drive utilization of LALs and ensure customer satisfaction.

3       40.   RxSight defined utilization as the number of LAL procedures per LDD

4   per month, calculated by dividing the number of LAL procedures in a quarter by the

5   total number of LDDs installed at the end of the prior quarter, divided by three.

6   RxSight did not report utilization in its SEC filings but disclosed it in conference calls

7   with analysts, who calculated utilization based on RxSight's reported LDD and LAL

8   sales. Defendants and analysts considered utilization to be a key performance metric

9   indicating RxSight's adoption and penetration of the IOL market. However,

10  utilization did not indicate, and Defendants did not disclose, the distribution of

11  utilization among cohorts, so that the number alone did not indicate, for instance,

12  whether newer or older cohorts were driving utilization.

13      41.   In the years leading up to the Class Period, Defendants said they focused

14  sales efforts on high volume cataract surgeons who performed 70%-80% of all

15  premium IOL procedures in the United States. Defendants referred to each year's new

16  RxSight customers as a "cohort."

### C.   Defendants Materially Misrepresented the Benefits and Adoption of the Rxsight System

#### 1.   Defendants Misrepresented that LALs Eliminated the Need for Glasses Without Negative Side Effects

20      42.   Defendants promoted the RxSight System to investors and doctors as

21  premium cataract technology that was designed "to address the shortcomings of

22  competitive premium IOL technologies and provide a solution that doctors can trust to

23  improve visual outcomes and achieve high levels of patient satisfaction." According

24  to Defendants, the shortcomings that the RxSight technology purportedly addressed

25  included that "current non-adjustable premium IOL offerings often cannot deliver on

26  patient expectations regarding their desire to see at near, intermediate and far

27  distances *without reliance on glasses* and to avoid troubling side effects such as glare,

28  halos and loss of contrast sensitivity."

- 10 -

43.    Defendants therefore told investors throughout the Class Period in conference calls, SEC filings, and healthcare conferences that almost all patients receiving RxSight's LALs could read small font without glasses with both eyes while also achieving 20/20 distance vision after all adjustments, and that the LAL delivered "exceptionally high-quality vision" without negative side effects associated with other premium IOLs, such as glare and halos.

44.    These statements were false and misleading because most patients receiving LALs could *not* read "without glasses" after all adjustments were completed, and many LAL+ patients complained of "waxy" vision, glare, and halos.

45.    For these reasons, Defendants knew by late 2023 that LALs were not competitive with other IOLs already being offered and that surgeons and patients could not justify the increased cost or burdens of LALs over conventional IOLs.

### 2.    Defendants Misrepresented the Benefits that the RxSight System Offered to Surgeons

46.    Surgeons and their practices faced substantial start-up costs when electing to adopt the RxSight System.  For example, RxSight sells each LDD for an average selling price of $130,000 and sells each LAL for $1,000.  Managing physicians must also ensure their practices are adequately staffed and trained to perform the postoperative diagnostic assessments and to administer all follow-on adjustments and lock-ins.  And adjustments and lock-ins require significant additional clinic time compared to other premium and conventional IOLs, negatively affecting workflow and profits.

47.    It was therefore important for Defendants to convince investors that, despite these start-up costs and added clinical or "chair time" hours, practices were adopting and would continue to adopt the RxSight System.  To that end, Defendants told investors in conference calls, SEC filings, and healthcare conferences throughout the Class Period that the RxSight System offered substantial economic returns and clinical benefits compared to other premium and conventional IOL procedures, which

- 11 -

countered the initial cost and ongoing additional time commitment.  Defendants said, for example, that the RxSight System increased surgeons' confidence in cataract surgery outcomes for their patients compared to traditional IOL procedures because of the ability to customize vision after surgery.  Increased confidence in results meant increased LAL utilization, allowing surgeons to quickly see a return on their LDD investment, expand their premium IOL practices, and charge up to $9,000 per LAL lens – a significant profit over the $1,000 per LAL that surgeons payed RxSight. Defendants claimed that 40% of LAL patients would have otherwise chosen conventional monofocal IOLs, which they claimed are far less profitable for a practice than LAL procedures.

48.     But by fall 2023, surgeons were finding that the post-surgical adjustments and lock-ins were extremely burdensome, consumed too much clinic time, and interrupted clinical workflow.  Instead, LALs required up to ***five additional clinical hours*** to make up to three adjustments and two lock-ins, thereby reducing doctors' profits and making LALs less economical than other premium procedures.

49.     Thus, the substantial increased cost of LALs was not justifiable, and surgeons were not obtaining the economic or clinical benefits Defendants promoted.

### 3.     Defendants Misrepresented Adoption of the RxSight System

50.     As surgeons in older and newer RxSight customer cohorts gained clinical experience with the RxSight System, doctors realized by the beginning of the Class Period that LALs did not provide superior outcomes to traditional premium and conventional IOLs, and were not worth the substantial increased cost compared to conventional IOLs for most patients.  The limited efficacy of LALs in practice combined with time-consuming postoperative adjustments that interrupted clinic workflow and diminished profits caused surgeons in earlier cohorts to drastically reduce their utilization of LALs, and caused newer cohorts to adopt the RxSight

System more slowly as knowledge of its limitations spread in the ophthalmology community.

51.     For these reasons, the market for the Company's technology was saturated by mid-2023.

52.     In addition, the RxSight System required substantial field support to drive surgeon and clinic adoption, including education and training of not only surgeons but their staffs.   Substantial field support was also required to promote increased utilization of LALs within practices that had adopted the technology.   However, RxSight lacked adequate field support in 2024 and 2025 to continue to drive adoption and utilization in its new and existing cohorts, which further exacerbated the undisclosed adoption gaps and declines occurring then due to limited efficacy and clinical burden.

53.     Defendants knew by late 2023 that adoption was slowing for all of these reasons, yet they repeatedly misrepresented after that in 2024 and 2025 that all cohorts were "growing" and increasing utilization, and that newer cohorts were adopting more quickly than older cohorts.

**D.     Defendants Took Advantage of RxSight's Artificially Inflated Stock Price by Completing a Secondary Offering and Selling Their Own Shares**

54.     As Defendants misrepresented the efficacy and adoption trends of the RxSight System throughout the Class Period, RxSight's stock price increased from below $24 per share at the beginning of the Class Period to a high of over $64 per share in May 2024.

55.     Defendants took advantage of investors' misplaced confidence in RxSight and the resulting artificial inflation of RxSight's stock price by completing a secondary public offering of over 2 million shares at $56 per share, reaping proceeds of $115 million, on May 13, 2024.

56.     Defendants Thunen and Kurtz also sold hundreds of thousands of their own shares at artificially inflated prices as high as $60.15 per share, reaping collective

- 13 -

proceeds of over $16 million.  Thunen sold 40% of her holdings for over $8.5 million between December 2023 and October 2024, and Kurtz sold 165,000 of his shares in less than five months, between December 2023 and May 2024, for nearly $7.7 million.

57.    Along with Kurtz and Thunen, additional RxSight insiders – including Board members and senior executives – unloaded more than 1 million shares at artificially inflated prices during the Class Period, reaping over $44 million in profits. Particularly, Board members sold over 1.1 million shares from November 2023 to January 2025, reaping nearly $34 million.  Senior Executives Eric Weinberg and Illya Goldshleger reaped over $10 million between December 2023 and November 2024.

58.    In total, Class Period insider sales at the Company exceeded $60 million.

**E.    The Truth Is Revealed Between July 2024 and July 2025, Causing RxSight's Stock Price to Plummet and Wiping Out Its Market Capitalization**

59.    The truth was gradually revealed in a series of partial disclosures beginning in July 2024 and continuing through July 2025.

60.    On July 10, 2024, Wells Fargo published results of its own survey of 50 cataract surgeons revealing that many surgeons believed that RxSight's adjustable lens technology "increases costs without a significant improvement in clinical outcomes" and was "inefficient," "cost prohibitive," and "too expensive for the patients and extremely time consuming."  On this news, RxSight's stock price fell from $56.99 per share on July 9, 2024 to $51.11 per share on July 10, 2024 losing almost 13% of its value.

61.    However, RxSight's stock price continued trading at artificially inflated prices as Defendants assuaged investor concerns, including by continuing to misrepresent on RxSight's August 5, 2024 earnings call that utilization was growing in all cohorts and newer cohorts were adopting faster.  On that earnings call, when analysts asked Defendants about the July 2024 Wells Fargo survey, Defendants denied

- 14 -

1  that the concerns raised in the survey were affecting adoption, and said that all cohorts

2  were continuing to grow and that newer customers were adopting faster.

3      62.     But on November 7, 2024, the Company revealed an 8% decline in

4  utilization from 2Q24 to 3Q24, essentially flat LDD placements, and a sequential LAL

5  revenue increase of only 1.4%, causing RxSight's stock price to decline by nearly 7%.

6  The stock continued to trade at artificially inflated prices, however, as Defendants

7  misleadingly blamed 3Q24 results on external factors, including "seasonality" and

8  doctors taking longer vacations.

9      63.     On January 12, 2025, however, Defendants revealed declining 4Q24

10  LDD sales growth of 8% year over year, compared to 18% year-over-year growth in

11  3Q24, which heightened investor concerns about decelerating adoption and caused

12  RxSight's stock price to decline by over 8% the next day on unusually high trading

13  volume.

14      64.     Then between trading sessions on April 2-3, 2025, Defendants revealed

15  that RxSight's 1Q25 revenue was down 6% sequentially from 4Q24, LDD sales had

16  declined 12% sequentially, LAL sales declined 5% sequentially, and utilization had

17  declined 6.4% year over year, the first such decline in utilization since 2021.

18  Defendants also admitted that cohorts were "not growing quite as quickly."

19  Defendants reduced RxSight's full-year 2025 guidance from a range of $185 million-

20  $197 million down to $160 million-$175 million, but they misleadingly attributed

21  declining revenues to non-Company specific factors including "headwinds affecting

22  the overall premium IOL market and broader economy" and "current market

23  conditions."

24      65.     In response to the April 2-3, 2025 disclosures, the price of RxSight's

25  common stock declined from $26.12 per share on April 2, 2025 to $16.21 per share on

26  April 3, 2025, representing a decline of nearly 42%, on above-average trading volume.

27  However, RxSight stock continued to trade at artificially inflated prices because

28  Defendants falsely attributed the Company's declining results to "transitory" effects of

- 15 -

a "weakened premium IOL market" and "abrupt changes in consumer sentiment," while concealing the true internal drivers – slower new-cohort adoption and declining utilization in all cohorts.

66.     Then, on July 8, 2025, after the market closed, RxSight issued a press release reporting preliminary 2Q25 financial results.  Defendants revealed that RxSight's LDD sales had plummeted to 40 units in 2Q25, down from 73 units in the prior quarter, a more than 45% decline; and sales of LALs had fallen sequentially to less than 27,400 units from 27,579 in 1Q25, so that utilization of the RxSight System had continued to deteriorate for the second straight quarter.  Defendants again reduced 2025 annual guidance, adjusting it downward to a range of $120 million-$130 million from $160 million-$175 million, which confirmed that utilization and adoption trends had deteriorated and would continue to deteriorate.

67.     Defendant Kurtz admitted for the first time during the July 8, 2025 conference call that LAL and LDD sales had declined, noting a "slower ramp" in LAL utilization by newer customers.  RxSight was therefore "executing a commercial pivot" to reverse downward utilization trends, which included overhauling its field support to "close adoption gaps, enhance customer satisfaction, and to support sustained utilization [trends]."  Kurtz also admitted that, contrary to Defendants' statements for over a year, customer cohorts "require[d] more support to get started and to move up the adoption curve," which had adversely impacted adoption "over the last few quarters," and that utilization by "older customers [was] flat" going back at least "four quarters."

