GREGORY L. WATTS, State Bar No. 197126
Email: gwatts@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
95 South State Street, Suite 1000
Salt Lake City, UT 84111
Telephone: (801) 401-8510
Facsimile: (866) 974-7329

DIANE M. WALTERS, State Bar No. 148136
Email: dwalters@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304-1050
Telephone: (650) 493-9300
Facsimile: (866) 974-7329

*Attorneys for Defendants*
*RxSight, Inc., Ron Kurtz, and Shelley Thunen*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re RxSIGHT, INC. SECURITIES LITIGATION | Case No. 8:25-cv-01596-FWS-KES |
| | CLASS ACTION |
| This Document Relates To: ALL ACTIONS. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| | Date: May 28, 2026<br>Time: 10:00 a.m.<br>Courtroom: 10D, 10th Floor<br>Before: Hon. Fred W. Slaughter |

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1
FACTUAL AND PROCEDURAL BACKGROUND ..... 3
PROCEDURAL HISTORY ..... 5
ARGUMENT ..... 5
I. APPLICABLE LEGAL STANDARDS ..... 5
II. PLAINTIFF FAILS TO PLEAD FALSITY ..... 6
A. The Repetitive Catalog of Unsupported Conclusions Does Not Suffice to Plead a Material Misrepresentation or Omission. ..... 7
1. The Statements Regarding Study and Clinical Data Are Accurate Statements of Historical Fact. ..... 7
2. The Allegations Regarding Patient Results and Doctor Complaints Do Not Suffice to Plead Falsity. ..... 9
3. The Cost and Burden Allegations Fail to Plead Falsity. ..... 10
4. The Unsupported Market Saturation Allegations Fail. ..... 11
5. The Sparse Field Support and “Rebate” Allegations Are Deficient. ..... 12
B. Many of the Statements Are Non-Actionable as a Matter of Law. ..... 12
1. Many Statements Are Non-Actionable Opinions. ..... 13
2. Many Statements Are Non-Actionable Puffery. ..... 14
III. THE ITEM 303 ALLEGATIONS DO NOT STATE A CLAIM ..... 14
IV. PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER ..... 15
A. No Contemporaneous, Contradictory Knowledge Is Alleged. ..... 16
1. The Doctor Complaint Allegations Add Nothing. ..... 16
2. Plaintiff Fails to Allege Contradictory Internal Information. ..... 17
3. The Generic Allegations Fail to Withstand the PSLRA. ..... 17
B. The “Motive” Allegations Do Not Plead Scienter. ..... 18
1. The Stock Sale Allegations Do Not Provide the Missing Inference of Scienter. ..... 18

2. The Secondary Offering Fails to Establish Scienter.................20
C. The July 2025 Statements Do Not Constitute "Admissions." ............21
D. The CAC Does Not Support a Core Operations Inference.................22
E. The CAC Allegations Fail Both Individually and Holistically. .........22
V. THE SECTION 20(A) CLAIM ALSO FAILS ...........................................23
CONCLUSION..........................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Baron v. HyreCar Inc.*,
2022 WL 17413562 (C.D. Cal. Dec. 5, 2022) .......... 20

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) .......... 1

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) .......... 20

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) .......... 16, 22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) .......... 13

*Curry v. Yelp*,
2015 WL 1849037 (N.D. Cal. Apr. 21, 2015) .......... 10

*Curry v. Yelp Inc.*,
875 F.3d 1219 (9th Cir. 2017) .......... 19

*Hessong v. Pinterest, Inc.*,
2021 WL 4339193 (N.D. Cal. Sept. 23, 2021) .......... 11

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
782 F. App'x 572 (9th Cir. 2019) .......... 20, 21

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) .......... 9

*In re Dropbox Sec. Litig.*,
2020 WL 6161502 (N.D. Cal. Oct. 21, 2020) .......... 8

*In re ICN Pharms., Inc. Sec. Litig.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004),
*aff'd*, 184 F. App'x 672 (9th Cir. 2006) .......... 11

*In re Nektar Therapeutics Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) .......... 6, 11

*In re NVIDIA Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) .......... 22

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) .......... 8, 20

*In re SunPower Corp. Sec. Litig.*,
2018 WL 1863055 (N.D. Cal. Apr. 18, 2018) .......... 22

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) .......... 19, 20

*Kairalla v. Advanced Med. Optics, Inc.*,
2008 WL 2879087 (C.D. Cal. June 6, 2008) .......... 17

*Kong v. Fluidigm Corp.*,
2023 WL 2134394 (9th Cir. Feb. 21, 2023) .......... 14

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002) .......... 17, 20

*M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*,
2017 WL 5635424 (C.D. Cal. Aug. 20, 2017) .......... 18

*Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*,
39 F.4th 1092 (9th Cir. 2022) .......... 14

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024) .......... 14

*Mazzaferro v. Aruba Networks, Inc.*,
2015 WL 456534 (N.D. Cal. Feb. 2, 2015),
*aff'd sub nom. PAR Inv. Partners, L.P. v. Aruba Networks, Inc.*,
681 F. App'x 618 (9th Cir. 2017) .......... 9, 10

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
540 F.3d 1049 (9th Cir. 2008) .......... *passim*

*Okla. Firefighters Pension & Ret. Sys. v. IXIA Corp.*,
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .......... 19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) .......... 13

*Park v. GoPro, Inc.*,
2019 WL 1231175 (N.D. Cal. Mar. 15, 2019) .......... 19

*Pittleman v. Impac Mortg. Holdings, Inc.*,
No. SACV 07-0970 AG (MLGx), 2009 WL 648983 (C.D. Cal. Mar. 9, 2009),
*aff'd sub nom. Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010) .......... 16

*Plevy v. Haggerty*,
38 F. Supp. 2d 816 (C.D. Cal. 1998) .......... 12

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .......... *passim*

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .......... 20, 23

*Scandlon v. Blue Coat Sys., Inc.*,
2013 WL 308879 (N.D. Cal. Jan. 25, 2013) .......... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .......... 1, 6, 15, 23