68.     Defendant Kurtz's admission that the adoption problems disclosed in July 2025 existed throughout 2024 and 2025 – when Defendants were making positive contrary statements – confirmed that these earlier statements were contemporaneously misleading, not merely in hindsight, and that Defendants knew or recklessly disregarded those adverse facts when choosing to speak positively about adoption and utilization.

4936-6684-5824.v2

69.     On the July 8, 2025 revelations, the price of RxSight common stock fell from $12.79 per share on July 8, 2025 to below $8.00 per share on July 9, 2025, a decline of nearly 48%, on above-average trading volume.

70.     During the Class Period, RxSight's stock price traded at an artificially inflated high of over $64 per share.  By the end of the Class Period, when the price collapsed to under $8 per share, RxSight had lost $1.87 billion in market capitalization since the May 2024 Offering.

## V.     DEFENDANTS' MISLEADING STATEMENTS

71.     Throughout the Class Period, Defendants defrauded investors by repeatedly choosing to speak about the performance and adoption of RxSight's LAL technology in a misleading manner, including by omitting material adverse information.

### A.     November 2023 Through March 2024 Statements

72.     On November 9, 2023, RxSight issued a press release announcing its financial results for 3Q23, reporting: (i) $22.2 million in revenues, a 76% increase compared to 3Q22; (ii) the sale of 66 LDDs, a 35% increase over 3Q22, which increased its installed base to 589 LDDs in the United States; and (iii) the sale of 13,657 LALs, a 107% increase in procedures compared to 3Q22.  Defendant Kurtz was quoted in the release: "The post-operative adjustability of the LAL sets it apart from any other premium lens on the market today and makes it an increasingly popular choice for the precise, high-quality vision it provides across a range of distances."

73.     Also on November 9, 2023, Defendants convened an earnings call in connection with RxSight's press release of its 3Q23 results, during which defendant Kurtz made the following misleading statements[2]:

---

[2]     Words and phrases in the alleged misleading statements are bolded and italicized for emphasis.

4936-6684-5824.v2

(a)     "[R]eal-world clinical data on 738 bilateral LAL subjects from nearly 80 clinical sites . . . continues to illustrate the clear advantages of postoperative adjustability. . . . *91% of LAL subjects* achieved uncorrected binocular near vision of J2 or better, which means *they could read 5-point type without glasses, while 79% could read at J1 or better[,] equivalent to 4-point type*."

(b)     "The results showed that 97% of blended vision LAL patients achieved 20/20 or better uncorrected distance vision and *95% achieve[d] J2 or better uncorrected near vision*."

74.     Defendants' representations had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports.  For example, BTIG, LLC's ("BTIG") November 9, 2023 RxSight report repeated Defendants' misrepresentation that the LAL+ had "extended depth of focus . . . to help with near vision."  Oppenheimer& Co. Inc.'s ("Oppenheimer") RxSight report of the same day likewise repeated Defendants' purportedly "strong clinical data."  J.P. Morgan's November 9, 2023 report noted RxSight's touted "competitive advantage" and "clinically superior premium product."

75.     On January 10, 2024, defendants Kurtz and Thunen presented at the JPMorgan Healthcare Conference, where Kurtz told analysts and investors:

Based on our Phase 3 and Phase 4 studies, approximately twice the number of eyes will achieve *20/20 vision or better without glasses* using the LAL, and about 90% of patients will see 20/20 or better at distance, and be *able to read small fonts without glasses using both eyes*.

76.     On February 28, 2024, Defendants convened an earnings call in connection with RxSight's press release of its Q423 results, during which defendant Kurtz made the following misleading statements:

(a)     "With both the LAL and LAL+, doctors treat the actual refraction that is measured post-operatively, rather than trying to predict a result pre-operatively for the first time, *achieving LASIK-level refractive results after cataract surgery*."

- 18 -

(b)     "We see again in our registry data that it's – over – approximately 90% of patients are seeing 20/20 at distance and *able to read J2 at near, which is about 5.5, so it's a size of the footnote on a page*."

77.     Defendants' repeated representations had the desired effect of misleading the market, as demonstrated by contemporaneous analyst reports.  For example, Oppenheimer's February 29, 2024 report repeated Defendants' misrepresentations concerning "LAL's ability to optimize quality of vision over a range of distances (without the halos/glares often seen in multifocals)" and that "LAL+ provides additional near/intermediate vision early following surgery."

78.     On March 13, 2024, defendants Kurtz and Thunen presented at the Oppenheimer Healthcare MedTech & Services Conference, where Kurtz made the following misleading statements:

(a)     "Because the Light Adjustable Lens is adjustable, it means that we can attain much higher refractive outcomes, *better vision without glasses*.  We maintain very high quality of vision and we allow the patient to customize their vision, typically in both eyes."

(b)     "[W]e correct vision with the same – *at the same level of precision as glasses or contact lenses*."

79.     Defendants' November 2023 through March 2024 statements in ¶¶73, 75-76, and 78 were misleading when made because Defendants knew or recklessly disregarded the following facts:

(a)     The clinical results Defendants discussed were based on controlled studies and selected data that did not reflect the results that surgeons and patients were obtaining in uncontrolled practice settings.  For example, Phase III study subjects had only one eye implanted, unlike patients in non-study settings who were having both eyes implanted for blended vision.  In addition, study patients were carefully selected based on strict inclusion and exclusion criteria, and were required, among other things, to have perfect corneas, very good retinas, and no dry eyes, so that their

- 19 -

1  monocular results were more likely to be favorable than binocular results in

2  uncontrolled clinical settings.  In clinical, non-study settings most patients were not

3  obtaining "LASIK-level" results and did not obtain "better vision without glasses," let

4  alone "at the same level of precision as glasses or contact lenses."  Instead, most

5  patients required reading glasses for near vision after having LALs implanted because

6  these lenses did not provide optimal near vision.  The continuing need for reading

7  glasses in most patients had manifested by late 2023, as doctors were increasingly

8  gaining experience with LALs in clinical, non-study settings.

9        (b)    In 2023 and 2024, doctors complained regularly to Defendants

10  about the results, performance, and limited use cases associated with LALs on the

11  American Society of Cataract and Refractive Surgery ("ASCRS") Ad Board, a chat

12  log available only to the medical community, which included Kurtz, who is a surgeon.

13  Doctor and clinician complaints were also recorded in "Study Patient" customer

14  service data and Doctor Readiness reports sent to Kurtz and other senior managers,

15  and discussed on weekly and monthly sales calls, in Town Hall meetings, in Team

16  Meetings, and on regular Zoom and conference calls they typically attended or

17  participated in.

18        (c)    LALs therefore were not more effective than free, standard IOLs

19  for near vision, making LALs uncompetitive due to the massively increased cost

20  compared to standard IOLs that were free or covered by Medicare or insurance.

21        (d)    LALs were proving to be a niche (not mainstream) product

22  primarily efficacious for former LASIK patients and/or when implanted by LASIK

23  surgeons in actual clinical, non-study settings.  But former LASIK patients and

24  LASIK surgeons represented only a small fraction of all cataract surgeries, premium

25  IOL patients, and cataract surgeons.

26        (e)    Moreover, by mid-2023 RxSight had saturated its main LASIK and

27  high-volume surgery markets and Defendants knew any remaining market was

28  otherwise extremely limited and without broad application, including because the

- 20 -

remaining surgeons lacked the skill or volume to become sufficiently proficient with the technology to obtain adequate patient results.

(f)     RxSight's expensive products were more burdensome for doctors than competing, free IOL products, requiring up to five additional clinical hours per LAL patient (and often an additional physician or optometrist) to make up to five adjustments and lock-ins. The lengthy process and drawn out procedural timeline negatively impacted surgeons' profit margins, making the RxSight System less economical or efficient and thereby reducing adoption and usage.

(g)     As a result of (a)-(f), by mid-2023 RxSight was experiencing slowing adoption. These negative trends were apparent in RxSight's internal LAL and LDD Sales Reports, "Study Patient" customer service data, and Doctor Readiness reports sent to Kurtz and other senior managers, and discussed on weekly and monthly sales calls, Town Hall meetings, Team Meetings, and regular Zoom and conference calls they typically attended or in which they participated.

(h)     In 2024, RxSight initiated a reward system called "Study Patient" for its larger clients, who received a $500 rebate per eye for each LDD adjustment rendered on a client. After 40 eye adjustments, $20,000 was allotted to the physician. The Study Patient sales incentive masked dissatisfaction with LALs and propped up revenues and adoption temporarily by incentivizing surgeons and clinics to utilize LALs in greater volumes than they would have without the incentives.

**B.     May and June 2024 Statements**

80.     On May 6, 2024, Defendants convened an earnings call in connection with RxSight's press release of its 1Q24 results, where defendant Kurtz said concerning data collected from approximately 1,000 bilaterally implanted LAL subjects: "Approximately 90% of LAL patients attained binocular and corrected vision of 20/20 or better, while ***over 90% were able to read J2 or 5.5 with both eyes***."

81.     On May 13, 2024, Defendants announced the completion of a public offering (the "Offering") pursuant to the May 8, 2024 Registration Statement

- 21 -

("Registration Statement") and May 8, 2024 Prospectus Supplement ("Prospectus Supplement") (together the "Offering Materials"), selling over 2 million RxSight shares of common stock at $56 per share, for proceeds of $115 million.

82.    The Offering Materials contained untrue statements of material fact and omitted facts necessary to make the statements therein not false or misleading about RxSight's purported efficacy and adoption of RxSight's LALs.

83.    For example, the Offering Materials stated:

(a)    "Most LAL patients choose minor differences in the refractive correction of each eye, *resulting in glasses-free vision across a full range of distances*."

(b)    "In addition, *over 90% of patients were also able to read 5-point font at near vision, which is typically the size of footnotes on a page*."

(c)    "We believe competitive premium IOLs often fail to deliver on patients' expectations for quality vision across a *range of distances without glasses*. We believe our RxSight system offers doctors and patients a significantly more reliable approach that can consistently deliver optimal, fully customized visual outcomes with few compromises, *ultimately driving broad adoption* and establishing it as the standard of care for premium cataract procedures."

(d)    "*LAL patients do not experience increased incidence of glare or halos that are common with other premium IOLs*."

84.    Defendants' statements had the intended effect of misleading the market as demonstrated by contemporaneous analyst reports.  J.P. Morgan's May 6, 2024 report similarly echoed Defendants' statements in noting supposedly "healthy trends in adoption" and its "clinically superior premium product."  Oppenheimer's May 7, 2024 RxSight report noted "[h]igher [u]tilization."

85.    On May 15, 2024, defendants Kurtz and Thunen presented at the Bank of America Health Care Conference, where Kurtz made the following misleading

1  statement: "We've seen **steady increase in visibility and adoption** of the technology

2  and I think that what we saw in Q1 was more of the same."

3      86.  On June 18, 2024, defendant Thunen presented at the Truist Securities

4  MedTech Conference, where she made the following misleading statements:

5      I look at our installed customers in 2020, 2021, 2022, 2023. . . .  And I

6      look at the number of LALs per LDD per month, right? . . .  And what I

7      see is all the [c]lasses [cohorts] end up at relatively the same position of

8      LALs per LDD, and **they're all growing**.

9      The other thing that is good about this data, as far as we're

10      concerned, is **the slope of line is steeper in our 2022 and 2023 [c]lasses**

11      **than in the early [c]lasses**.