*Veal v. LendingClub Corp.*,
423 F. Supp. 3d 785 (N.D. Cal. 2019) .......... 17

*Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*,
321 F. Supp. 3d 1133 (C.D. Cal. 2018),
*aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669
(9th Cir. 2020) .......... 7

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) .......... 6

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .......... 15, 18, 19, 23

## STATUTES

Private Securities Litigation Reform Act ("PSLRA"),
15 U.S.C. § 78u-4 .......... *passim*

Securities Exchange Act § 10(b),
15 U.S.C. § 78j(b) .......... 5, 23

Securities Exchange Act § 20(a),
15 U.S.C. § 78j(a) .......... 5, 23

## RULES

Civil L.R. 7-3 .......... 5

Fed. R. Civ. P. 9(b) .......... 5

Rule 10b-5,
17 C.F.R. § 240.10b-5 .......... 2, 5

## PRELIMINARY STATEMENT

RxSight is a company dedicated to improving vision through the research and development, manufacture, and sale of premium intraocular light adjustable lenses (LALs) and capital equipment light delivery devices (LDDs) used to adjust them. In the first three years following its 2021 IPO, RxSight experienced significant growth. As 2025 progressed, however, RxSight began to encounter certain challenges and headwinds, resulting in RxSight lowering its annual revenue guidance on April 2, 2025 and again on July 8, 2025. Two weeks after the July 8, 2025 announcement, this action was filed asserting claims for securities fraud.

Because securities fraud class actions present "a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739 (1975), Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which imposes "[e]xacting pleading requirements" as "a check against abusive litigation," *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313 (2007), designed to end such cases at the motion to dismiss stage, where, as here, the pleading requirements "are not met." 15 U.S.C. § 78u-4(b)(3)(A).

Originally filed as a seven-month, primarily missed financial forecast case, the consolidated amended complaint ("CAC" or "¶_") no longer asserts claims based on RxSight's annual financial forecasts. Instead, the CAC alleges a twenty-month class period, asserting a hodgepodge of allegedly misleading statements relating to product efficacy, doctor adoption, utilization rates (LALs per LDD per month, including by annual cohort), doctor return on investment ("ROI"), seasonality, consumer sentiment, market saturation, and macroeconomic trends. Plaintiff alleges that Defendants Dr. Kurtz, RxSight's CEO, and Ms. Thunen, RxSight's then-CFO, engaged in a nearly two-year fraud. Missing in the CAC are the requisite pleaded facts to support Plaintiff's sweeping claims.

Securities class action plaintiffs typically attempt to plead falsity and scienter

using information attributed to former employees who claim to have *both* knowledge of internal contemporaneous facts that contradicted defendants' public statements *and* to have interacted with the individual defendants in a manner showing they knew these contradictory facts, as well. Such plaintiffs often also plead contradictory details from contemporaneous internal reports, communications, or meetings. Here, Plaintiff pleads *none* of these allegations. Instead, the CAC largely repeats a list of Plaintiff's *own* unsupported *conclusions*. This *ipse dixit* style of pleading falls far short of satisfying the PSLRA's formidable pleading requirements.

When Plaintiff is not relying on its own conclusions, it points to clinical study results and registry data (information Plaintiff does not allege is false), a non-scientific survey from which Plaintiff cherry picks anecdotal comments, vague references to doctor complaints on chat boards, and purported internal reports from which Plaintiff provides no information, let alone specifics. None of Plaintiff's allegations contain contemporaneous facts contradicting Defendants' public statements. Regardless, there are no facts alleged showing that Kurtz or Thunen ever viewed chat boards or became aware of any information from internal reports or meetings that contradicted their public statements.

Plaintiff's "motive" allegations also fail as Defendants' stock sales are not suspicious. Kurtz and Thunen only sold a fraction of their stock holdings during the class period. All of Kurtz's stock sales, and most of Thunen's stock sales, were made pursuant to pre-established Rule 10b5-1 trading plans. And Defendants' so-called "admissions" at the end of the class period were nothing of the sort; to the contrary, Plaintiff's "admissions" allegations reflect the type of "fraud-by-hindsight" pleading that courts routinely reject.

When viewed holistically, the non-culpable inference—that Defendants promptly disclosed emerging challenges and disappointing results and reduced the company's financial forecasts for FY25 twice as a result—is more compelling than an inference that Defendants purportedly engaged in a lengthy fraud without

pointing to any contemporaneous facts that contradicted their public statements.

In sum, the CAC fails to satisfy the PSLRA's requirements and should be dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

RxSight "develops and sells products to treat cataracts and improve vision following cataract surgery." ¶6. Dr. Kurtz has served as RxSight's CEO since 2016. ¶23. Ms. Thunen has served as CFO since 2017 and served as CFO during the alleged class period. ¶24.

Cataract surgery involves removing an eye's cloudy natural lens and replacing it with an intraocular lens ("IOL"). ¶30. Conventional IOLs provide vision at one fixed distance. ¶31. Nearly all conventional IOL patients "require glasses following surgery to achieve the best distance, intermediate, and near vision." *Id.* Premium IOLs are intended to improve upon conventional IOLs by providing certain benefits, including "vision at multiple distances, including far, intermediate, and near, correction of other conditions such as astigmatism," and "reducing or eliminating the need for glasses." ¶32.

RxSight's system includes LAL/LAL+, collectively, "LALs," and LDDs. ¶6. LALs are premium IOLs, and LDDs are devices used to adjust the LALs. *Id.* Unlike competing IOLs, the RxSight system allows a doctor to customize a patient's vision *after* surgery. ¶33.

Following its August 2021 IPO (¶37), RxSight experienced significant growth. On November 9, 2023, the start of the alleged class period, RxSight reported results for the third quarter of 2023 ("3Q23"), including revenue of $22.2 million, an increase of 76% over 3Q22. ¶72.

On February 28, 2024, RxSight announced results for fiscal year ("FY") 2023 (¶76), reporting FY23 revenue of $89.1 million, an increase of 82% over FY22.