12      87.  Defendants' May and June 2024 statements in ¶¶80, 83, and 85-86 were

13  misleading when made because they knew or recklessly disregarded the following

14  facts:

15      (a)  The clinical data Defendants discussed was based on controlled

16  studies and selective data that did not reflect the results that surgeons and patients

17  were experiencing in uncontrolled practice settings.  For example, study subjects were

18  carefully selected based on strict inclusion and exclusion criteria, and were required,

19  among other things, to have perfect corneas, very good retinas, and no dry eyes, so

20  that their results were more likely to be favorable than in uncontrolled clinical

21  settings.  In clinical, non-study settings, most patients were not obtaining "glasses-free

22  vision" or a range of distance "without glasses."  Instead, most patients required

23  reading glasses for near vision after having LALs implanted because these lenses did

24  not provide optimal near vision.  The continuing need for reading glasses in most

25  patients had manifested by late 2023, as doctors were increasingly gaining experience

26  with LALs in clinical, non-study settings.

27      (b)  In 2023 and 2024, doctors complained regularly to Defendants

28  about the results, performance, and limited use cases associated with LALs on the

- 23 -

ASCRS Ad Board, a chat log available only to the medical community, which included Kurtz, who is a surgeon.  Doctor and clinician complaints were also recorded in "Study Patient" customer service data and Doctor Readiness reports sent to Kurtz and other senior managers, and discussed on weekly and monthly sales calls, in Town Hall meetings, in Team Meetings, and on regular Zoom and conference calls they typically attended or participated in.

(c)    Defendants introduced the LAL+ in April 2024 to reduce the number of post-implant adjustments and improve the near vision limitations of the LAL.  But RxSight had very little data before releasing it to market.  In fact, the LAL+ created glares and halos similar to other IOLs and was difficult to position correctly so as to be effective.  As a result, surgeon chat lines were full of negative comments, making it very difficult for RxSight to sell the product, as doctors in the industry abandoned the lens and its adoption cratered.

(d)    LALs therefore were not more effective than free, standard IOLs for near vision, making LALs uncompetitive due to the massively increased cost compared to standard IOLs that were free/covered by Medicare or insurance.

(e)    LALs were proving to be a niche (not mainstream) product primarily efficacious for former LASIK patients and/or when implanted by LASIK surgeons in actual clinical, non-study settings.  But former LASIK patients and LASIK surgeons represented only a small fraction of all cataract surgeries, premium IOL patients, and cataract surgeons.

(f)    Moreover, by mid-2023 RxSight had saturated its main LASIK and high-volume surgery markets and Defendants knew any remaining market was otherwise extremely limited and without broad application, including because the remaining surgeons lacked the skill or volume to become sufficiently proficient with the technology to obtain adequate patient results.

(g)    RxSight's expensive products were more burdensome for doctors than competing, free IOL products, requiring up to five additional clinical hours per

- 24 -

1  LAL patient (and often an additional physician or optometrist) to make up to five

2  adjustments and lock-ins.  The lengthy process and drawn out procedural timeline

3  negatively impacted surgeons' profit margins, making the RxSight System less

4  economical or efficient and thereby reducing adoption and usage.

5         (h)    RxSight lacked adequate field support to drive adoption and

6  utilization.

7         (i)    As a result of (a)-(h), when Defendants made these statements,

8  RxSight had already saturated the market for the Company's technology and was not

9  enjoying "increase[d]" or "broad adoption" but rather experiencing "adoption

10 challenges," which the Company did not disclose until July 2025, when it revealed

11 that "newer customers [had been] adopting more slowly than our previous customers"

12 for "the last few quarters" and that older customers' utilization was "flat" going back

13 "four quarters," during which time each newer cohort was down "more than the one

14 before."

15        (j)    In 2024, RxSight initiated a reward system called "Study Patient"

16 for its larger clients, who received a $500 rebate per eye for each LDD adjustment

17 rendered on a client.  After 40 eye adjustments, $20,000 was allotted to the physician.

18 The Study Patient sales incentive masked dissatisfaction with LALs and propped up

19 revenues and adoption temporarily by incentivizing surgeons and clinics to utilize

20 LALs in greater volumes than they would have without the incentives.

21        88.    Defendant Thunen further misled investors at the June 18, 2024 Truist

22 Securities MedTech Conference by understating the workflow and clinical burdens for

23 doctors created by RxSight lenses.  When asked about how many adjustments were

24 needed per patient, she stated: "It's been running about 1.6, which is the same as our

25 PMA trial.  And then, of course, they have two lock-ins."  This statement was

26 misleading because Thunen knew or was reckless in not knowing that doctors had told

27 her based on their real-world use that RxSight lenses usually required three

28 adjustments per patient in addition to two lock-ins, eating up as much as five hours of

- 25 -

valuable clinical time per LAL patient and thereby severely reducing doctors' profits on LALs.

**C.    July 2024 Disclosure and August 2024 Through September 2024 Statements**

89.    On July 10, 2024 the truth about surgeons' slowing adoption of RxSight's technology was partially disclosed when Wells Fargo published an analyst report citing its own survey of 50 cataract surgeons.  The survey showed that many surgeons had no plans to adopt RxSight's adjustable lens technology because it "increases costs without a significant improvement in clinical outcomes," was "inefficient," "cost prohibitive," and "too expensive for the patients and extremely time consuming."  On this news of what BTIG later called in its August 5, 2024 report "conflicting research that questioned the strength [of] customer demand," RxSight's stock price fell precipitously from $56.99 per share on July 9, 2024 to $51.11 per share on July 10, 2024 – losing nearly 13% of its value in one day.  RxSight's stock price continued to decline after, losing approximately 30% of its value between July 10, 2024 and August 5, 2024.

90.    Defendants assuaged these concerns about customer demand and prevented the market from knowing the truth about slowing adoption of RxSight's products three weeks later, on August 5, 2024, when they convened a post-market earnings call in connection with RxSight's press release of its 2Q24 results ("2Q24 Call").

91.    For example, on the 2Q24 Call, when asked directly about "investor concerns after some conflicting sell side research on . . . the ability to grow on LDD and LAL adoption," Defendants gave the following misleading responses:

(a)    "[Kurtz:] I'm not sure qualitatively that there's a large difference. We're still at the early phase of penetration of the market.  And so we have – ***our new customers are similar to our previous customers that we continue to grow*** into the market."

(b)    "[Thunen:] As we move to LAL adoption, I think that, as you [noted] earlier, we have talked about adoption by different cohorts of installs.  And certainly those **folks in '23 and '24 have accelerated faster**.  But the important thing with that number also is that we have continued to see **all cohorts continue to grow**. And we think an important part of the component of **newer customers getting going faster**, obviously is one, we have more references."

92.    Defendants also made the following misleading statements during the 2Q24 Call, which assured investors that RxSight's adoption and usage growth was continuing and even increasing by cohort, especially with newer customers:

(a)    "And part of that is, one, adding procedures from new customers, having them accelerate a little bit more rapidly than we had customers do in '20, '21, '22.  And we started seeing that for customers installed in '23 and again in '24."

(b)    "[P]articularly when we look at our cohorts – as we've talked about multiple times, that our cohort is the one I look at is based upon year of install. And those cohorts continue to grow. . . .  And then, of course, the slope of the line in terms of **adoption is higher for our newer customers**.  And if we think about it overall that the most important thing we do with the LAL is continue to get adoption. . . .  But overall, **the slope of the line is up** and that's what we're working with."

93.    These misrepresentations caused RxSight's stock price to increase from $40.78 per share on August 5, 2024 to $47.85 per share on August 6, 2024, a 16% jump.  RxSight's stock price then continued to climb to over $56 per share by the end of August 2024, or over 30%, gaining back any losses from the July 10, 2024 analyst survey of cataract surgeons.

94.    Defendants' statements had the intended effect of misleading the market as demonstrated by contemporaneous analyst reports.  For example, BofA Securities reported on August 6, 2024 that "RXST's very clean quarter should dispel recent investor concerns that . . . growth/utilization may be slowing," noting specifically that

- 27 -

"RXST said that all cohorts of LDD placements continue to grow utilization but newer placements are ramping [up] faster than older ones."  Morgan Stanley & Co. LLC ("Morgan Stanley") exclaimed similarly on August 5, 2024 that RxSight was "firing on all cylinders" with a "strong quarter" that would "provide relief tomorrow" and assuage "worries following some market surveys."  And BTIG's August 5, 2024 report repeated Defendants' misleading statements that "adoption is accelerating" and that RxSight's products "create a virtuous cycle for physicians, both clinically and economically."  J.P. Morgan's August 5, 2024 report likewise noted the purported "healthy trends in adoption."

95.    On September 4, 2024, defendants Kurtz and Thunen presented at the Morgan Stanley Global Healthcare Conference, where Thunen made the following misleading statements in response to a question about "the newer people who've come onboard and the utilization of the LAL, relative to some of the first generation docs who are adopting it": "But *what we have seen in our cohorts is all the cohorts continue to grow. . . .   [W]e've seen an overall upward [utilization] trend consistently over the last year, two-and-a-half, three years*."

96.    Defendants' statements had the intended effect of misleading the market as demonstrated by contemporaneous analyst reports.  For example, Morgan Stanley reported on September 4, 2024 that "RXST is still in very early innings of adoption given c. 10,000 practitioners in the US," driven by "patient demand (opting out of glasses)," and that "the company notes that . . . utilization (defined by LAL's per LDD) dynamics are generally consistent with an attractive upward trend."  Needham & Company, LLC's September 13, 2024 RxSight report repeated Defendants' statements that "penetration is still in the early innings" and that "RXST is seeing utilization continue to increase across all customer cohorts.  Further, it is seeing newer cohorts ramp utilization at a faster pace vs. older cohorts beginning utilization."

97.    Defendants' July 2024 through September 2024 statements above in ¶¶91-92 and 95 were all misleading when made because Defendants knew or recklessly disregarded the following facts:

(a)    In clinical, non-study settings, most patients required reading glasses for near vision after having LALs implanted because these lenses did not provide optimal near vision. The continuing need for reading glasses in most patients had manifested by late 2023, as doctors were increasingly gaining experience with LALs in clinical, non-study settings.

(b)    In 2023 and 2024, doctors complained regularly to Defendants about the results, performance, and limited use cases associated with LALs on the ASCRS Ad Board, a chat log available only to the medical community, which included Kurtz, who is a surgeon. Doctor and clinician complaints were also recorded in "Study Patient" customer service data and Doctor Readiness reports sent to Kurtz and other senior managers, and discussed on weekly and monthly sales calls, in Town Hall meetings, in Team Meetings, and on regular Zoom and conference calls they typically attended or participated in.

(c)    Defendants introduced the LAL+ in April 2024 to reduce the number of post-implant adjustments and improve the near vision limitations of the LAL. But RxSight had very little data before releasing it to market. In fact, the LAL+ created glares and halos similar to other IOLs and was difficult to position correctly so as to be effective. As a result, surgeon chat lines were full of negative comments, making it very difficult for RxSight to sell the product, as doctors in the industry abandoned the lens and its adoption cratered.

(d)    LALs therefore were not more effective than free, standard IOLs for near vision, making LALs uncompetitive due to the massively increased cost compared to standard IOLs that were free/covered by Medicare or insurance.

(e)    LALs were proving to be a niche (not mainstream) product primarily efficacious for former LASIK patients and/or when implanted by LASIK

- 29 -

4936-6684-5824.v2

surgeons in actual clinical, non-study settings. But former LASIK patients and LASIK surgeons represented only a small fraction of all cataract surgeries, premium IOL patients, and cataract surgeons.

(f)     Moreover, by mid-2023 RxSight had saturated its main LASIK and high-volume surgery markets and Defendants knew any remaining market was otherwise extremely limited and without broad application, including because the remaining surgeons lacked the skill or volume to become sufficiently proficient with the technology to obtain adequate patient results.