Exhibit ("Ex.") 1, at 98.[1] In its Form 10-K annual report filed with the SEC that day, RxSight cautioned that its limited operating history, limited sales experience and other factors "make it difficult for us to forecast [RxSight's] financial performance and growth[.]" *Id.* at 26-27. RxSight warned that it "cannot predict how quickly, if at all, patients, doctors, or payors will accept our RxSight system or, if accepted, how frequently it will be used[]" (*id.* at 31), and RxSight faces "significant competition" (*id.* at 33). RxSight also cautioned that, if "unfavorable conditions in the national and global economy persist, or worsen," it may cause "customers and potential customers to slow or reduce spending, or vary order frequency, on our products." *Id.* at 80.

On February 25, 2025, RxSight announced results for FY24, reporting revenue of $139.9 million, a 57% increase over FY23. Ex. 2, at 6. It also provided a FY25 revenue forecast of $185-197 million. *Id.* at 6. In its Form 10-K filed that day, RxSight again cautioned that a number of factors render it difficult to forecast RxSight's financial performance and growth. Ex. 3, at 26-80.

On April 2, 2025, RxSight issued a press release providing preliminary 1Q25 results and lowering its FY25 revenue forecast from $185-$197 million to $160-175 million. ¶64. During a conference call the next day, Dr. Kurtz explained that various factors, including new offerings from competitors, a weakened premium IOL market, and changes in consumer sentiment late in 1Q25, affected 1Q25 revenue and FY25 guidance. ¶112(a). He opined that, because premium IOLs cost more than standard IOLs, "[g]iven the widely reported and rapid changes in the macro environment . . . during the latter part of the quarter, we believe that negative wealth effects may have impacted premium IOL procedure decision-making, leading to potential trade downs to lower priced" alternatives. Ex. 4, at 4.

On July 8, 2025—the end of the class period—RxSight issued a press release

---

[1] All exhibits are attached to the Declaration of Diane M. Walters.

reporting preliminary 2Q25 financial results and again reducing its FY25 financial forecast from $160-175 million to $120-130 million. ¶66. During a conference call that same day, Thunen explained that the LDD sales funnel had "looked great all quarter up until the end. . . . So that was a new phenomenon for us." Ex. 5, at 7.

## PROCEDURAL HISTORY

On July 22, 2025, this action was filed. On October 6, 2025, the Court consolidated this action with a related action and appointed a lead plaintiff ("Plaintiff"). On December 12, 2025, Plaintiff filed the CAC, asserting claims for alleged violations of Section 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b-5(b)[2] and alleging that Defendants made misleading statements between November 9, 2023 and July 8, 2025.

## ARGUMENT

### I. APPLICABLE LEGAL STANDARDS

To plead a claim for securities fraud under Section 10(b) and Rule 10b-5, a plaintiff must plead, among other elements: (i) a material misrepresentation or omission, and (ii) scienter.[3] *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1057 (9th Cir. 2014). Plaintiff's Section 10(b) claims are subject to Rule 9(b)'s heightened pleading standard and the PSLRA's "formidable" pleading requirements. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55 (9th Cir. 2008).

To withstand dismissal under the PSLRA, a complaint must: (i) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief … state with particularity all facts on which that belief is

---

[2] During the L.R. 7-3 conference of counsel, Plaintiff confirmed that it is not asserting scheme claims under Rule 10b-5(a) & (c).

[3] Because Plaintiff's failure to plead falsity or scienter *each* provides grounds for dismissal, Defendants do not address the other elements.

formed" (15 U.S.C. § 78u-4(b)(1)(B)); and (ii) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" as to "each act or omission" (*id*. § 78u-4(b)(2)).

The PSLRA's "strong inference" standard requires plaintiffs to plead with particularity "facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference" of scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313, 319, 321-23 (citation omitted).

**II. PLAINTIFF FAILS TO PLEAD FALSITY**

"For a statement to be false or misleading, it must 'directly contradict what the defendant knew at that time' or 'omit[] material information.'" *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citation omitted). Alleged omissions "'must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'" *Intuitive Surgical*, 759 F.3d at 1161 (citation omitted).

To satisfy the PSLRA's exacting requirements, Plaintiff must plead specific, contemporaneous facts indicating why each statement was false or misleading when made. *Metzler*, 540 F.3d at 1070. "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 835 (9th Cir. 2022) (citation omitted).

Here, "vague allegations of deception" (*id.*) are all that Plaintiff pleads. Plaintiff challenges dozens of statements, including those made in press releases, conference calls, healthcare conferences, and SEC filings (¶¶71-123, 144-47), but fails to plead facts showing the fraudulent nature of any statement.

### A. The Repetitive Catalog of Unsupported Conclusions Does Not Suffice to Plead a Material Misrepresentation or Omission.

Plaintiff alleges that, over the course of a nearly two-year period, Defendants repeatedly—and intentionally—deceived investors regarding product efficacy, adoption, utilization rates, doctor ROI, cohort growth, seasonality, market saturation, the premium IOL market, consumer sentiment, and macroeconomic trends. ¶¶71-123, 144-47. Instead of pleading particularized, contemporaneous facts as to each of these challenged statements, however, Plaintiff simply quotes excerpts from the statements, followed by a repetitive list of *Plaintiff's* conclusory assertions as to why the statements were purportedly misleading—*i.e.*, precisely what the PSLRA prohibits. *Compare* ¶79(a)-(h); ¶87(a)-(j); ¶97(a)-(j); ¶102(a)-(j); ¶107(a)-(j); ¶114(a)-(j); ¶119(a)-(j). This catalog approach does not satisfy the PSLRA as it fails to "draw a connection between each individual disclosure and the specific facts supporting plaintiff's conclusion that the statement was false when made or omitted material information." *Waterford Twp. Police & Fire Ret. Sys. v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1146-47 (C.D. Cal. 2018), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020). Plaintiff's bare conclusions fail to plead the falsity of any statement.

#### 1. The Statements Regarding Study and Clinical Data Are Accurate Statements of Historical Fact.

Plaintiff challenges a number of statements in which Defendants referenced past FDA study results or clinical data. For example, Plaintiff challenges excerpts of statements during the November 8, 2023 earnings call in which Kurtz referenced clinical data on 738 bilateral subjects, stating:

> "91% of LAL subjects achieved uncorrected binocular near vision of J2 or better, which means they could read 5-point type without glasses, while 79% could read at J1 or better[,]" (¶73(a));
>
> "The results showed that . . . 95% achieve[d] J2 or better uncorrected

near vision[]" (¶73(b)).