(g)     RxSight's expensive products were more burdensome for doctors than competing, free IOL products, requiring up to five additional clinical hours per LAL patient (and often an additional physician or optometrist) to make up to five adjustments and lock-ins. The lengthy process and drawn out procedural timeline negatively impacted surgeons' profit margins, making the RxSight System less economical or efficient and thereby reducing adoption and usage.

(h)     RxSight lacked adequate field support to drive adoption and utilization.

(i)     As a result of (a)-(h), when Defendants made these statements, RxSight had already saturated the market for the Company's technology and adoption was not "higher" and cohorts were not "continuing to grow." Instead, RxSight was experiencing "adoption challenges," which the Company did not disclose until July 2025, when it revealed that "newer customers [had been] adopting more slowly than our previous customers" for "the last few quarters" and that older customers' utilization was "flat" going back "four quarters," during which time each newer cohort was down "more than the one before."

(j)     In 2024, RxSight initiated a reward system called "Study Patient" for its larger clients, who received a $500 rebate per eye for each LDD adjustment rendered on a client. After 40 eye adjustments, $20,000 was allotted to the physician. The Study Patient sales incentive masked dissatisfaction with LALs and propped up

- 30 -

revenues and adoption temporarily by incentivizing surgeons and clinics to utilize LALs in greater volumes than they would have without the incentives.

### D.    November 2024 Disclosure and Statements

98.    After the market closed on November 7, 2024, RxSight issued a press release reporting 3Q24 financial results that were disappointing to investors. RxSight reported an 8% sequential decline in utilization from 2Q24, essentially flat sequential LDD placements, and a sequential LAL revenue increase of only 1.4%, missing street expectations. RxSight's 3Q24 results heightened investor concerns about decelerating utilization and adoption, and caused the stock price to decline by nearly 7% the next day, November 8, 2024, on unusually high trading volume. However, the price of RxSight stock continued to trade at artificially inflated levels because Defendants falsely attributed 3Q24 results to "seasonality" and "doctors taking longer vacations," while continuing to mislead investors about the efficacy and adoption of their technology.

99.    For example, after the market closed on November 7, 2024, Defendants convened an earnings call in connection with RxSight's press release of its 3Q24 results, during which defendant Kurtz told investors that:

(a)    "[T]he LAL+ delivers an average of 1.3 additional lines of distance corrected near vision compared to the already excellent vision achieved with the standard LAL. This combined with the ability to customize refraction in both eyes, a path taken by over 90% of LAL patients, leads to remarkable binocular visual outcomes, with more than 90% of patients achieving distance vision of 20, 20 or better and near vision of *J2 or better without glasses*."

(b)    "*[U]tilization has grown over time and it continues to grow*. So, I think that overall, the . . . numbers are going in the right direction. . . . But generally[,] we see those numbers going up."

100.    Defendant Thunen made the following misleading statements on the earnings call:

- 31 -

(a) When asked whether utilization trends had changed in the past few quarters, Thunen responded: "[W]hat we've seen is that the classes by year of install, '21 and before, '22 and then '23 which you're now probably 'installed enough' is that they all end up at the same place in terms of volume. . . .  And as I've said, what we do see is the newer accounts, right[?]  [*T]hose adopted in '23 and now the beginning of '24, tend to get to the same place, not the same apex [a]s the rest of the accounts, but get to the same place a bit quicker as well*."

(b) Later, Thunen reiterated: "[W]hen I look internally at our data by cohort by [year of] install, *the more recent installs get to the same place a little bit more quicker*, right?"

101.    Defendants' statements had the intended effect of misleading the market as demonstrated by contemporaneous analyst reports, which downplayed the results and reiterated Defendants' excuse of seasonality.  For example, Jefferies' LLC's ("Jeffries") November 7, 2024 report noted that "investors were expecting a higher beat for 3Q" and that "[m]anagement called out more surgeon vacations in 3Q."  Wells Fargo's November 7, 2024 RxSight report repeated Defendants' statements misleadingly attributing "softer LAL volume" to "seasonality."  BTIG cut its price target but touted "continued strong adoption" in its RxSight report of the same day.  BofA Securities' ("BofA") November 7, 2024 RxSight report noted the LAL miss but believed it was "not . . . a concern" due to Defendants' assurance that "utilization for each system placement cohort continues to grow."  Likewise, on November 7, 2024, J.P. Morgan noted the "[s]ofter LAL [v]olumes" but attributed them to "stronger than usual seasonality" and "remain[ed] optimistic on RxSight's ability to drive adoption."  Morgan Stanley reported on November 8, 2024 that "RXST showing c. 8% down after market largely due to only 1% sales beat and softer LAL figure," while believing Defendants' misleading statements that the "softness [wa]s a seasonal function."

102.    Defendants' statements in ¶¶98-100 were misleading when made because Defendants knew or recklessly disregarded the following facts:

(a)     In clinical, non-study settings, most patients required reading glasses for near vision after having LALs implanted because these lenses did not provide optimal near vision.  The continuing need for reading glasses in most patients had manifested by late 2023, as doctors were increasingly gaining experience with LALs in clinical, non-study settings.

(b)     In 2023 and 2024, doctors complained regularly to Defendants about the results, performance, and limited use cases associated with LALs on the ASCRS Ad Board, a chat log available only to the medical community, which included Kurtz, who is a surgeon.  Doctor and clinician complaints were also recorded in "Study Patient" customer service data and Doctor Readiness reports sent to Kurtz and other senior managers, and discussed on weekly and monthly sales calls, in Town Hall meetings, in Team Meetings, and on regular Zoom and conference calls they typically attended or participated in.

(c)     Defendants introduced the LAL+ in April 2024 to reduce the number of post-implant adjustments and improve the near vision limitations of the LAL.  But RxSight had very little data before releasing it to market.  In fact, the LAL+ created glares and halos similar to other IOLs and was difficult to position correctly so as to be effective.  As a result, surgeon chat lines were full of negative comments, making it very difficult for RxSight to sell the product, as doctors in the industry abandoned the lens and its adoption cratered.

(d)     LALs therefore were not more effective than free, standard IOLs for near vision, making LALs uncompetitive due to the massively increased cost compared to standard IOLs that were free/covered by Medicare or insurance.

(e)     LALs were proving to be a niche (not mainstream) product primarily efficacious for former LASIK patients and/or when implanted by LASIK surgeons in actual clinical, non-study settings.  But former LASIK patients and LASIK surgeons represented only a small fraction of all cataract surgeries, premium IOL patients, and cataract surgeons.

- 33 -

(f)     Moreover, by mid-2023 RxSight had saturated its main LASIK and high-volume surgery markets and Defendants knew any remaining market was otherwise extremely limited and without broad application, including because the remaining surgeons lacked the skill or volume to become sufficiently proficient with the technology to obtain adequate patient results.

(g)     RxSight's expensive products were more burdensome for doctors than competing, free IOL products, requiring up to five additional clinical hours (and often an additional physician or optometrist) to make up to five adjustments and lock-ins.  The lengthy process and drawn out procedural timeline negatively impacted surgeons' profit margins, making the RxSight System less economical or efficient and thereby reducing adoption and usage.

(h)     RxSight lacked adequate field support to drive adoption and utilization.

(i)     As a result of (a)-(h), when Defendants made these statements, RxSight had already saturated the market for the Company's technology and was not enjoying "quicker" adoption or growing utilization, but rather was experiencing "adoption challenges," which the Company did not disclose until July 2025, when it revealed that "newer customers [had been] adopting more slowly than our previous customers" for "the last few quarters" and that older customers' utilization was "flat" going back "four quarters," during which time each newer cohort was down "more than the one before."

(j)     In 2024, RxSight initiated a reward system called "Study Patient" for its larger clients, who received a $500 rebate per eye for each LDD adjustment rendered on a client.  After 40 eye adjustments, $20,000 was allotted to the physician. The Study Patient sales incentive masked dissatisfaction with LALs and propped up revenues and adoption temporarily by incentivizing surgeons and clinics to utilize LALs in greater volumes than they would have without the incentives.

- 34 -

**E.    January 2025 Through February 2025 Disclosure and Statements**

103.    After the market closed on January 12, 2025, RxSight issued a press release containing the Company's preliminary 4Q24 and full-year 2024 financial and operational results ("4Q24 Preliminary Release").  RxSight's 4Q24 Preliminary Release disclosed declining 4Q24 LDD sales growth of 8% year over year, compared to 18% year-over-year growth in 3Q24.  LAL and LDD sales in 4Q24 were also slightly short of market expectations.  This news heightened investor concerns about decelerating adoption and caused the stock price to decline by over 8% the next day on unusually high trading volume.  However, the price of RxSight stock continued to trade at artificially inflated levels because Defendants falsely attributed decelerating LDD sales to doctors using third-party LDD treatment centers and outsourcing LDDs, while continuing to mislead investors.

104.    For example, just a few days later, on January 15, 2025, defendants Kurtz and Thunen presented at the JPMorgan Healthcare Conference, where Kurtz told investors that:

(a)    "We believe the Light Adjustable Lens enables a better approach, namely post-operative customization of the LAL for optimized **vision without glasses**."

(b)    "Just as important as better clinical results is the ability of the LAL to enable a better business solution by boosting practice profitability through enhanced premium IOL adoption. . . .  The combination of patients converting from each of these other lenses to the LAL with the LAL's higher revenue leads to approximately $2,000 in additional revenue per LAL implanted for the practice.  This means that average practices can pay for the cost of the Light Delivery Device in about six months, after which the additional revenue accrues to their bottom line."

105.    J.P. Morgan's January 12, 2025 and Morgan Stanley's January 13, 2025 reports noted the "4Q [m]iss" and "LDD miss" after the January 12, 2025 pre-

1    announcement, with J. P. Morgan explaining that "these results could feed into fears

2    that RxSight may be hitting a wall on adoption" and "looking for additional color"

3    from the Company.  Wells Fargo's January 12, 2025 report lowered its price target on

4    the basis of "slower LDD placements."

5        106.   On February 25, 2025, Defendants convened an earnings call in

6    connection with RxSight's press release of its 4Q24 results, during which defendant

7    Thunen told investors:

8        What **we've always seen is that [cohorts are] continu[ing] to grow**,

9        right?

10            And so, **all of the cohorts end up in just about the same place** of

11        number of LALs per LDD.  And that's been very consistent as we've

12        been looking at this for the last couple of years.  Of course, **the class of**

13        **'23 got to those same numbers a little faster**[,] obviously[,] than in the

14        classes of '21 and '22.

15        107.   Defendants' statements in ¶¶104 and 106 were misleading when made

16    because they knew or recklessly disregarded the following facts:

17            (a)    In clinical, non-study settings, most patients required reading

18    glasses for near vision after having LALs implanted because these lenses did not

19    provide optimal near vision.  The continuing need for reading glasses in most patients

20    had manifested by late 2023, as doctors were increasingly gaining experience with

21    LALs in clinical, non-study settings.

22            (b)    In 2023-2025, doctors complained regularly to Defendants about

23    the results, performance, and limited use cases associated with LALs on the ASCRS

24    Ad Board, a chat log available only to the medical community, which included Kurtz,

25    who is a surgeon.  Doctor and clinician complaints were also recorded in "Study

26    Patient" customer service data and Doctor Readiness reports sent to Kurtz and other

27    senior managers, and discussed on weekly and monthly sales calls, in Town Hall

28

- 36 -

meetings, in Team Meetings, and on regular Zoom and conference calls they typically attended or participated in.

(c)    Defendants introduced the LAL+ in April 2024 to reduce the number of post-implant adjustments and improve the near vision limitations of the LAL. But RxSight had very little data before releasing it to market. In fact, the LAL+ created glares and halos similar to other IOLs and was difficult to position correctly so as to be effective. As a result, surgeon chat lines were full of negative comments, making it very difficult for RxSight to sell the product, as doctors in the industry abandoned the lens and its adoption cratered.