*See also* ¶75 (Phase 3 and 4 studies); ¶76(b) (registry data); ¶80 (data from approximately 1,000 subjects); ¶83(b) & Ex. 6, at 2 (Phase 4 study).[4]

Plaintiff does not, however, allege any facts showing that any of the past FDA study results or the clinical data was inaccurate. Such statements are merely accurate statements of historical fact, and as such, cannot form a basis for liability. *See, e.g.*, *In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *7 (N.D. Cal. Oct. 21, 2020) (disclosure of accurate historical data not misleading).

Plaintiff repeatedly suggests that these accurate statements regarding study results and clinical data were nevertheless misleading because Defendants purportedly "knew or recklessly disregarded" that these results "did not reflect the results that" doctors and patients allegedly were experiencing in practice settings. *E.g.*, ¶79(a). As shown below, Plaintiff's conclusions lack the pleaded facts required by the PSLRA. *Infra* II.A.2.

To the extent Plaintiff critiques the FDA Phase 3 study (*e.g.*, ¶79(a)), merely criticizing "statistical methodology" does not adequately plead falsity. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878-79 (9th Cir. 2012). Regardless, the details about how RxSight conducted these studies was publicly available. ¶35 ("391 subjects had an LAL implanted in one eye"). In fact, the "inclusion and exclusion criteria" (¶79(a)) for the Phase 3 study (and other studies) are publicly available on the FDA web site.[5]

---

[4] *See also* ¶99(a); Ex. 7, at 4 (data presented at American Academy of Ophthalmology meeting), 118(d); Ex. 8 (data from academic ophthalmology department patients).

[5] Ex. 14; https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P160055

### 2. The Allegations Regarding Patient Results and Doctor Complaints Do Not Suffice to Plead Falsity.

Plaintiff alleges that virtually every challenged statement[6] regardless of topic was false and misleading because Defendants knew or recklessly disregarded that "most patients" purportedly still needed reading glasses (¶79(a)), "the LAL+ created glares and halos" (¶87(c)), and doctors purportedly "complained regularly" to Defendants about results and limited use cases (¶79(b)). *See* ¶79(a)-(b); ¶87(a)-(c); ¶97(a)-(c); ¶102(a)-(c); ¶107(a)-(c); ¶114(a)-(c); ¶119(a)-(c). Instead of pleading contemporaneous facts, Plaintiff offers only vague allegations that: (i) "sources" for the CAC purportedly included unidentified and unenumerated former RxSight employees and "customers" (¶5), and (ii) Defendants would have had access to unidentified complaint information in internal reports (*e.g.*, ¶87(b)-(c)). None of Plaintiff's allegations is directly attributed to a specific former employee or "customer," and Plaintiff fails to plead "with particularity, including the 'who, what, when, where, and how[,]'" required by the PSLRA. *In re Downey Sec. Litig.*, 2009 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009) (citation omitted).

As of December 31, 2024, over 195,000 surgeries using the RxSight system had been performed by cataract surgeons (described by Plaintiff as "customers"). Ex. 3, at 2. To support Plaintiff's sweeping claims about post-surgery outcomes for "most patients," Plaintiff would have needed to speak with tens of thousands of LAL patients and hundreds of surgeons. *Id.* (installed base of 971 LDDs). The CAC does not allege that Plaintiff has spoken with *any* patients. Other than using "customers" (plural), the CAC does not identify or enumerate the surgeons Plaintiff purportedly interviewed. This is woefully deficient. *See, e.g.*, *Mazzaferro v. Aruba Networks, Inc.*, 2015 WL 456534, at *2 (N.D. Cal. Feb. 2, 2015) (defendant "sold its products to more than 20,000 wireless customers," so "the loss of three customers (even large

---

[6] ¶¶72-87, 90-122.

ones) does not support an inference that [it] was losing market share overall"), *aff'd sub nom. PAR Inv. Partners, L.P. v. Aruba Networks, Inc.*, 681 F. App'x 618 (9th Cir. 2017).

Plaintiff's vague "chat board" and "chat lines" allegations do not supply the missing details. Plaintiff repeatedly references an alleged American Society of Cataract and Refractive Surgery ("ASCRS") "chat board" that purportedly was available to doctors and included doctor complaints. ¶79(b); ¶87(b); ¶102(b); ¶107(b); ¶114(b); ¶119(b). Not one complaint from this "chat board," however, is referenced in the CAC. Indeed, no details are provided. *Id.*[7]

Plaintiff's allegations regarding "'Study Patient' customer service data" and "Doctor Readiness" (*e.g.*, ¶79(b)) reports also fail to plead the falsity of any statement. Plaintiff makes no attempt to plead what any of these purported internal "reports" or "data" showed at any given point in time, much less facts showing that this information contradicted Defendants' public statements or was provided to Kurtz or Thunen. Merely alleging the existence of complaints does not satisfy the PSLRA's requirements. *See, e.g.*, *Curry v. Yelp*, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015) ("customer complaints generally do not, on their own, establish the veracity of the allegations contained therein and the falsity of a defendant's representations to the contrary").[8]

**3. The Cost and Burden Allegations Fail to Plead Falsity.**

Plaintiff contends that virtually all of the challenged statements also were misleading because LALs allegedly were "uncompetitive" due to "increased costs compared to standard IOLs" (*e.g.*, ¶79(c)) and "were more burdensome[,]" *i.e.*,

---

[7] Plaintiff's allegations regarding unidentified "surgeon chat lines" (¶87(c); ¶97(c); ¶102(c); ¶107(c); ¶114(c); ¶119(c)) likewise lack basic details, much less provide any support for the bald assertion that doctors purportedly "abandoned the [LAL+] lens and its adoption cratered." *Id.*

[8] The generic reference to unidentified "LAL and LDD Sales Reports" (¶79(g)) similarly is devoid of any contemporaneous facts.