(d)    LALs therefore were not more effective than free, standard IOLs for near vision, making LALs uncompetitive due to the massively increased cost compared to standard IOLs that were free/covered by Medicare or insurance.

(e)    LALs were proving to be a niche (not mainstream) product primarily efficacious for former LASIK patients and/or when implanted by LASIK surgeons in actual clinical, non-study settings. But former LASIK patients and LASIK surgeons represented only a small fraction of all cataract surgeries, premium IOL patients, and cataract surgeons.

(f)    Moreover, by mid-2023 RxSight had saturated its main LASIK and high-volume surgery markets and Defendants knew any remaining market was otherwise extremely limited and without broad application, including because the remaining surgeons lacked the skill or volume to become sufficiently proficient with the technology to obtain adequate patient results.

(g)    RxSight's expensive products were more burdensome for doctors than competing, free IOL products, requiring up to five additional clinical hours (and often an additional physician or optometrist) to make up to five adjustments and lock-ins. The lengthy process and drawn out procedural timeline negatively impacted surgeons' profit margins, making the RxSight System less economical or efficient and thereby reducing adoption and usage.

- 37 -

1    (h)    RxSight lacked adequate field support to drive adoption and

2  utilization.

3    (i)    As a result of (a)-(h), when Defendants made these statements,

4  RxSight had already saturated the market for the Company's technology and was not

5  enjoying "faster" or growing adoption but rather was experiencing "adoption

6  challenges," which the Company did not disclose until July 2025, when it revealed

7  that "newer customers [had been] adopting more slowly than our previous customers"

8  for "the last few quarters" and that older customers' utilization was "flat" going back

9  "four quarters," during which time each newer cohort was down "more than the one

10  before."

11    (j)    In 2024, RxSight initiated a reward system called "Study Patient"

12  for its larger clients, who received a $500 rebate per eye for each LDD adjustment

13  rendered on a client.  After 40 eye adjustments, $20,000 was allotted to the physician.

14  The Study Patient sales incentive masked dissatisfaction with LALs and propped up

15  revenues and adoption temporarily by incentivizing surgeons and clinics to utilize

16  LALs in greater volumes than they would have without the incentives.

17  108.   Defendants' statements on the earnings call had the intended effect of

18  misleading the market as demonstrated by contemporaneous analyst reports.  For

19  example, BTIG's February 25, 2025 RxSight report stated the Company had "ample

20  runway."  UBS's Securities LLC ("UBS") February 25, 2025 report likewise touted

21  RxSight's "runway for LAL adoption remains long."  And Wells Fargo's RxSight

22  report of the same day echoed that "RXST expects LAL utilization to continue to

23  increase . . . ."  Oppenheimer's February 26, 2025 report highlighted "[i]ncreasing

24  LAL utilization" and "4x increase in odds of achieving 20/20 vision post-LAL

25  procedure."

26  **F.    April 2025 Disclosure and Statements**

27  109.   After the market closed on April 2, 2025, RxSight issued a press release

28  containing the Company's preliminary 1Q25 financial and operational results for the

- 38 -

period ending March 31, 2025 ("1Q25 Preliminary Release") and revising full-year 2025 guidance.  RxSight's 1Q25 Preliminary Release disclosed that 1Q25 revenue was down 6% sequentially from 4Q24, materially missing consensus estimates by 5%, and announced that the Company was reducing full-year 2025 guidance from a range of $185 million-$197 million down to $160 million-$175 million, representing a reduction of nearly $24 million at the midpoint.

110.  The 1Q25 Preliminary Release misleadingly attributed declining revenues to non-Company specific factors including "headwinds affecting the overall premium IOL market and broader economy" and "current market conditions."

111.  On April 3, 2025, Defendants convened an investor call at 7:00 a.m. EST, before the markets opened, in connection with RxSight's 1Q25 Preliminary Release. During the earnings call, Defendants further elaborated on RxSight's 1Q25 results, and partially disclosed that cohorts were "not growing quite as quickly" as before. Defendants also disclosed that: (i) 1Q25 LDD sales had declined 12% sequentially; (ii) 1Q25 LAL sales declined 5% sequentially; and (iii) utilization had declined 6.4% year over year to about 9.5 LALs per LDD per month, the first such decline in utilization since 2021.

112.  Defendants concealed the true reasons for these declines.  For example, defendant Kurtz misled investors about the reason for RxSight's decline as "transitory" and related to "the macro environment," as he continued to misrepresent the consumer satisfaction and demand:

(a)  "[T]he top line miss in Q1 was due to several factors, ***including a weakened premium IOL market*** and unusual sequential launches of new premium IOLs that have extended from mid-2024 and into Q1 of 2025.  These factors subsequently combined with ***abrupt changes in consumer sentiment*** that occurred later in Q1, resulting in our first year-over-year drop in same-store LAL sales, most commonly measured as LALs per LDD per month."

(b)    "I would say that as you described, there's been a confluence of factors that happened in Q1, particularly in the latter part of Q1.  And I think that all of them are **transitory** to some extent . . . .  I think the obvious thing that changed in Q1 was **the macro environment**."

(c)    "I don't think that we've fully penetrated any group.  There are a wide variety of practices that have not yet adopted our technology.  We have about 1,000 LDDs.  There are about 2,000 surgeons.  There are 10,000 cataract surgeons out there with at least several to more thousands of practice product offices where cataract surgery is cataract surgery patients are seen.  So **I certainly don't believe that we're anywhere near a saturation point** and even by a class of surgeon."

113.    One analyst asked: "[D]id this start much earlier than you've acknowledged," and commented that "**we're not necessarily hearing all of those market trends called out by your peers**."   Defendant Kurtz demurred and misleadingly blamed RxSight's "growth," which he claimed "led us to underappreciate the softening in the market."

114.    Defendants' statements in ¶¶110 and 112-113 were misleading when made because they knew or recklessly disregarded that the following facts, not "the macro environment," were responsible for RxSight's drop in LAL sales, which was not "transitory" but structural and permanent:

(a)    In clinical, non-study settings, most patients required reading glasses for near vision after having LALs implanted because these lenses did not provide optimal near vision.  The continuing need for reading glasses in most patients had manifested by late 2023, as doctors were increasingly gaining experience with LALs in clinical, non-study settings.

(b)    In 2023-2025, doctors complained regularly to Defendants about the results, performance, and limited use cases associated with LALs on the ASCRS Ad Board, a chat log available only to the medical community, which included Kurtz, who is a surgeon.  Doctor and clinician complaints were also recorded in "Study

- 40 -

Patient" customer service data and Doctor Readiness reports sent to Kurtz and other senior managers, and discussed on weekly and monthly sales calls, in Town Hall meetings, in Team Meetings, and on regular Zoom and conference calls they typically attended or participated in.

(c)    Defendants introduced the LAL+ in April 2024 to reduce the number of post-implant adjustments and improve the near vision limitations of the LAL. But RxSight had very little data before releasing it to market. In fact, the LAL+ created glares and halos similar to other IOLs and was difficult to position correctly so as to be effective. As a result, surgeon chat lines were full of negative comments, making it very difficult for RxSight to sell the product, as doctors in the industry abandoned the lens and its adoption cratered.

(d)    LALs therefore were not more effective than free, standard IOLs for near vision, making LALs uncompetitive due to the massively increased cost compared to standard IOLs that were free/covered by Medicare or insurance.

(e)    LALs were proving to be a niche (not mainstream) product primarily efficacious for former LASIK patients and/or when implanted by LASIK surgeons in actual clinical, non-study settings. But former LASIK patients and LASIK surgeons represented only a small fraction of all cataract surgeries, premium IOL patients, and cataract surgeons.

(f)    Moreover, by mid-2023 RxSight had saturated its main LASIK and high-volume surgery markets and Defendants knew any remaining market was otherwise extremely limited and without broad application, including because the remaining surgeons lacked the skill or volume to become sufficiently proficient with the technology to obtain adequate patient results.

(g)    RxSight's expensive products were more burdensome for doctors than competing, free IOL products, requiring up to five additional clinical hours (and often an additional physician or optometrist) to make up to five adjustments and lock-ins. The lengthy process and drawn out procedural timeline negatively impacted

- 41 -

1  surgeons' profit margins, making the RxSight System less economical or efficient and

2  thereby reducing adoption and usage.

3      (h)    RxSight lacked adequate field support to drive adoption and

4  utilization.

5      (i)    As a result of (a)-(h), when Defendants made these statements,

6  RxSight had already saturated the market for the Company's technology and was

7  experiencing "adoption challenges," which the Company did not disclose until July

8  2025, when it revealed that "newer customers [had been] adopting more slowly than

9  our previous customers" for "the last few quarters" and that older customers'

10  utilization was "flat" going back "four quarters," during which time each newer cohort

11  was down "more than the one before."

12      (j)    In 2024, RxSight initiated a reward system called "Study Patient"

13  for its larger clients, who received a $500 rebate per eye for each LDD adjustment

14  rendered on a client.  After 40 eye adjustments, $20,000 was allotted to the physician.

15  The Study Patient sales incentive masked dissatisfaction with LALs and propped up

16  revenues and adoption temporarily by incentivizing surgeons and clinics to utilize

17  LALs in greater volumes than they would have without the incentives.

18      115.  Market analysts noted the miss contemporaneously, but Defendants'

19  statements had the intended effect of misleading the market and maintaining some of

20  the stock's artificial inflation.  For example, BofA's April 3, 2025 RxSight report

21  downgraded to underperform, stating: "The lower guide implies decelerating growth

22  for the rest of the year and raises several questions about possible light adjustable lens

23  (LAL) saturation," but accepted the Company's statements blaming this downturn on

24  the "'broader economy.'"  BTIG's RxSight report of the same day likewise noted the

25  "slower new customer adoption," but also accepted the Company's "macroeconomic

26  conditions," warning not to "[t]hrow the [b]aby [o]out with the [b]athwater" and

27  claiming "RXST is down but not out."  UBS's April 8, 2025 RxSight report still

28

4936-6684-5824.v2

believed that "long-term growth momentum may not be a significant concern" citing "macroeconomic pressures" as the biggest concern.

116.   In response to the April 2-3, 2025 partial disclosures, the price of RxSight's common stock declined from $26.12 per share on April 2, 2025 to $16.21 per share on April 3, 2025, a decline of nearly 42%, on above-average trading volume. However, RxSight stock continued to trade at artificially inflated prices because Defendants continued to conceal the true truth about RxSight's products, market, and performance, falsely attributing causation to external factors while omitting internal drivers – slower new-cohort adoption and deficient field support – as later admitted by Defendants and evidenced by continued utilization deterioration.

## G.   May 2025 Statements

117.   On May 7, 2025, after the market closed, Defendants convened an earnings call in connection with RxSight's press release of its 1Q25 results earlier that day ("1Q25 Call").  During the 1Q25 Call, defendants Kurtz and Thunen continued to mislead investors concerning the cause and nature of the Company's 1Q25 downturn by calling it "temporary" and stabilized, falsely attributing it to "negative macroeconomic headwinds," and continued to make misleading statements about the efficacy of RxSight's technology.

118.   For example, on the 1Q25 Call, defendant Kurtz told investors that:

(a)   "As we discussed during our pre-announcement just over a month ago, the first quarter brought an unusual combination of *macroeconomic headwinds* and competitive disruptions that led to our first top line miss since becoming a public company in Q3 2021."

(b)   "LALs were also affected by *temporary negative wealth effects and uncertainty*."

(c)   "While *macro trends* worsened in early April, there were signs of *improved stabilization* later in the month, which were also observed in our procedure volumes."