require more follow-up visits than other IOLs (¶79(f)). ¶87(d)&(g); ¶97(d)&(g); ¶102(d)&(g); ¶107(d)&(g); ¶114(d)&(g); ¶119(d)&(g). Apart from the deficient chat board and internal report allegations, the only purported support for these assertions is a non-scientific Wells Fargo survey that included information from *only 50* cataract surgeons out of the *9,000* cataract surgeons in the U.S. ¶89, ¶126; Ex. 9, at 4. Of those 50, *only 11* respondents pointed to costs or time consumption as a reason for not using the RxSight system. Ex. 9, at 11. And of those 11, *only 4* respondents are quoted in the CAC. *Id*. If such scant anecdotal information—only 4-to-11 surgeons out of 9,000—sufficiently pleads the falsity of statements made by a medical device provider, then every drug and device provider has committed securities fraud. *See Nektar*, 34 F.4th at 836 ("cherry-picking" of "data from only three patients does not plausibly show the falsity of the [] claim"); *In re ICN Pharms., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1066 (C.D. Cal. 2004) (finding as insufficient allegations from "numerous [] employees" claiming that ICN's product was inferior to competing products and cost 20-30% more), *aff'd*, 184 F. App'x 672 (9th Cir. 2006).

Importantly, Plaintiff fails to mention that 46% of the surgeons surveyed were already using LAL technology and another 30% were intending to use it within the next 24 months. Ex. 9, at 10. Thus, the report itself refutes Plaintiff's claim that LAL technology is "uncompetitive."

**4. The Unsupported Market Saturation Allegations Fail.**

Plaintiff alleges that the challenged statements also were misleading because LALs are a "niche" market primarily for LASIK patients (¶79(d)), and by mid-2023, RxSight had "saturated" the market (¶79(e)). Once again, no facts are pleaded in support of Plaintiff's suppositions. Merely repeating Plaintiff's own conclusions does not plead falsity. ¶79(d); ¶87(e)-(f); ¶97(e)-(f); ¶102(e)-(f); ¶107(e)-(f); ¶114(e)-(f); ¶119(e)-(f); *see, e.g., Hessong v. Pinterest, Inc.*, 2021 WL 4339193, at *6 (N.D. Cal. Sept. 23, 2021) ("[plaintiff] alleges no facts showing why Pinterest's

domestic market was so saturated that the user growth statements were necessarily known by Pinterest to be misleading”).

### 5. The Sparse Field Support and “Rebate” Allegations Are Deficient.

Plaintiff repeatedly parrots the allegation that “RxSight lacked adequate field support to drive adoption and utilization,” but pleads no facts to support this assertion. ¶87(h); ¶97(h); ¶102(h); ¶107(h); ¶114(h). Indeed, Plaintiff does not cite a single RxSight employee, doctor, patient, internal report, internal meeting, or any other purported contemporaneous facts suggesting that RxSight lacked adequate field support. Plaintiff thus “offer[s] no direct or circumstantial facts, such as, but not limited to, inconsistent contemporaneous statements or internal reports,” to support the assertion that allegedly inadequate field support rendered any statement misleading when made. *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 826 (C.D. Cal. 1998).

Plaintiff’s bare assertions regarding purported “rebates” (¶ 87(j)) are equally unavailing as Plaintiff fails to plead any facts showing the existence of any such “rebates,” much less that they artificially propped up revenues, adoption, or utilization. *Plevy*, 38 F. Supp. 2d at 826.[9]

## B. Many of the Statements Are Non-Actionable as a Matter of Law.

Even if Plaintiff had pleaded the facts necessary to show the falsity of any statement—it has not—many statements are non-actionable as a matter of law.

---

[9] Plaintiff challenges Thunen’s statement at a June 18, 2024 Truist conference in which she stated that the number of post-surgery adjustments per patient had been “running about 1.6” and “two lock-ins.” ¶88. Plaintiff asserts that the statements were misleading because doctors purportedly told her that the lenses “usually required three adjustments” and “two lock-ins[,]” but offers no facts supporting this claim.

**1. Many Statements Are Non-Actionable Opinions.**

Many of the challenged statements express Defendants' opinions regarding product efficacy, adoption, utilization, growth trends, headwinds, and market saturation. *See, e.g.*, ¶83(c) ("[w]e believe competitive premium IOLs often fail to deliver on patients' expectations for quality vision across a range of distances without glasses"; "[w]e believe our [] system offers doctors and patients a significantly more reliable approach, . . . ultimately driving broad adoption"), ¶104(a) ("We believe the [LAL] enables a better approach,. . . for optimized vision without glasses"), ¶110 ("headwinds affecting the overall premium IOL market and broader economy," and "current market conditions"); ¶112(c) ("I certainly don't believe that we're anywhere near a saturation point").[10]

As the Supreme Court has held, pleading a misleading opinion statement is "no small task," and investors are not "allow[ed]" to "second-guess inherently subjective and uncertain assessments." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194, 186 (2015). None of these opinion statements is actionable because Plaintiff fails to plead—as it must—any facts showing that: (i) Defendants did not genuinely believe the statements, and the statements were objectively untrue, (ii) the expressed opinions contained embedded statements of untrue facts, or (iii) material omitted facts were known to Defendants that go to the basis for their opinions and their omission rendered the statements misleading to a reasonable person. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616-17 (9th Cir. 2017).

---

[10] *See also* ¶78(a) ("much higher refractive outcomes, better vision without glasses"); ¶95 ("continue to grow"); ¶99(b) ("utilization has grown over time and it continues to grow"); ¶112(a) ("weakened premium IOL market"; "abrupt changes in consumer sentiment"); ¶112(b) ("I think that all of them are transitory to some extent"; "I think the obvious thing that changed in Q1 was the macro environment"); ¶113 ("softening in the market"); ¶118(a) ("macroeconomic headwinds"); ¶118(b) ("temporary negative wealth effects"); ¶118(c) ("macro trends"; "improved stabilization"), ¶118(e) ("I don't see a good argument for" saturation).