- 43 -

(d)    "[B]oth binocular distance and near visual acuity ***without glasses*** was found to be statistically better with an adjustable lens with more than twice the number of patients attaining 20/20 distance and J1 reading vision than with the fixed multifocal IOL."

(e)    When asked if RxSight's LAL was "nearing or approaching some sort of saturation point" in the United States, Kurtz responded: "***I don't see a good argument for that*** based on the overall penetration of the technology. We're currently sitting at maybe somewhere between 10% and 12% where there are many, many surgeons, I would say, even most who are just getting familiar with the LAL and the potential."

119.    Defendants' statements above in ¶¶117-118 were misleading when made because they knew or recklessly disregarded the following facts, which they knew were causing a structural and permanent drop in LAL and LDD sales and growth, not "macroeconomic headwinds" or "temporary negative wealth effects":

(a)    In clinical, non-study settings, most patients required reading glasses for near vision after having LALs implanted because these lenses did not provide optimal near vision. The continuing need for reading glasses in most patients had manifested by late 2023, as doctors were increasingly gaining experience with LALs in clinical, non-study settings.

(b)    In 2023-2025, doctors complained regularly to Defendants about the results, performance, and limited use cases associated with LALs on the ASCRS Ad Board, a chat log available only to the medical community, which included Kurtz, who is a surgeon. Doctor and clinician complaints were also recorded in "Study Patient" customer service data and Doctor Readiness reports sent to Kurtz and other senior managers, and discussed on weekly and monthly sales calls, in Town Hall meetings, in Team Meetings, and on regular Zoom and conference calls they typically attended or participated in.

- 44 -

(c)      Defendants introduced the LAL+ in April 2024 to reduce the number of post-implant adjustments and improve the near vision limitations of the LAL.  But RxSight had very little data before releasing it to market.  In fact, the LAL+ created glares and halos similar to other IOLs and was difficult to position correctly so as to be effective.  As a result, surgeon chat lines were full of negative comments, making it very difficult for RxSight to sell the product, as doctors in the industry abandoned the lens and its adoption cratered.

(d)      LALs therefore were not more effective than free, standard IOLs for near vision, making LALs uncompetitive due to the massively increased cost compared to standard IOLs that were free/covered by Medicare or insurance.

(e)      LALs were proving to be a niche (not mainstream) product primarily efficacious for former LASIK patients and/or when implanted by LASIK surgeons in actual clinical, non-study settings.  But former LASIK patients and LASIK surgeons represented only a small fraction of all cataract surgeries, premium IOL patients, and cataract surgeons.

(f)      Moreover, by mid-2023 RxSight had saturated its main LASIK and high-volume surgery markets and Defendants knew any remaining market was otherwise extremely limited and without broad application, including because the remaining surgeons lacked the skill or volume to become sufficiently proficient with the technology to obtain adequate patient results.

(g)      RxSight's expensive products were more burdensome for doctors than competing, free IOL products, requiring up to five additional clinical hours (and often an additional physician or optometrist) to make up to five adjustments and lock-ins.  The lengthy process and drawn out procedural timeline negatively impacted surgeons' profit margins, making the RxSight System less economical or efficient and thereby reducing adoption and usage.

(h)      RxSight lacked adequate field support to drive adoption and utilization.

- 45 -

4936-6684-5824.v2

(i)    As a result of (a)-(h), when Defendants made these statements, RxSight had already saturated the market for the Company's technology and the decline was not stabilizing and not due to macro trends. Rather, RxSight was experiencing "adoption challenges," which the Company did not disclose until July 2025, when it revealed that "newer customers [had been] adopting more slowly than our previous customers" for "the last few quarters" and that older customers' utilization was "flat" going back "four quarters," during which time each newer cohort was down "more than the one before."

(j)    In 2024, RxSight initiated a reward system called "Study Patient" for its larger clients, who received a $500 rebate per eye for each LDD adjustment rendered on a client. After 40 eye adjustments, $20,000 was allotted to the physician. The Study Patient sales incentive masked dissatisfaction with LALs and propped up revenues and adoption temporarily by incentivizing surgeons and clinics to utilize LALs in greater volumes than they would have without the incentives.

120.    Defendants' statements on the earnings call had the intended effect of misleading the market as demonstrated by contemporaneous analyst reports. For example, BTIG's May 7, 2025 RxSight report stated that "[g]rowth is [s]till [h]ealthy." Jefferies' RxSight report of the same day noted the purported "improved stability . . . in April." Piper Sandler & Co. likewise noted Defendants' statements that they "saw some recovery in the business towards the latter part of April after macro trends remained challenged to begin April" in its May 7, 2025 RxSight report. BofA's May 8, 2025 report noted that the Company "expects 2H [second half] LAL recovery" as "RXST was encouraged to see procedure volume begin to recover." Oppenheimer reported that "the primary driver of the previously lowered '25 guidance was a slower premium IOL market," while noting that "[management] expressed cautious optimism noting signs of stability" and that "RXST takes proactive measures to support workflow/patient acquisition with [the] best practice education."

4936-6684-5824.v2

**H.    July 8, 2025: Defendants Reveal the Truth About Declining Adoption of RxSight's Technology and Again Cut 2025 Guidance**

121.    On July 8, 2025, after the market closed, RxSight issued a press release reporting preliminary 2Q25 financial results and again reducing 2025 annual revenue guidance.  In the press release, Defendants revealed that RxSight's LDD sales had plummeted to 40 units in 2Q25, down from 73 units in the prior quarter, a more than 45% decline and sales of LALs had fallen sequentially to less than 27,400 units from 27,579 in 1Q25, so that utilization of the RxSight System had continued to deteriorate for the second straight quarter.  As a result of declining revenues and utilization, RxSight reduced 2025 annual guidance for the second time, adjusting it downward by more than $27 million at the midpoint to a range of $120 million-$130 million from $160 million-$175 million, implying a 30% year-over-year decline in sales, which confirmed that utilization and adoption trends had deteriorated and would continue to deteriorate.

122.    Following the press release, Defendants held a conference call on July 8, 2025, during which defendants Kurtz and Thunen revealed for the first time that newer cohorts, and in particular the 2024 cohort, were adopting more slowly, and that utilization had been declining with each cohort since the first cohort, which was "pretty flat going back four quarters," with each newer cohort down "more than the one before."  Defendant Kurtz admitted for the first time that LAL and LDD sales had declined because of a "slower ramp in LAL utilization" and disclosed that "our newer customers are adopting more slowly than our previous customers" because they "require[d] more support to get started and to move up the adoption curve," which had adversely impacted adoption "over the last few quarters."  Kurtz said that as a result, RxSight was "executing a commercial pivot" to reverse downward utilization trends, which included overhauling its field support and implementing initiatives "designed to close adoption gaps, enhance customer satisfaction, and to support sustained utilization [trends]."

123.   On the July 8, 2025 revelations, the price of RxSight common stock fell from $12.79 per share on July 8, 2025 to below $8.00 per share on July 9, 2025, a decline of nearly 48%, on above-average trading volume.

## VI.   LOSS CAUSATION

124.   As a result of Defendants' scheme, RxSight common stock traded at artificially inflated levels throughout the Class Period, reaching a high of $64.29 per share on May 15, 2024.

125.   Defendants' scheme was revealed to the market through a series of partial disclosures in 2024 and 2025.  As depicted below, the inflation in RxSight's stock price dissipated via price declines starting on July 10, 2024, continuing on November 8, 2024, on January 13, 2025, on April 3, 2025, and culminating on July 9, 2025.



4936-6684-5824.v2

**A.    July 10, 2024 Corrective Disclosure**

126.    On July 10, 2024 the truth about surgeons' adoption of, and willingness to adopt, RxSight's technology was partially disclosed when Wells Fargo published an analyst report citing its own survey of 50 cataract surgeons.  The survey showed that many surgeons had no plans to adopt RxSight's adjustable lens technology because it "increases costs without a significant improvement in clinical outcomes," was "inefficient," "cost prohibitive," and "too expensive for the patients and extremely time consuming."  Surgeons reported having "seen some unhappy LAL patients in consultation," and some said that laser touchups were "more precise than LAL."

127.    As a result of these partial disclosures, RxSight's stock price fell precipitously from $56.99 per share on July 9, 2024 to $51.11 per share on July 10, 2024, losing nearly 13% of its value in one day, after removing market and sector effects.

**B.    November 7, 2024 Corrective Disclosure**

128.    On November 7, 2024, Defendants disclosed LAL deceleration, causing RxSight's stock price to decline by nearly 7% the next day, November 8, 2024, on unusually high trading volume.

129.    Analysts noted Defendants' November 7, 2024 corrective disclosure.  For example, Jefferies' November 7, 2024 report cut its price target by 28%, noting that "investors were expecting a higher beat for 3Q."  And BofA's November 7, 2024 RxSight report likewise cut its price target by 20% while stating that it "expect[ed] RXST shares to be under pressure," noting that "LAL missed."

130.    As a result of the November 7, 2024 corrective disclosure, RxSight's stock price fell $2.84 per share from a closing price of $50.85 per share on November 7, 2024 to $48.01 per share on November 8, 2024 – a decline of nearly 7% after removing market and sector effects.

### C.    January 12, 2025 Corrective Disclosure

131.   On January 12, 2025, Defendants disclosed decelerating LDD sales, which were short of market expectations, heightening investor concerns about decelerating adoption and causing the stock price to decline by over 8% the next day on unusually high trading volume.

132.   Analysts took note of Defendants' January 12, 2025 corrective disclosure.  For example, J.P. Morgan's January 12, 2025 and Morgan Stanley's January 13, 2025 reports noted the "4Q Miss" and "LDD miss" after the January 12, 2025 pre-announcement, with J. P. Morgan explaining that "these results could feed into fears that RxSight may be hitting a wall on adoption" and "looking for additional color" from the Company.  Wells Fargo's January 12, 2025 report lowered its price target on the basis of "slower LDD placements."

133.   As a result of the January 12, 2025 corrective disclosure, RxSight's stock price declined $2.71 per share, from a closing price of $33.43 per share on Friday, January 10, 2025, to $30.72 per share on Monday, January 13, 2015 – a decline of more than 8%, after removing market and sector effects.

### D.    April 3, 2025 Corrective Disclosure

134.   On the April 3, 2025 1Q25 earnings call, Defendants partially disclosed a slowdown in cohort growth, adoption, and utilization.  They also disclosed a surprise revenue shortfall that missed consensus estimates by 5%, a sequential LAL sales decline quarterly, and slashed RxSight's annual revenue guidance for fiscal 2025 from a range of $185 million - $197 million to a range of $160 million - $175 million – reducing it nearly $24 million at the midpoint.

135.   Analysts took note of Defendants' April 2, 2025 corrective disclosure. For example, BofA's April 3, 2025 RxSight report downgraded to underperform, stating: "The lower guide implies decelerating growth for the rest of the year and raises several questions about possible light adjustable lens (LAL) saturation . . . ."

- 50 -

1   BTIG's RxSight report of the same day likewise noted the "slower new customer

2   adoption" in dropping its price target by $16.00 or close to 40%.

3       136.   As a result of the April 2, 2025 corrective disclosure, RxSight's stock

4   price dropped $9.91 per share from a closing price of $26.12 per share on April 2,

5   2025, to $16.21 per share on April 3, 2025 – a drop of nearly 42% after removing

6   market and sector effects.