**2. Many Statements Are Non-Actionable Puffery.**

The Ninth Circuit has repeatedly held that statements expressing generalized corporate optimism "fit beneath the umbrella" of non-actionable "puffery." *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098-99 (9th Cir. 2022); *Kong v. Fluidigm Corp.*, 2023 WL 2134394, at *2 (9th Cir. Feb. 21, 2023) (assurances that product adoption was "robust" and sales funnel was "very deep" were puffery); *Intuitive Surgical*, 759 F.3d at 1060 (statements regarding potential for growth in the market were "'non-actionable puffing'") (citation omitted). Here, many of the statements are nothing more than general expressions of corporate optimism regarding growth and demand: ¶83(c) ("broad adoption"); ¶85 ("steady increase in visibility and adoption"); ¶86 ("they're all growing"); ¶91(a) ("new customers are similar to our previous customers that we continue to grow"), ¶91(b) ("all cohorts continue to grow"); ¶92(b) ("the slope of the line is up"); ¶95 ("all the cohorts continue to grow"; "[w]e've seen an overall upward [] trend"); ¶106 (cohorts continuing to grow). The Ninth Circuit has found similar statements to be non-actionable. *See Macomb*, 39 F.4th at 1098-99 ("great growth market," "dynamics" that "are really good").

**III. THE ITEM 303 ALLEGATIONS DO NOT STATE A CLAIM**

Plaintiff claims that four Forms 10-Q, filed with the SEC between May 6, 2024 and May 7, 2025, and RxSight's Form 10-K filed February 25, 2025, failed to disclose material "known trends or uncertainties" that were "reasonably likely" to have a material "unfavorable" impact on net sales. ¶¶144-47. Because "[p]ure omissions are not actionable," an alleged failure to disclose information required by Item 303 "can support a Rule 10b-5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265-266 (2024).

Plaintiff alleges that statements in RxSight's SEC filings between May 2024 and May 2025 regarding increased LAL and LDD sales due to "strong adoption"

were misleading because RxSight purportedly should have disclosed "the then-known trend of adoption gaps and challenges, flat adoption, and slowing adoption by cohort." ¶147. Plaintiff fails, however, to plead facts showing that Kurtz or Thunen had identified adoption issues as a material known "trend[] or uncertain[y]" at the time of each filing. ¶144. The cursory allegations regarding internal reports, meetings, and "regular Zoom and conference calls" that Plaintiff asserts—with no factual support—Kurtz or Thunen "typically attended or participated in" (¶146) are missing any pleaded facts showing that any such conclusion had been reached. Plaintiff's attempt to plead its Section 10(b)/Item 303 claim by hindsight (*id.*) also is unavailing. *See infra*, Section IV.C.

## IV. PLAINTIFF FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER

Even assuming, *arguendo*, that Plaintiff had pleaded facts showing that any statement was misleading—it has not—Plaintiff fails to plead facts giving rise to any inference of scienter, much less a strong inference of scienter. To satisfy the PSLRA, Plaintiff must plead particularized facts giving rise to a strong inference that *each* defendant acted with the required state of mind, which is "an 'intent to deceive, manipulate, or defraud,'" or deliberate recklessness. *Metzler*, 540 F.3d at 1061, 1065 (citation omitted). Deliberate recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 911 (9th Cir. 2009) (citation omitted). In assessing scienter, a court engages in both an individual and a holistic analysis, considering not only "inferences urged by the plaintiff" but also any "plausible, nonculpable explanations." *Tellabs*, 551 U.S. at 314-15, 324. The culpable inference must be "at least as compelling" as any inference of innocent or negligent conduct. *Id.* at 314.

**A. No Contemporaneous, Contradictory Knowledge Is Alleged.**

To plead a strong inference of scienter, Plaintiff must allege particularized facts identifying specific, contemporaneous information known to Kurtz or Thunen that "demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Metzler*, 540 F.3d at 1066 (citation omitted). Merely alleging the availability or potential awareness of unidentified data does not suffice, absent some additional allegation of specific information conveyed to management and related to the alleged fraud. *Id.* at 1068. No such facts are pleaded.

Indeed, the CAC lacks any facts—much less particularized facts—regarding the mental states of Kurtz or Thunen at the time any statement was made. Plaintiff thus fails to plead a strong inference of scienter as to any statement. *See Intuitive Surgical*, 759 F.3d at 1061 ("the complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind'") (citation omitted); *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *10 (N.D. Cal. Sept. 1, 2021) (dismissal where plaintiffs "fail to include any allegations against Defendants from confidential witnesses" or former employees). Because Plaintiff fails to plead scienter as to any individual, Plaintiff "cannot successfully plead scienter on the part" of RxSight. *Pittleman v. Impac Mortg. Holdings, Inc.*, No. SACV 07-0970 AG (MLGx), 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009), *aff'd sub nom. Sharenow v. Impac Mortg. Holdings, Inc.*, 385 F. App'x 714 (9th Cir. 2010).

**1. The Doctor Complaint Allegations Add Nothing.**

Plaintiff's allegations that "doctors complained regularly" on an alleged ASCRS "Ad Board" and complaints "were also recorded" in purported "'Study Patient' data," "Customer Service Reports," and "Doctor Readiness reports" (¶¶150-51) lack the particularized facts necessary to plead a strong inference of scienter. *See Intuitive Surgical*, 59 F.3d at 1063 ("[N]egative characterizations of reports relied on by insiders, without specific reference to the contents" are insufficient)

(citation omitted); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("allegations of negative internal reports and IMS data are insufficient to demonstrate deliberate or conscious recklessness").[11] "[W]ithout more, customer complaints do not give rise to a strong inference of scienter." *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 815 (N.D. Cal. 2019); *Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *11 (C.D. Cal. June 6, 2008) (eight complaints did "not indicate a meaningful relationship between [contact solution] and [eye infections]").[12]

**2. Plaintiff Fails to Allege Contradictory Internal Information.**

Plaintiff offers no contemporaneous, particularized facts contradicting any of the challenged statements regarding efficacy, adoption, utilization, ROI, cohort growth, seasonality, consumer sentiment, the premium IOL market, and macroeconomic trends that Defendants purportedly knew or recklessly disregarded. At most, Plaintiff alleges poor prediction of challenges. In the absence of contemporaneous information, Plaintiff has "not pleaded facts to support a compelling inference that any such misrepresentations or omissions were the result of an intent to deceive, as opposed to a failure to analyze business conditions correctly." *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 308879, at *4 (N.D. Cal. Jan. 25, 2013).