7       **E.    July 8, 2025 Corrective Disclosure**

8       137.   On July 8, 2025, Defendants disclosed that RxSight's LDD sales had

9   declined more than 45% quarterly and that LAL sales had fallen sequentially to less

10  than 27,400 units from 27,579 in 1Q25, so that utilization of the RxSight System had

11  continued to deteriorate for the second straight quarter.  As a result of declining

12  revenues and utilization, RxSight reduced 2025 annual guidance for the second time,

13  adjusting it downward by more than $27 million at the midpoint to a range of $120

14  million-$130 million from $160 million-$175 million, implying a 30% year-over-year

15  decline in sales, which confirmed that utilization and adoption trends had deteriorated

16  and would continue to deteriorate.

17      138.   Defendants also revealed for the first time that newer cohorts, and in

18  particular the 2024 cohort, were adopting more slowly, and that utilization had been

19  declining with each cohort since the first cohort, which was "pretty flat going back

20  four quarters."  Defendant Kurtz admitted for the first time that LAL and LDD sales

21  had declined because of a "slower ramp in LAL utilization" and disclosed that "our

22  newer customers are adopting more slowly than our previous customers" because they

23  "require[d] more support to get started and to move up the adoption curve," which had

24  adversely impacted adoption "over the last few quarters."  Kurtz said that as a result,

25  RxSight was "executing a commercial pivot" to reverse downward utilization trends,

26  which included overhauling its field support and implementing initiatives "designed to

27  close  adoption  gaps,  enhance  customer  satisfaction,  and  to  support  sustained

28  utilization [trends]."

4936-6684-5824.v2

139.    Securities analysts issued reports in response to the July 8, 2025 disclosure.  For example, J.P. Morgan noted in its July 8, 2025 RxSight report that "this quarter reflects a continued worsening of trends first seen last quarter rather than a hopeful improvement, a concerning trend set to continue into 2H25 with no clear resolution in sight."  UBS's report of the same day noted that the main "[f]actors [l]eading to [m]iss" were that "[n]ewer customer cohorts are adopting the LAL slower than older cohorts," noting the "slowdown in newer cohorts."  And Wells Fargo's July 8, 2025 report bemoaned the "[l]imited [v]isibility into the [b]usiness" while highlighting that "[management] pointed out that established cohorts were seeing flat utilization trends which declined w/each subsequent cohort."  BofA's July 9, 2025 report observed that "the Q1 miss was driven by lower LAL sales, the Q2 miss was driven by a meaningful drop-off in LDD placements and softer LAL sale," noting Defendants' statements that "the underlying cause of both was the slower utilization ramp," with "the oldest installs closer to flat and more recent installs down more."

140.    On this news, RxSight's stock price declined $4.84 per share from a close of $12.79 per share on July 8, 2025 to a close of $7.95 per share on July 9, 2025 – a nearly 48% decline after removing market and sector effects.

141.    The timing and magnitude of the declines in the price of RxSight common stock negates any inference that losses suffered by Plaintiff and other Class members were fully caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

142.    For the entire period from the initial partial disclosure in July 2024 to the final disclosure in July 2025, RxSight's stock price dropped from $56.99 per share to $7.95 per share, or more than $49.00 per share, a decline of more than 86%.  In contrast, the market and industry sector rose by double digits during the same time period (*e.g.*, S&P 500 was up over 12%).

143.    As a result of their purchases of RxSight common stock during the Class Period, and the subsequent decline in the value of those shares when the truth was

- 52 -

revealed to the market, Plaintiff and other members of the Class suffered economic loss (*i.e.*, damages), under the federal securities laws.

## VII.   DEFENDANTS FAILED TO DISCLOSE "KNOWN TRENDS" AND OTHER MATERIAL INFORMATION IN VIOLATION OF ITEM 303 OF REGULATION S-K

144.   By 1Q24, RxSight's SEC filings, including its Forms 10-Q filed with the SEC on May 6, 2024, August 5, 2024, November 7, 2024, and May 7, 2025, Form 10-K filed February 25, 2025, failed to disclose material information required pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §299.303 ("Item 303").   Item 303 requires a registrant to disclose information relevant to assessing its financial condition and results of operations in a section of its SEC filings entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations," or "MD&A."   These mandatory disclosures include "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. §299.303(b)(2)(ii).

145.   RxSight violated Item 303 by making statements in the MD&A section of its Class Period SEC filings that were misleading because of the Company's failure to disclose material information concerning the known trend of its declining adoption, including by cohort.   For example, in its May 6, 2024, August 5, 2024, November 7, 2024, February 25, 2025, May 7, 2025 and SEC filings, Defendants consistently told investors that its "increased LDD sales" and "increased LAL sales" were the result from "***strong adoption of our RxSight system by practices and doctors***."

146.   But in truth, Defendants knew when they made these statements that RxSight was experiencing "adoption gaps" and "adoption challenges," which the Company disclosed in July 2025 had been ongoing for "the past few quarters" before that, and that utilization by older customers had been "flat" for at least the past "four quarters."   Defendants further admitted in July 2025 that their "newer customers [were] adopting more slowly than our previous customers," with each newer cohort

down "more than the one before." These same negative trends disclosed in July 2025 were also apparent in RxSight's internal sales data, reflected in "Study Patient" customer service data and Doctor Readiness reports sent to Kurtz and other senior managers, and discussed on weekly and monthly sales calls, Town Hall meetings, Team Meetings, and regular Zoom and conference calls they typically attended or participated in – contemporaneous with Defendants' public statements to the contrary.

147.    Thus, Defendants failed to disclose material information required pursuant to Item 303 concerning the then-known trend of adoption gaps and challenges, flat adoption, and slowing adoption by cohort in its May 6, 2024, August 5, 2024, November 7, 2024, and May 7, 2025 Forms 10-Q and its February 25, 2025 Form 10-K.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

148.    Each Defendant knew or acted with deliberate recklessness that material facts were being concealed from investors during the Class Period and the statements set forth in ¶¶73, 75-76, 78, 80, 83, 85-86, 91-92, 95, 98-100, 104, 106, 110, 112-113, and 117-118 above would be misleading to investors when made, and had the motive and opportunity to commit fraud.

### A.    The Individual Defendants' Actual Knowledge

149.    As revealed in Defendants' public filings and statements, Defendants knew and tracked RxSight's year-over-year LDD sales, LAL sales, LDD installed base, and total revenue. The data was available to Defendants throughout the Class Period and is probative of Defendants' contemporaneous knowledge of the RxSight System's limited efficacy for near vision, the increased time and work burden the product imposed on clinics, and its consequent declining adoption, utilization, and demand – as disclosed at the end of the Class Period.

150.    By fall 2023, Defendants knew that cataract surgeons were complaining regularly on the ASCRS Ad Board, a chat log available only to the medical community, including Kurtz who is a surgeon, about the near vision shortcomings of

- 54 -

1  RxSight adjustable lenses and the added work and clinic hours required after
2  implantation of LALs.

3      151.    Doctor and clinician complaints about patients still needing glasses and
4  increased workflow after LAL procedures were also recorded in:

5          (a)    "Study Patient" data that Defendants purchased from clinics and
6  surgeons;

7          (b)    Customer Service Reports that were generated internally by
8  RxSight's customer service personnel, who fielded calls from surgeons and clinics
9  then input called-in complaints into reports that were distributed to management,
10  including Kurtz and Thunen; and

11          (c)    Doctor Readiness reports and "Study Patient" customer service
12  data sent to Kurtz and other senior managers.  These same complaints were discussed
13  on weekly and monthly sales calls, quarterly Town Hall meetings, Team Meetings,
14  and regular Zoom and conference calls that Kurtz and Thunen attended or participated
15  in.

16      152.    Defendants also initiated a reward system in 2024 called "Study Patient"
17  for RxSight's larger clients, who received a $500 rebate per eye for each LDD
18  adjustment rendered on a client.  After 40 eye adjustments, $20,000 was allotted to the
19  physician.  Defendants knew or were reckless in not knowing that Study Patient sales
20  incentives masked dissatisfaction with LALs and propped up revenues and adoption
21  temporarily by incentivizing surgeons and clinics to utilize LALs in greater volumes
22  than they would have without the incentives – helping to conceal declining adoption
23  and utilization from investors until the end of the Class Period.

24      153.    Thus, Defendants knew when they spoke positively about adoption and
25  utilization during the Class Period that RxSight was contemporaneously experiencing
26  "adoption gaps," "adoption challenges," and declining utilization, as Defendants
27  disclosed in July 2025, when they admitted that adoption challenges had been ongoing
28  for "the past few quarters," "newer customers [were] adopting more slowly than our

previous customers," and older customers' utilization had been "flat" for at least the past "four quarters" with each newer cohort down "more than the one before."

154.    Defendants' own statements further confirm their knowledge.    For example, during the JPMorgan Healthcare Conference on January 10, 2024, Thunen responded to a question concerning the trends in utilization and LAL's share at newer accounts compared to more mature ones *by appealing to her own review of cohort and utilization data*, which the Company later disclosed was declining: "We look at from a more macro viewpoint is the cohort of LDD on sales.  So *we look at the customers that were installed* in 2020, 2021, '22 and '23."

155.    Likewise, during the Bank of American Health Care Conference on May 15, 2024, Kurtz responded to a question regarding doctors' adoption by stating how close he was to the Company's customers: "[A]s you can kind of tell, *we survey and we're very close to our customers.  And we are always taking their feedback*."

156.    On the Morgan Stanley Global Healthcare Conference on September 4, 2024, Kurtz responded to a question concerning LAL growth and market penetration by admitting that RxSight collected doctors' opinions about their patients: "*We do a survey – customer survey every year.  We've done it now for about three years*.  And in that survey, we ask doctors and optometrists and practice managers where the patients are coming from."

157.    Kurtz made similar statements affirming his personal knowledge of physician concerns at the Wells Fargo Healthcare Conference on September 5, 2024:

> [O]ne of the things that we do every year is we survey our customers, about how they use LAL, but we also ask them what they would like to have in LAL.  And consistent feedback we got in earlier years was we'd like to have a broader depth of focus, and that's what the LAL+ does.
>
> So, for any doctor who wasn't implanting an LAL in a particular patient, because that was a concern, they now have a reason to implant an LAL+, and they're going to get the same high-quality vision, they're

- 56 -

4936-6684-5824.v2

1    going to get the ability to adjust that patient with a slightly broader depth

2    to focus.

3    158.    Similarly, on the November 7, 2024 3Q24 earnings call, Thunen

4    answered an analyst's question concerning RxSight's long-term continued share gains

5    for LAL in the United States by referencing her knowledge of the internal RxSight

6    data: "*[W]hen I look internally at our data by cohort by [year of] install*, the more

7    recent installs get to the same place a little bit more quicker, right?  And so that's

8    where we work with the practice with our knowledge and their knowledge and of

9    course, the references we've gotten."

10    159.    On the same November 7, 2024 3Q24 earnings call, Thunen also

11    answered a question regarding the number of active surgeons per LDD and what the

12    upper limit on that metric might be by referencing "*the numbers that I most recently*

13    *got from sales and marketing*."

14    **B.    The Allegations Concern RxSight's Core Operations**

15    160.    The RxSight System was the Company's sole product.  Defendants Kurtz

16    and Thunen were top executives at the Company and led its day-to-day operations.

17    Thus, they monitored and/or oversaw the overall business strategy, which hinged

18    entirely upon the RxSight System, and driving sales of the high-priced LDDs to

19    advance recurring, higher-margin LAL procedures.  Indeed, the RxSight System

20    represented nearly 100% of the Company's business.  The Individual Defendants also

21    had ultimate responsibility for directing and managing the Company's business,

22    operations, and communications to investors, and had to keep themselves informed of

23    the Company's day-to-day business and operations.

24    161.    Additionally, the Individual Defendants each made public statements on

25    earnings calls and investor conferences about the Company's products, including their

26    efficacy, adoption, and utilization rates.  *See, e.g.*, ¶¶73, 75-76, 78, 80, 83, 85-86, 91-

27    92, 95, 98-100, 104, 106, 110, 112-113, 117-118.