**3. The Generic Allegations Fail to Withstand the PSLRA.**

The remaining allegations are routinely made—and routinely given little to no weight. The generic allegations of Defendants' "access to internal documents, internal communications, management meetings, Board meetings, and committee

---

[11] Just as the anecdotal allegations regarding the Wells Fargo report fail to plead falsity, so too do they fail to plead scienter. *Supra* at 10-11.

[12] Other allegations such as "RxSight lacked adequate field support" (¶87(h)) and the products "were more burdensome for doctors" (¶87(g)) also lack the particularized facts necessary to plead scienter.

meetings" (¶163) are conclusory and "insufficient to establish . . . scienter." *Intuitive Surgical*, 759 F.3d at 1063. Likewise, the allegations of Defendants' roles (¶¶160, 165) "are not sufficiently particular to suggest that Defendants had actual knowledge of their statements' falsity[.]" *M & M Hart Living Tr. v. Glob. Eagle Ent., Inc.*, 2017 WL 5635424, at *14 (C.D. Cal. Aug. 20, 2017).

The allegations that Defendants "held themselves out as knowledgeable about RxSight's products" (¶162) and made comments about reviewing internal information (¶¶154-159) are also insufficient. General references to reviewing unspecified cohort information, sales "numbers," or customer surveys do not provide the particularized facts necessary to plead a strong inference of scienter. *See Zucco*, 552 F.3d at 1000-01 (no scienter despite allegation that CFO "closely reviewed the accounting numbers"). What was reviewed? When? The bare allegation that Kurtz and Thunen "signed SOX certifications" (¶164) is likewise insufficient. *See Glob. Eagle*, 2017 WL 5635424, at *14.

**B. The "Motive" Allegations Do Not Plead Scienter.**

**1. The Stock Sale Allegations Do Not Provide the Missing Inference of Scienter.**

Lacking any particularized facts giving rise to a strong inference of scienter, Plaintiff relies on stock sale allegations in an attempt to plead a purported motive to engage in securities fraud. In evaluating stock sale allegations, courts consider: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Zucco*, 552 F.3d at 1005. Here, Plaintiff fails to plead facts showing that the sales were unusual or suspicious.

The initial complaints in this action had class periods that began in May 2024 and November 2024 and did not include any stock sale allegations. ECF No. 1; No. 8:25-cv-02093, ECF No. 1. Unlike its predecessors, the CAC extends its putative class period back to November 2023, thereby including stock sales dating back to

December 2023. Scienter is not supported where "plaintiffs have selected an unusually long class period" in order to "sweep as many stock sales into their totals as possible." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (63-week class period).

***Dr. Kurtz***. Plaintiff alleges that Kurtz sold 165,000 shares of stock during the class period, which Plaintiff alleges constituted 100% of his lifetime sales. ¶166. Plaintiff omits, however, that those sales amounted to just 10%[13] of his total holdings. Exs. 10, 13. Courts routinely find much larger stock sales to be insufficient. *See Zucco*, 552 F.3d at 1000-01 (no scienter with sale of 48% of holdings); *Metzler*, 540 F.3d at 1067 (no scienter with CFO sales of 100% and CEO sales of 37%).

Plaintiff also disregards that all of Kurtz's stock sales were made pursuant to a pre-determined Rule 10b5-1 plan that he entered into in September 2023—*before* the class period. Ex. 10. As courts have recognized, the fact that "the vast majority of Individual Defendants' stock sales were made pursuant to a Rule 10b5-1 plan," undercuts scienter. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226-27 n.2 (9th Cir. 2017); *Metzler*, 540 F.3d at 1067 n.11; *Park v. GoPro, Inc.*, 2019 WL 1231175, at *23 (N.D. Cal. Mar. 15, 2019) ("the innocent alternative explanation that the sales were from a non-discretionary 10b5-1 plan negates scienter").

The fact that the sales were made early in the lengthy twenty-month class period (¶166)—more than one year before many of the challenged statements—also undermines an inference of scienter. *See Okla. Firefighters Pension & Ret. Sys. v. IXIA Corp.*, 2015 WL 1775221, at *35 (C.D. Cal. Apr. 14, 2015) ("where no link is pled and the class period is exceedingly long, it 'becomes difficult to see how particular stock sales would strengthen allegations that particular statements were

---

[13] Plaintiff failed to allege a percentage of holdings. Without accepting Plaintiff's percentage methodology for Thunen, Defendants have calculated Kurtz's percentage using a method similar to what Plaintiff appears to have used for Thunen.

uttered with [scienter] at the times they were made'") (citation omitted).

Contrary to Plaintiff's suggestion, the fact that Kurtz had not sold stock before the class period is not meaningful. *See Lipton*, 284 F.3d at 1037 (no scienter where defendant "had never before sold PathoGenesis stock and thus we cannot compare" to past trading history); *Vantive*, 283 F.3d at 1095-96 (same); *but cf. Baron v. HyreCar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. Dec. 5, 2022) (stock sales supported scienter where none of the executives had previously sold stock and all sales occurred within three months of the first corrective disclosure).