28

- 57 -

### C. The Individual Defendants Held Themselves Out as Knowledgeable

162. The Individual Defendants held themselves out as knowledgeable about RxSight's products, including their efficacy, adoption, and utilization rates. *See, e.g.*, ¶¶73, 75-76, 78, 80, 83, 85-86, 91-92, 95, 98-100, 104, 106, 110, 112-113, 117-118.

### D. The Individual Defendants Received Briefings

163. As senior executive officers, the Individual Defendants were privy to confidential and proprietary information concerning the Company's business strategies and performance. Each had access to internal documents, internal communications, management meetings, Board meetings, and committee meetings, as well as information provided to them or made available to them. This included RxSight's internal LAL and LDD Sales Reports, "Study Patient" customer service data, and Doctor Readiness reports sent to Kurtz and other senior managers as discussed on weekly and monthly sales calls, Town Hall meetings, Team Meetings, and regular Zoom and conference calls they typically attended or participated in.

### E. The Individual Defendants Executed SOX Certifications

164. Kurtz and Thunen signed SOX certifications, undertaking the affirmative obligation to ensure the Company's disclosures to the market were not false or misleading and so represented that they had evaluated the effectiveness of RxSight's disclosure controls.

### F. The Individual Defendants Directed Public Statements

165. Kurtz and Thunen were able to and did control the content of SEC filings, press releases, and other public statements. They attended earnings calls and spoke on behalf of RxSight throughout the Class Period. Kurtz and Thunen also participated in the drafting, preparation, review, approval, and/or signing of RxSight's Forms 10-K, 10-Q, and other public statements, and they had the ability and/or opportunity to prevent their issuance or correct them.

**G.  Defendants Kurtz and Thunen and Other Company Insiders Pocketed Millions from Insider Trades at the Top of the Market**

166.    Defendants' scheme inflated RxSight's stock price, and the Individual Defendants capitalized on this artificial inflation, selling over $16 million of their own RxSight shares at artificially inflated prices as high as $60.15 per share.  Kurtz reaped $7,684,350 (100% of his total reported lifetime proceeds from RxSight stock sales) from sales during the Class Period, selling 165,000 shares at prices as high as $60.15 per share, and for an average price of $44.86 per share, in less than five months, between December 2023 and May 2024.  Thunen collected $8,540,302 (100% of her total reported lifetime proceeds from RxSight stock sales and almost 40% of her holdings) during the Class Period, selling 180,174 shares at prices as high as $59.56 per share, and for an average price of $49.85 per share, between December 2023 and October 2024.  Following RxSight's final revelation, RxSight stock was trading at less than $7.95 per share.

167.    Additionally, other executives and directors collectively reaped over $44 million from sales of their RxSight stock during the Class Period.  Members of the Board collected $33,925,787, selling over 1.1 million shares at an average price of $40.90 per share.  Senior Executives Eric Weinberg and Illya Goldshleger also collectively reaped $10,275,369 from Class Period sales, selling 216,861 shares at an average price of $46.04 per share.  Goldshlegar, who served as RxSight's Chief Operating Officer from June 2019 to July 2024 and, since 2024, Co-President and Chief Operating Officer, reaped $8,015,282 in proceeds, selling 166,861 shares at an average price of $47.75 per share.  Weinberg, who served as Chief Commercial Officer from June 2015 through July 2024 before becoming RxSight's current Co-President and CFO, reaped $2,260,087 from sales.  Between December 2023 and February 2024, he sold 50,000 shares at an average price of $44.43 per share.  After the truth was fully revealed, RxSight stock was trading at less than $7.95 per share.

**H.    Defendants Helped the Company Reap $115 Million from a Secondary Offering at the Top of the Market**

168.    Defendants also took advantage of investors' misplaced confidence in RxSight and the resulting artificial inflation of RxSight's stock price from Defendants' fraudulent scheme by completing a secondary public offering on May 13, 2024 of over 2 million shares at $56 per share, reaping proceeds of $115 million.

# IX.    THE PRESUMPTION OF RELIANCE APPLIES

169.    The Class is entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), and *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

170.    The Class is entitled to a presumption of reliance under the *Basic* fraud-on-the-market doctrine because, among other things:

(a)    Defendants failed to disclose material facts;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market; and

(d)    Defendants' misleading statements and omissions would tend to induce a reasonable investor to misjudge the value of the Company.

171.    Plaintiff and other Class members purchased RxSight common stock between the time Defendants misstated or failed to disclose material facts and the time that the truth was disclosed.

172.    At all relevant times, the market for RxSight common stock was efficient because, *inter alia*:

(a)    RxSight common stock met the requirements for listing, was listed, and was actively traded on the NASDAQ;

(b)    Average daily trading volume exceeded 625,000 shares;

(c)    As a regulated issuer, RxSight filed periodic reports with the SEC;

(d)    At least 11 market analysts covered RxSight;

(e)    RxSight was eligible to file an SEC Registration Form S-3;

- 60 -

(f)    RxSight regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

(g)    Unexpected material news about RxSight was rapidly incorporated into its stock price.

173.    The market for RxSight common stock promptly digested current information from all publicly available sources and reflected such information in the prices of RxSight common stock.  Accordingly, all purchasers of RxSight common stock during the Class Period suffered similar injury when the truth was revealed to the market in a series of partial disclosures, causing the stock price to decline.

## X.    CLASS ACTION ALLEGATIONS

174.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a putative class consisting of all those who purchased or otherwise acquired the common stock of RxSight between November 9, 2023 and July 8, 2025, inclusive (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any judicial officer who presides over this action and their immediate families.

175.    Class members are so numerous that joinder is impracticable. Throughout the Class Period, RxSight stock was actively traded on the NASDAQ, with over 39 million shares outstanding and average daily trading volume exceeding 625,000 shares.  While the exact number of Class members can be determined only by appropriate discovery, there are likely thousands of Class members who are geographically dispersed.  Record owners and other Class members may be identified from records maintained by RxSight or its transfer agent.  Notice can be provided to

- 61 -

such record owners by a combination of publication notice and first-class mail, using techniques and a form of notice similar to those customarily used in securities class actions.

176. There is a well-defined community of interest in the questions of law and fact in this case. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members, including:

(a)    whether Defendants violated the Exchange Act;

(b)    whether Defendants engaged in a scheme to defraud;

(c)    whether Defendants made misleading statements;

(d)    whether Defendants concealed material facts;

(e)    whether Defendants engaged in fraudulent course of business;

(f)    whether Defendants knew, or were deliberately reckless in disregarding, that their public statements were misleading or otherwise acted with the requisite scienter;

(g)    whether Defendants' misconduct artificially inflated the stock price during the Class Period; and

(h)    the extent and appropriate measure of damages sustained by the Class.

177. Plaintiff believes its claims are typical of those of the Class, as all Class members were similarly damaged by Defendants' misconduct alleged herein.

178. Plaintiff believes it will adequately protect the interests of the Class and has retained counsel who are competent and experienced in class action securities litigation. Moreover, neither Plaintiff nor Lead Counsel has any known interest that conflicts with those of the Class.

179. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it

- 62 -

1   impossible for all members of the Class to individually redress the wrongs done to

2   them.

3      180.   Plaintiff is aware of no difficulty in the management of this action as a

4   class action.

5                  **COUNT I**

6        **For Violation of §10(b) of the Exchange Act
and SEC Rule 10b-5**

7            **Against All Defendants**

8      181.   Plaintiff incorporates by reference and expressly realleges all of the

9   above allegations, as if fully set forth herein.

10     182.   During the Class Period, RxSight and the Individual Defendants made

11   statements that they knew or recklessly disregarded were untrue or failed to disclose

12   material facts necessary in order to make the statements made, in light of the

13   circumstances under which they were made, not misleading.

14     183.   Defendants violated §10(b) of the Exchange Act and the subsections of

15   Rule 10b-5 in that, by the use of means and instrumentalities of interstate commerce,

16   the mails, and/or the facilities of a national securities exchange, they:

17           (a)    Employed devices, schemes, and/or artifices to defraud;

18           (b)    Omitted to state material facts necessary in order to make the

19   statements made, in light of the circumstances under which they were made not

20   misleading; and/or

21           (c)    Engaged in acts, practices, and a course of business that operated

22   as a fraud or deceit upon Plaintiff and the Class in connection with their purchase of

23   RxSight common stock during the Class Period.

24     184.   Defendants and the Company's officers, management, and agents,

25   individually and in concert, directly and indirectly, engaged and participated in a

26   continuous course of conduct to conceal adverse material information about RxSight's

27   business as detailed herein.

28

185.   RxSight is liable for the alleged misconduct of its employees and agents, including the Individual Defendants, under the principle of respondent superior.  As CEO and CFO, respectively, throughout the Class Period, Kurtz and Thunen are liable for the misleading statements and omissions of RxSight employees during the Class Period.

186.   Defendants had actual knowledge of the scheme, omitted material facts, and/or deceptive business practices, or acted with reckless disregard for the truth.

187.   As a result of Defendants' scheme, misleading statements, and wrongful course of business, Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for RxSight stock. Plaintiff and the Class would not have purchased or acquired the stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' misconduct.

188.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their transactions in RxSight common stock during the Class Period.

189.   By virtue of the foregoing, RxSight and the Individual Defendants each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

### COUNT II

**For Violation of §20(a) of the Exchange Act**
**Against Defendants Kurtz and Thunen**

190.   Plaintiff incorporates by reference and expressly realleges all of the above allegations, as if fully set forth herein.

191.   As alleged herein, Defendants violated §10(b) and SEC Rule 10b-5, and Plaintiff and other members of the Class suffered damages due to their misconduct.

192.   During the Class Period, the Individual Defendants were controlling persons of RxSight within the meaning of §20(a) of the Exchange Act.  By virtue of their high-level positions, their awareness of RxSight's operations, knowledge of

4936-6684-5824.v2

information disseminated to the public, and their ability to control and direct the Company's decision making and day-to-day operations, the Individual Defendants had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the methods and means of the scheme set forth herein.

193.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act, jointly and severally with, and to the same extent as RxSight is liable.

194.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Certifying this as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiff to serve as Class Representative, and appointing Lead Counsel to serve as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members and against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expenses and expert fees; and

D.    Awarding such other further relief as the Court may deem just.

4936-6684-5824.v2

1

## JURY DEMAND

2          Plaintiff demands a trial by jury.

3    DATED:  December 12, 2025                 ROBBINS GELLER RUDMAN
                                                 & DOWD LLP
4                                             SPENCER A. BURKHOLZ
                                              LAURA ANDRACCHIO
5                                             CHRISTOPHER R. KINNON
                                              ASHLEY G. PYLE
6

7                                                    s/ Christopher R. Kinnon

8                                             CHRISTOPHER R. KINNON

9                                             655 West Broadway, Suite 1900
                                              San Diego, CA  92101
10                                            Telephone:  619/231-1058
                                              619/231-7423 (fax)
11                                            spenceb@rgrdlaw.com
                                              landracchio@rgrdlaw.com
12                                            ckinnon@rgrdlaw.com
                                              apyle@rgrdlaw.com
13

14                                            Lead Counsel for Lead Plaintiff

15                                            WATKINS, PAWLICK, CALATI
                                                 & PRIFTI, PC
16                                            LAUREN CRUMMEL
                                              1423 E. Twelve Mile Road
17                                            Madison Heights, MI  48071
                                              Telephone:  248/658-0797
18                                            248/658-0801 (fax)
                                              lcrummel@wpcplaw.com
19

20                                            Additional Counsel

21

22

23

24

25

26

27

28

- 66 -

4936-6684-5824.v2