***Ms. Thunen***. Plaintiff alleges that Thunen sold 180,174 shares of stock, "almost 40% of her holdings" during the class period. ¶166. Courts have found much larger percentages insufficient to plead scienter. *Supra* at 19; *Ronconi v. Larkin*, 253 F.3d 423, 435-36 (9th Cir. 2001) (sales by seven insiders in excess of 69% insufficient where timing of sales was not suspicious). Nor was the timing of Thunen's sales suspicious as all of the sales were made long before the July 8, 2025 announcement. Ex. 11. As with Kurtz, most of Thunen's stock sales were made pursuant to Rule 10b5-1 trading plans entered into before the start of the class period, further undermining an inference of scienter here. *Id.*; *supra* at 19.[14]

**2. The Secondary Offering Fails to Establish Scienter.**

Plaintiff's theory that scienter is enhanced by a May 2024 secondary offering is incorrect. ¶168. The Ninth Circuit has rejected similar "allegations of routine corporate objectives such as the desire to obtain good financing and expand." *Rigel*, 697 F.3d at 884; *In re Arrowhead Pharms., Inc. Sec. Litig.*, 782 F. App'x 572, 575

[14] Plaintiff's allegations regarding sales by non-defendants (¶¶11, 57, 167) also fail to plead scienter. Where, as here, Plaintiff "do[es] not explain how stock sales by non-defendants relate to the issue of whether the defendants acted with scienter," there "is no need to consider such stock sales." *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *17 n.5 (N.D. Cal. Mar. 24, 2014). Regardless, Plaintiff fails to allege facts, such as such as percentages of holdings and past trading practices, sufficient to show that the officers' sales were suspicious. Plaintiff's "group" allegations as to the directors fail to plead *any facts* specific to each unidentified director. *Supra* at 18.

(9th Cir. 2019) (finding insufficient allegation that "Defendants made false statements in order to … raise $43.2 million in a secondary offering").

**C. The July 2025 Statements Do Not Constitute "Admissions."**

Plaintiff's attempts to convert certain statements made on July 8, 2025, at the end of the class period, into purported admissions that Defendants allegedly knew of materially declining adoption for all cohorts throughout the class period are unavailing. ¶¶67, 122, 138. As an initial matter, Plaintiff's allegations regarding the excerpted statements from the July 8, 2025 earnings call (*e.g.*, ¶122)—as with Plaintiff's other excerpts in the CAC—are incomplete and mistakenly mix different concepts. Ex. 5. Cohorts refer to annual LALs per LDD cohorts, such as 2022, 2023, and 2024. Ex. 12, at 8. As Thunen stated during the February 2025 earnings call, it was still "a little too early" in February 2025 "to look at [utilization rates for the new 2024 cohort] because it takes about a year for an account to get to roughly the same number that the previous cohorts get in aggregate." *Id.* Thunen further explained that the older cohorts "end up in just about the same place of number of LALs per LDD" (*id.*), *i.e.*, ultimately flat.

As Dr. Kurtz stated during the July 8, 2025 earnings call, "the realization that [newer] customers require more support to get started and to move up the adoption curve is ***what has changed over the last few quarters***," *i.e.*, 1Q25 and 2Q25. Ex. 5, at 8 (emphasis added). During that same period, RxSight was trying to ascertain the effect of various factors, such as macroeconomic headwinds, launches of new competing premium IOLs, and abrupt changes in consumer sentiment late in 1Q25 and 2Q25, all of which it disclosed. *Supra* at 4-5. Moreover, Plaintiff disregards that the biggest contributor to the 2Q25 revenue shortfall and reduced FY2025 guidance—that led to the filing of this lawsuit—was a significant drop in new LDD sales, which occurred late in the quarter. *Supra* at 5. The evolving environment in

the first half of 2025 in no way constitutes an admission that any earlier class period statement was knowingly or deliberately false when made.

Regardless, courts have recognized that "[s]tatements by defendants reflecting that they were aware of some signs of a slow down" before the end of the class period "is not tantamount to an admission of wrongdoing, and does not create a strong inference of scienter." *In re SunPower Corp. Sec. Litig.*, 2018 WL 1863055, at *3 (N.D. Cal. Apr. 18, 2018); *Carr*, 2021 WL 3913509, at *12 ("an assertion of fraud by hindsight" is "insufficient under the PSLRA").[15]

**D. The CAC Does Not Support a Core Operations Inference.**

As the Ninth Circuit has "cautioned," the core operations inference will "generally fall short of a strong inference of scienter," '"absent some additional allegation of specific information conveyed to management and related to the fraud' or other allegations supporting scienter." *In re NVIDIA Sec. Litig.*, 768 F.3d 1046, 1063-64 (9th Cir. 2014) (citation omitted). None of the factors that the Ninth Circuit has identified for invoking the doctrine are present here: (i) there are no allegations that, when read in combination with the CAC's core operations allegations, give rise to a strong inference of scienter; (ii) the CAC alleges no facts concerning "'specific information conveyed to management and related to the fraud'"; and (iii) the circumstances fall far short of those so "unusual" that it would be "absurd" not to impute scienter. *Id.*[16]

**E. The CAC Allegations Fail Both Individually and Holistically.**

"When conducting [a] holistic review," courts "must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter."

---

[15] Defendants' July 8, 2025 statements also do not say anything about inadequate field support (¶122), nor do the statements regarding a "commercial pivot" suggest to the contrary. Ex. 5.

[16] The allegation that the RxSight system was RxSight's "sole product" (¶160) is insufficient. *See Carr*, 2021 WL 3913509, at *12 (rejecting "only product" allegations without further details).

*Zucco*, 552 F.3d at 1006 (quoting *Tellabs*, 551 U.S. at 323). When considered holistically, Plaintiff's conclusory allegations—bereft of witness statements, contemporaneous internal documents, or inconsistent statements or actions by Defendants—do not overcome the competing inference that Defendants (correctly) believed RxSight's system was effective, that customer adoption and utilization growth would continue, were surprised when 2Q25 sales dropped off at the very end of the quarter, and promptly disclosed emerging challenges and disappointing results when they encountered them. Defendants' "[h]onest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness," *Ronconi*, 253 F.3d at 432.

## V. THE SECTION 20(A) CLAIM ALSO FAILS

Because the Section 10(b) claims fail, the Section 20(a) claim should be dismissed. *Intuitive Surgical*, 759 F.3d at 1064 n.6.

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed.

Dated: February 13, 2026

WILSON SONSINI GOODRICH & ROSATI,
Professional Corporation

By: /s/ *Gregory L. Watts*
Gregory L. Watts
Email: gwatts@wsgr.com

*Attorneys for Defendants RxSight, Inc., Ron Kurtz, and Shelley Thunen*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants RxSight, Inc., Ron Kurtz, and Shelley Thunen, certifies that this brief contains 6,991 words, which complies with the word limit of L.R. 11-6.1.

/s/ *Gregory L. Watts*

Gregory L. Watts