# EXHIBIT A

2026 WL 790911
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

In re The Trade Desk, Inc. Securities Litigation, et al

Case No. 2:25-cv-01396-CAS-DFMx
|
Filed 03/17/2026

**Attorneys and Law Firms**

Catherine Jeang, Deputy Clerk, Attorneys Present for Plaintiffs: Not Present

Not Present, Court Reporter / Recorder, N/A, Tape No., Attorneys Present for Defendants: Not Present

Benjamin M. Crosson, Caz Hashemi, Wilson Sonsini Goodrich and Rosati PC, Palo Alto, CA, Jessica L. Snorgrass, Wilson Sonsini Goodrich and Rosati, Los Angeles, CA, for The Trade Desk, Inc., Jeffrey Terry Green, Laura Schenkein.

Caz Hashemi, Wilson Sonsini Goodrich and Rosati PC, Palo Alto, CA, for Samantha Jacobson.

**Proceedings:** (IN CHAMBERS) - MOTION TO DISMISS FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Dkt. 80, filed on October 14, 2025)

The Honorable CHRISTINA A. SNYDER

## I. INTRODUCTION

**\*1** On February 19, 2025, United Union of Roofers, Waterproofers & Allied Workers Local Union No. 8 WBPA Fund filed a class action complaint against The Trade Desk, Inc. ("TTD"), Jeffrey Terry Green ("Green"), and Laura Schenkein ("Schenkein") for violations of the federal securities laws. Dkt. 1. On June 4, 2025, the Court granted the motion of Arkansas Public Employees' Retirement System ("APERS") and Public Employees' Retirement System of Mississippi ("MissPERS") for appointment as Lead Plaintiff, approval of their selection of Lead Counsel, and consolidation of related actions. Dkt. 64.

On August 15, 2025, Lead Plaintiff filed the operative first amended consolidated class action complaint against defendants TTD, Green, Schenkein, and Samantha Jacobson ("Jacobson") (collectively, "defendants") for violations of the

federal securities laws. Dkt. 75 ("FAC"). Lead Plaintiff brings this action on behalf of Lead Plaintiff and a class consisting of all persons and entities that purchased TTD common stock from November 15, 2023, through August 8, 2025 (the "Class Period"). Id. at 1.

The FAC asserts three claims for relief: (1) violations of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) promulgated thereunder against all defendants; (2) violations of Section 20(a) of the Exchange Act against defendants Green, Schenkein, and Jacobson (the "executive defendants"); and (3) violations of Section 20A of the Exchange Act against the executive defendants. FAC ¶¶ 287-306.

On October 14, 2025, defendants filed a motion to dismiss, dkt. 80 ("Mot."), and a request for judicial notice and notice of incorporation by reference of certain SEC filings, investor call transcripts, analyst reports, and publicly available articles, press releases, web content, and video., dkt. 81 ("RJN"). [1]

On December 12, 2025, Lead Plaintiff filed an opposition to the motion to dismiss. Dkt. 84 ("Opp."). On January 22, 2026, Lead Plaintiff filed a notice of supplemental authority. Dkt. 85.

On January 26, 2026, defendants filed a reply in support of the motion to dismiss. Dkt. 86 ("Reply"). On February 17, 2026, defendants filed a response to Lead Plaintiff's notice of supplemental authority. Dkt. 90.

On March 16, 2026, the Court held a hearing. Having carefully considered the parties' arguments and submissions, the Court finds and concludes as follows.

## II. BACKGROUND

Lead Plaintiff alleges the following facts in the FAC:

### A. The Parties

APERS and MissPERS are pension funds for the benefit of the current and retired public employees of Arkansas and Mississippi. FAC ¶¶ 20-21. APERS provides benefits to over 60,000 retirees, manages over $12 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 200,000 current public employees. Id. ¶ 20. During the Class Period, APERS purchased 228, 475 shares of TTD common stock, and lost more than $12,608 million as a result of such purchases. Id. (citing FAC Ex.

1). MissPERS provides benefits to over 75,000 retirees, manages over $33 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current public employees. Id. ¶ 21. During the Class Period, MissPERS purchased 350,179 shares of TTD common stock, and lost more than $7.185 million as a result of such purchases. Id. (citing FAC Ex. 2).

**\*2** TTD is an advertising technology company incorporated in Nevada and headquartered in Ventura, California, that operates a digital platform that helps advertisers place advertisements, including on websites, podcasts, and streaming services. Id. ¶ 22. TTD was founded in 2009 and completed its initial public offering ("IPO") in September 2016. Id. Following its IPO, TTD's common stock has traded on the NASDAQ under the ticker symbol "TTD." Id.

Green co-founded TTD in 2009 and has since been TTD's Co-Founder, Chief Executive Officer ("CEO"), and Chairman. Id. ¶ 23. In his role as CEO, Green signed TTD's Forms 10-Q and 10-K and spoke publicly on behalf of TDD, including on earnings calls, to analysts, on TTD's social media platforms, and to the press. Id.

Schenkein was announced as TTD's Chief Financial Officer ("CFO") on May 10, 2023, and she held that role from June 2023 to August 7, 2025. Id. ¶ 24. Prior to her role as CFO, Schenkein was TTD's director of Financial Planning & Analysis since 2014. Id. In her role as CFO, Schenkein signed TTD's Forms 10-Q and 10-K and spoke publicly on behalf of TDD, including on earnings calls, to analysts, on TTD's social media platforms, and to the press. Id.

Jacobson has been TTD's Chief Strategy Officer and Executive Vice President since February 2022 and joined TTD's board in January 2024. Id. ¶ 25. In her roles, Jacobson signed TTD's Forms 10-K and spoke publicly on behalf of TTD, including at advertising technology conferences and on Trade Desk's social media platforms. Id.

Lead Plaintiff alleges that the executive defendants directly participated in the management of TTD's operations and had direct and supervisory involvement in TTD's day-to-day operations. Id. 26. Lead Plaintiff alleges that the executive defendants each had the ability to control and did control TTD's statements to investors, including in TTD's press releases and on its websites. Id. Lead Plaintiff alleges that the executive defendants were responsible for and involved in drafting, reviewing, approving, publishing, and making

TTD's public statements, including the false and misleading statements and omissions alleged in the FAC. Id.

### B. TTD's Business and Revenue Model

TTD is an advertising technology company that purports to help advertisers optimize their advertising budgets across digital formats, including connected television, webpages, social media, podcasts, mobile devices, computers, and streaming devices. FAC ¶ 27. Advertisers want to obtain views or "impressions," by their target audience that are most likely to result in a purchase, subscription, or other desired action by the target audience at the lowest possible price. Id. ¶ 28. TTD tracks and collects vast amounts of information about audiences and ad publishers. Id. ¶ 29. TTD claims to use proprietary technology and algorithms to analyze that data and then optimally bid on its clients' behalf to place ads in digital spaces (like banners on the top of a website or pop-ups on a mobile device) that will yield the highest quality ad impressions. Id. This type of ad-buying is known as "programmatic advertising." Id. TTD does this through its platform, which is the tool by which clients design and execute their ad campaigns. Id. ¶ 30. The platform consists of a front end, the user experience ("UX") or user interface ("UI") through which clients interact with the platform, and a back end, the engineering that matches a client's ads with available ad space based on underlying data and the client's chosen settings or parameters. Id.

**\*3** TTD's revenue generation is dependent on clients not just signing up to use TTD's platfonn but actually spending money on it instead of on competitor platforms. Id. ¶ 31. Specifically, TTD only generates revenue by charging its clients a platform fee based on a percentage of a client's total spending on advertising and from providing data and other value-added services and platfonn features to clients. Id. According to Lead Plaintiff, TTD's success rises and falls on the quality of, clients' adoption of, and clients' engagement with its platform. Id.

### C. TTD's Transition to Kokai

In 2021, TTD launched its then-latest ad-buying platform, Solimar. FAC ¶ 32. According to multiple unnamed former employees, TTD's clients found Solimar useful, productive, and easy to operate. Id. On June 6, 2023, TTD launched Kokai, a new iteration of TTD's platform, to replace Solimar. Id. ¶ 33.

### D. Defendants' Representations about Clients' Adoption of Kokai

Lead Plaintiff alleges that defendants made several positive statements about clients' adoption of Kokai despite allegedly knowing and omitting that Kokai adoption was significantly slower than represented and that large numbers of clients detested Kokai, rejecting it entirely or at least refusing to increase their spending on it. FAC ¶ 42.

As of August 2024, only 5-10% of FE5's [2] portfolio's clients had adopted Kokai and only approximately 18% of FE6's [3] client business had moved to Kokai. Id. 44. By the end of 2024, only 50% of TTD's clients had adopted Kokai. Id. ¶ 43.

According to Lead Plaintiff, a personnel vacuum, including the termination of Christine Jennings, the Vice President of Product Marketing, in September 2023 just weeks after Kokai's launch, contributed to slow adoption of Kokai. Id. ¶ 50-51.

### E. Defendants' Alleged Knowledge of Lagging Kokai Adoption

Lead Plaintiff alleges that defendants knew about Kokai's actual lagging adoption rates. Id. ¶ 52. Multiple TTD former employees stated that the executive defendants received regular reports detailing in real-time Kokai's lagging adoption rates throughout the Class Period. Id. Multiple former employees also stated that Kokai's adoption rates were discussed in weekly all-hands meetings held throughout the Class Period, which were led by Green and attended by Schenkein and Jacobson. Id. ¶ 59.

### F. TTD's Alleged Manipulation of Adoption Metrics

Lead Plaintiff alleges that defendants manipulated how they were counting which clients had "adopted" Kokai in an effort to maintain an image of Kokai's quick adoption and popularity. FAC ¶ 48. Specifically, Lead Plaintiff alleges that defendants counted clients who primarily were still working through the Solimar platform as having adopted Kokai. Id. FE6 explained that TTD personnel were encouraged by TTD management to push certain line items over to Kokai from Solimar, so the client could access the same business on either platform, and then TTD would claim the account had been migrated to Kokai and had been "adopted" by the client. Id.

Lead Plaintiff also alleges that TTD forced clients onto Kokai, often over their express objections, in order to further boost adoption numbers. Id. 49. According to an unnamed director of a marketing company for TTD clients, TTD forced certain client accounts to migrate from Solimar to Kokai, despite repeated protests from those clients about the new platform's poor performance. Id. According to the unnamed director, the director's clients began noticing these forced changes in December 2024. Id. FE5 also stated that TTD personnel were encouraged to send clients emails pushing them to adopt Kokai, even when they did not want to switch platform. Id.

### G. Defendants' Representations about Kokai's Performance Issues

 *4  Lead Plaintiff alleges that throughout the Class Period, defendants repeatedly claimed that Kokai offered a simple and effective interface with the features that clients needed, streamlined first-party data integration, and offered other improvements over predecessor and competitor products. FAC ¶ 62. Lead Plaintiff alleges that, in reality, defendants concealed from investors that Kokai had numerous and serious product defects that prevented clients from performing key functions and made Kokai worse than Solimar and competitor products, thereby impeding adoption and revenue growth. Id. ¶ 71.

Lead Plaintiff alleges that defendants touted the key performance indicators ("KPIs") for Kokai while concealing from investors and the public the truth that many of KPIs were totally unreliable, not offered in Kokai, or still in development. FAC 72.

One of Kokai's purported key KPI's was "Relevance," which measures how similar the audiences an advertiser is reaching are to the audience an advertiser intends to target. Id. ¶ 73. According to FE1, Kokai's "Relevance" metric might not accurately reflect how relevant the reached audience was because FE1 was not aware of any "sensitivity analysis" used to calibrate Kokai's "Relevance" metric. Id. ¶¶ 75-76.

Lead Plaintiff also alleges that Kokai's interface did not support "programmatic guarantee" deals, which permit clients to contract with a publisher to buy a certain volume of ad slots at a fixed price. IT 77. "Programmatic guarantee deals" are a highly popular method of purchasing ad space for TTD clients because they assure clients that their ads will be placed somewhere. Id. FE1, FE5, and FE9 stated that Kokai did not support programmatic guarantee deals and, because of that, customers resisted transitioning to Kokai. Id. ¶ 78.

Lead Plaintiff also alleges that, contrary to defendants' representations, Kokai's "Sellers & Publishers 500 Plus list" did not actually function. Id. ¶ 80. Specifically, it did not identify the highest quality publishers with which to advertise. Id.

Lead Plaintiff also alleges that Kokai was unable to "seed" the platform because it could not effectively integrate first-party data for many industries. Id. ¶ 85. First-party data can include demographics, background, spending habits, personal interests, and political interests. Id. 86. "Seeding" is a process of combing through first-party data to find patterns that can be used to find other customers in databases that are likely to exhibit similar behavior. Id. If first-party data were effectively integrated into Kokai, advertisers would be able to use that data set to specify which types of customers the client would like to target in its ad campaign, using parameters like age, location, and spending habits. Id. Lead Plaintiff alleges that defendants told investors that clients could "seed" a target audience, but FE2, FE6, and FE11 stated that clients in key sectors were either unable to integrate their data or unwilling to pay for the data that had been integrated and thus unable to utilize the seeding functionality. Id. ¶¶ 87-97.

Lead Plaintiff also alleges that Kokai suffered from significant problems with "pacing," which is how a client's money is spread out over a campaign's lifecycle. Id. ¶ 103. Inefficient pacing can result in ad campaigns spending money too fast or too slowly. Id.

Lead Plaintiff also alleges that Kokai's user interface was unnavigable and created significant inefficiencies for clients that deterred them from adopting and spending on the platform. Id. ¶ 105. According to Lead Plaintiff, the interface was confusing, tremendously unpopular with TTD clients, and deterred rather than facilitated increased spending on Kokai. Id. Customers reported that the interface directly impeded functionality on Kokai. Id. ¶ 107.

 *5 Lead Plaintiff alleges that Kokai reduced functionality from Solimar, contrary to defendants' claims that Kokai was an upgrade, and the fundamental defects in Kokai's platform significantly impeded TLD's revenue growth. Id. ¶¶ 113, 121.

### H. Defendants' Alleged Knowledge of Kokai's Performance Issues

According to Lead Plaintiff, the executive defendants had direct knowledge of Kokai's deficiencies. FAC ¶ 81. Green was directly informed about the "Relevance" metric issues.

Id. Through the Tableau dashboard, the executive defendants requested and had access to KPI data throughout the Class Period that showed metrics not working as represented. Id. Poor KPI results were also confirmed through direct client feedback. Id. ¶ 82. FE1 was told by a colleague that Green was aware of Kokai's pacing issues and Green attended meetings with product managers where Kokai's pacing problems were discussed. Id. ¶ 104.

According to Lead Plaintiff, as early as Kokai's launch in June 2023, defendants knew that its clients were dissatisfied with Kokai and that the interface deterred adoption. Id.¶108.

According to Lead Plaintiff, the executive defendants knew through weekly meetings that, contrary to their public statements touting Kokai's interface, design, efficacy, performance, and features, TTD's clients were regularly reporting that they thought that Kokai's interface and design was hugely problematic and difficult to use, that its efficacy and performance were poor, and that many of its features were not even developed. Id. ¶ 249.

### I. The Truth Regarding Kokai's Adoption and Performance Issues Becomes Publicly Known

On February 12, 2025, after market close, TTD issued its fourth quarter 2024 results, and, for the first time in TTD's history, TTD fell far short of its stated revenue expectations of $756 million. FAC ¶ 128. In an earnings call on February 12, 2025, Green explained that Kokai execution errors and slow adoption was the cause of the revenue miss. Id. ¶ 129. Green admitted that "Kokai rolled out slower than we anticipated," and that because TTD had not yet reached full adoption of Kokai, "today we're maintaining two systems, Solimar and Kokai." Id. Green added that "[s]ome clients are still transitioning from our previous platform," and that the revenue miss was not due to macroeconomic factors or issues out of TTD's control. Id. Defendants admitted that the miss was "our fault," with TTD forced to take "full ownership of the shortfall." Id. 129, 228-29. Analysts reported "a slower than expected deployment of Kokai, falling short of its expectations to reach 50% of its install base and impacting results." Id.¶ 132.

On March 11, 2025, after markets closed, *AdWeek* published an expose based on interviews of twelve industry insiders— including two ad publishers, a tech partner, and nine brand and agency ad buyers—who used TTD as their primary demand-side platform. Id. ¶ 136. The expose allegedly revealed that Kokai performance was not what defendants claimed.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Id. The article described how, rather than driving growth through its improved performance, Kokai "greatly reduced the use and function of [TTD's] buying platform." Id. ¶ 37. The article described how Kokai had been met with "widespread resistance among media buyers," and ad buyers were "reluctant to use it." Id. The article detailed how the new interface was "not intuitive," but rather it "force[d] media buyers to learn an entirely new workflow that feels disconnected from industry norms." Id. While the *AdWeek* article was protected by a paywall, over the following two days, the article's critiques were highlighted on social media by accounts with thousands of followers. Id. ¶ 138.

**\*6** According to Lead Plaintiff, "[t]he *Adweek* expose revealed what many inside TTD had known for almost two years: that Kokai was not a state-of-the-art, revolutionary ad selling technology, but instead a defective platform—built upon a wholly untested design with unstable performance indicators—which clients refused to voluntarily adopt." Id. ¶139.

On August 7, 2025, after markets closed, TTD released its second quarter 2025 earnings, which Lead Plaintiff alleges revealed the full truth, including further delays in Kokai's adoption and an expected slow down in revenue. Id. ¶ 142. Green admitted that only three-quarters of client spend was through Kokai, and that key Kokai features were still not developed, including a feature intended to address the pacing issues as well as performance. Id. ¶¶ 47, 142. Client spend on Kokai as a percent of overall spend had increased only 8% as compared with TTD's previous earnings report. Id. ¶ 142.

### J. Executive Defendants' Stock Sales During the Class Period

According to Lead Plaintiff's analysis of publicly available trading data reported to the SEC on Form 4, the executive defendants sold over $465 million of their stock during the Class Period. FAC 145, 147.

Green sold 4,081,128 shares of his TTD stock during the Class Period, for proceeds of more than $443 million. Id. ¶ 148. Green sold over five times more shares during the Class Period than he sold during a control period of February 20, 2022, to November 14, 2024 (the "Control Period"). Id. ¶ 151. Green sold 225,000 of his shares for $18.6 million on February 21 and 23, 2024, approximately one week after one of his allegedly false or misleading statements on February 15, 2024. Id. ¶154. Green sold 400,000 shares for $48.3 million on February 11, 2025, just one day before

the February 12, 2025 disclosure that Kokai's slow adoption caused TTD's first revenue miss ever, which caused TTD's stock price to fall 33 percent. Id. ¶ 157.

Schenkein sold 169,840 shares of TTD stock during the Class Period, for proceeds of more than $18 million. Id. ¶ 149. In addition, during the Class Period, 34,162 shares of Schenkein's TTD stock, or just over $9 million, were withheld to pay for her personal taxes in connection with Company-issued stock. Id. Schenkein sold over fifty times more shares during the Class Period than she sold during the Control Period. Id. ¶ 151. Schenkein sold 2,613 of her shares for $173,712 on November 17, 2023, just two days after one of her alleged false or misleading statements. Id. ¶ 153. Schenkein sold 3,391 of her shares for $303,596 on February 16, 2024, just one day after alleged false or misleading statements by Green. Id. ¶ 154. Between August 22 and August 26, 2024, after an alleged false or misleading statement by Green on an August 8, 2024 earnings call, Schenkein sold 3,130 of her shares for $310,903. Id. ¶ 155. On November 7, 2024, the same day as multiple alleged false or misleading statements by Green, Schenkein sold 27,687 of her shares for $3.5 million. Id. ¶ 156.

Jacobson sold 71,697 shares of TTD stock during the Class Period, for proceeds of more than $7 million. Id. ¶ 150. In addition, during the Class Period, 17,284 shares of Jacobson's TTD stock, or just over $1.6 million, were withheld to pay for her personal taxes in connection with Company-issued stock. Id. On August 12, 2024, just four days after an alleged false or misleading statement by Green on an earnings call, Jacobson sold 21, 162 of her shares for over $2 million. Id. ¶ 155.

**\*7** Lead Plaintiff alleges that the executive defendants were able to avoid approximately $320 million in losses by selling unusually large amounts of stock before the corrective disclosures. Id. ¶¶ 159-162. [4]

Lead Plaintiff alleges that the executive defendants' stock sales were made contemporaneous to Lead Plaintiff's purchases of TTD common stock. FAC ¶¶ 168-171.

### III. LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in a complaint. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than

labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id. "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

Federal Rule of Civil Procedure 9(b) governs fraud claims, including securities fraud actions. Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014). A federal securities fraud suit is also subject to the demanding pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Enacted by Congress in 1995 to provide "protections to discourage frivolous [securities] litigation," H R. Conf. Rep. No. 104-369, 104th Cong., 1st Sess. at 32 (Nov. 28, 1995), the PSLRA strengthened the already-heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Under the PSLRA, private actions based on allegations of material misstatements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1061 (9th Cir. 2008).

In addition, the PSLRA imposes strict requirements for pleading scienter in actions brought pursuant to Section 10(b) and Rule 10b-5, requiring that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The Ninth Circuit has held that "a private securities plaintiff proceeding under the [PSLRA] must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." In re Silicon Graphics, Inc., 183 F.3d 970, 974 (9th Cir. 1999). In determining whether a plaintiff has sufficiently pleaded scienter, a court must consider "whether the totality

of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." Nursing Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 938 (9th Cir. 2003)). Moreover, "[i]n determining whether a strong inference of scienter exists, [a court] must consider all reasonable inferences, whether or not favorable to the plaintiff." Id.

**\*8** Certain statements are not actionable under the PSLRA because they fall within its safe-harbor provision. Specifically, the Safe Harbor Provision, 15 U.S.C. § 78u-5(c), provides that defendants shall "not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that" the statement is identified as forward-looking and accompanied by meaningful cautionary statements. Forward looking statements include statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(l)(B).

## IV. DISCUSSION

### A. Request for Judicial Notice and Incorporation by Reference

Defendants have requested judicial notice of thirty-two documents ("Mot. Ex. 1-32") cited in its motion to dismiss. RJN. Defendants also argue that the Court may consider twenty-nine [5] of these materials under the doctrine of incorporation by reference. RJN at 6-10.

Lead Plaintiff does not oppose defendants' request, see dkt. 87, but argues in its Opposition that "[e]xtrinsic exhibits proffered by [d]efendants may not be considered to resolve factual disputes." Opp. at 5 n.5 (citing Kuhn v. Three Bell Cap., 698 F. Supp. 3d 1119, 1122 (N.D. Cal. 2023)).

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).

Pursuant to the Federal Rules of Evidence, the Court may take judicial notice of a fact "that is not subject to reasonable dispute because it... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "[U]nder Federal Rule of Evidence 201, a court may take judicial notice of matters of public record." Lee v. City of Los Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001). Defendants request judicial notice of TTD's SEC filings, conference call transcripts and analyst reports. RJN at 1-5. "Courts routinely take judicial notice of these types of documents for the purpose of determining what information was available to the market." In re Splunk Inc. Sec. Litig., 592 F. Supp. 3d 919, 930 (N.D. Cal. 2022). Defendants also request judicial notice of two *AdWeek* articles, a Reddit thread, a screenshot of a webpage, and a YouTube video. RJN at 5-6. Documents on "publicly available websites" are proper subjects of judicial notice. See Calhoun v. Google LLC, No. 20-CV-05146-LHK, 2021 WL 1056532, at *5 (N.D. Cal. Mar. 17, 2021). However, "[b]ecause the truth of the matters asserted in these documents is subject to a reasonable dispute, ... the Court will take judicial notice of the statements in these documents, but not for the truth of the matters asserted therein or for the purpose of resolving factual disputes. See Khoja, 899 F.3d at 999-1001.

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." Khoja, 899 F.3d at 1002. "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom— their claims." Id. "Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). Here, defendant argues that the Court may consider the full contents of twenty-nine documents as incorporated by reference in the FAC. RJN at 8. The Court will consider the majority of these documents, including all of the judicially noticed SEC filings, conference call transcripts, and analyst reports. Additionally, the Court will consider: (1) the *AdWeek* article published on March 11, 2025, Ex. 17; and (2) the "Sellers and Publishers 500+" YouTube video, Ex. 32. The *AdWeek* article is referenced in six paragraphs of the complaint and forms the basis of Lead Plaintiff's allegation of loss causation. See FAC ¶¶ 2, 79, 136, 137, 236, 237. The "Sellers and Publishers 500+" video is

referenced in three paragraphs of the complaint and includes an alleged material misrepresentation. See id. ¶¶ 193-195. However, the Court does not consider the Reddit thread, Ex. 18, or the *AdWeek* article published on June 5, 2025, Ex. 31, as being incorporated by reference. These materials are not referenced extensively in the FAC and do not form the basis of any claims. Id. ¶¶ 113, 115, 126.

**B. Section 10(b) and Rule 10b-5 Fraud Claim**

**\*9** "Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014). To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611, 619 (9th Cir. 2022) (quoting Halliburton, 573 U.S. at 267).

Here, defendants' motion to dismiss Lead Plaintiff's Section 10(b) and Rule 10b-5 claim focuses on elements (1), (2), and (6) above.

1. Alleged Misrepresentations

Lead Plaintiff challenges two categories of statements made by defendants: (a) statements regarding TTD's clients' adoption of Kokai; and (b) statements regarding Kokai's performance and features.

Defendants argue that many of defendants' alleged misrepresentations are inactionable puffery and/or forward-looking statements protected by the PSLRA safe harbor. Mot. at 6-7. Defendants also argue that the FAC's allegations do not adequately plead falsity. Id. at 14-19. Defendants argue that Lead Plaintiff's overarching theory that defendants' positive statements are misleading by omission is not adequately pled because the allegations in the FAC do not demonstrate that defendants had a duty to disclose material information that was not disclosed or that defendants' statements gave a material misimpression of TTD's state of affairs. Id. at 8-12.

In opposition, Lead Plaintiff argues that the FAC adequately alleges false or misleading statements. Opp. at 2. Lead Plaintiff argues that defendants' statements regarding the adoption of Kokai were false, or, at a minimum, misleading because, having chosen to tout Kokai's adoption, defendants were obligated but failed to disclose the "adverse information that cuts against the positive information." Id. at 2-3 (quoting Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 706 (9th Cir. 2016)). Specifically, Lead Plaintiff argues that defendants "were required to disclose that adoption lagged and was slower than publicly represented; customers were reducing spending and switching to competitors due to material defects with Kokai; and TTD's publicly reported adoption metrics were manipulated and inflated." Id. at 3.

Lead Plaintiff also argues that the PSLRA's safe harbor for forward-looking statements does not protect defendants because the alleged misstatements were not purely forward-looking. Id. at 13. Lead Plaintiff argues that the safe harbor only applies to misstatements, not omissions. Id. Lead Plaintiff argues that defendants failed to provide the meaningful cautionary language necessary to invoke the safe harbor. Id. at 14. Lead Plaintiff argues that the alleged misrepresentations are actionable because they went beyond merely conveying optimism about Kokai and inaccurately told investors that Kokai had specific capabilities and had been adopted by a high percentage of its customers when it did not. Id. at 15, 18. Lead Plaintiff argues that even if some statements were opinions, they are actionable because they did not align with the information in defendants' possession at the time. Id. at 18.

In reply, defendants argue that the FAC attempts to transform a typical technology product launch into securities fraud. Reply at 1. Defendants argue that Lead Plaintiff's Opposition concedes that many challenged "defect" and adoption statements were not "technically false." Id. Defendants argue that Lead Plaintiff's omissions theory does not satisfy particularity pleading requirements or explain how any statement affirmatively created an impression of a state of affairs that differs in a material way from the one that actually exists. Id. at 1-2. Defendants argue that a duty to disclose adverse information that cuts against positive statements arises only if an omission would make the positive statements misleading. Id. at 6. Defendants further argue that Lead Plaintiff fails to adequately allege the existence of purported adverse information that would make defendants' statements misleading. Id. Defendants argue that their puffery statements are inactionable and distinguishable from the cases

cited by Lead Plaintiff where particularized, verifiable well-pled facts directly contradicted public statements. Id. at 10. Defendants argue that even if defendants' statements were not purely forward-looking, the forward-looking portions of defendants' statements are protected by the PSLRA's safe harbor. Id. Defendants argue that Lead Plaintiff erroneously argues that the safe harbor does not apply to "omissions." Id. (citing Golub v. Gigamon, Inc., 847 F. App'x. 368, 373 (9th Cir. 2021)). And defendants argue that TLD did provide meaningful cautionary language for the safe harbor to apply. Id. at 11. Defendants further argue that opinion statements are generally not actionable, and the FAC fails to allege particular and material facts going to the basis for each opinion to show that the opinion did not fairly align with the information in defendants' possession. Id.

**\*10** Lead Plaintiff alleges that defendants' statements relating to the adoption of Kokai were "false and misleading." See generally FAC. "Falsity is alleged when a plaintiff points to defendant's statements that directly contradict what the defendant knew at that time." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted). "Even if a statement is not false, it may be misleading if it omits material information." Id. at 1008-1009 (citation omitted). To be false or misleading, "a statement must be 'capable of objective verification.' " Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co., 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014)).

Defendants' challenged statements relating to the adoption of Kokai generally consist of: (1) reporting the then-present levels of adoption of Kokai by clients, FAC ¶¶ 212, 215, 220; (2) projecting when Kokai will achieve full adoption by clients, id. ¶¶ 174, 212, 215, 220; and (3) opining that Kokai adoption was "phenomenal," "incredibly encouraging," and "exciting," id. ¶¶ 177, 204, 208, 210, 221.

Defendants argue that their challenged statements were: not "technically false," Reply at 1; forward-looking statements protected by the PSLRA's safe harbor, Mot. at 7; and inactionable puffery, id. at 6. The Court finds that Lead Plaintiff adequately alleges actionable, material misrepresentations to survive a motion to dismiss.

First, defendants' statements of Kokai's then-present adoption rates are plainly "capable of objective verification." Hewlett-Packard, 845 F.3d at 1275. Lead Plaintiff adequately alleges

that these publicly reported adoption rates were misleading because defendants "manipulated" the adoption metrics by counting clients who were primarily still working through Solimar as having adopted Kokai. Id. ¶ 48. A reasonable investor may understand reported "adoption" metrics to exclude clients who primarily use an older company platform. This is a question of fact that cannot be decided on a motion to dismiss.

Second, defendants' projections of the timing of full Kokai adoption are adequately alleged to be unprotected by the PSLRA's safe harbor for forward-looking statements. Lead Plaintiff factually alleges that defendants had actual knowledge that adoption was lagging and slower than represented. FAC ¶ 277. And Lead Plaintiff alleges that defendants did not accompany those projections with "meaningful cautionary statements identifying important factors that could cause actual results to differ materially." 15 U.S.C. § 78u-5(c)(l); see FAC ¶ 276. A material, forward-looking statement by an individual is protected by the PSLRA's safe harbor only if the statement *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1141 (9th Cir. 2017) (emphasis in original) (citing In re Cutera Sec. Litig., 610 F.3d 1103, 1112-13 (9th Cir. 2010)). These are also factual issues that cannot be resolved against Lead Plaintiff on a motion to dismiss. [6]

**\*11** Third, defendants' opinion statements regarding how well Kokai adoption was progressing are adequately alleged to be actionable misrepresentations. [7] "Generally, 'vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers' are held to be inactionable 'puffing' because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.' " Retail Wholesale Dep't Store Union Loc. 338 Ret. Fund v. Stitch Fix, Inc.. 790 F. Supp. 3d 763, 778 (N.D. Cal. 2025) (quoting Cutera, 610 F.3d at 1111). However, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience." Omnicare, Inc, v. Laborers Dist. Council Const. Indus. Pension Fund, 575 U.S. 175, 188 (2015). "To state a claim that an opinion is false or misleading, the investor must identify particular material facts regarding the basis for the issuer's opinion, the omission of which make

the statement 'misleading to a reasonable person reading the statement fairly and in context.' " Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc., 63 F.4th 747, 764 (9th Cir. 2023) (quoting Omnicare. 575 U.S. at 194). At the pleading stage, the Court is "required to afford the allegations in the complaint reasonable inferences and presume their truth." Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc, 166 F.4th 805, 821 (9th Cir. 2026). Here, Lead Plaintiff adequately alleges that defendants knew of and did not disclose adoption data that contradicted their positive claims regarding the pace of adoption of Kokai by TTD clients, such that defendants' statements were misleading "in light of the circumstances under which they were made." 17 CFR § 240.10b-5(b).

Accordingly, Lead Plaintiff adequately alleges material misrepresentations by defendants regarding Kokai adoption.

Defendants' challenged statements regarding Kokai's performance and capabilities are also adequately alleged. Lead Plaintiff alleges that throughout the Class Period, defendants statements misleadingly represented that Kokai offered a simple and effective interface with the features that clients needed, streamlined first-party data integration, and offered other improvements over predecessor and competitor products, when in reality, defendants allegedly knew and concealed that Kokai had numerous and serious product defects that materially impeded adoption and revenue growth. FAC ¶¶ 62-71.

While defendants argue that Lead Plaintiff's allegations that Kokai suffered from severe defects and performance issues do not withstand scrutiny, Mot. at 10, this raises a factual dispute that cannot be resolved against Lead Plaintiff on a motion to dismiss. Accepting the factual allegations of the FAC as true, Lead Plaintiff adequately alleges that defendants misled investors by making unqualified statements touting Kokai's perfonnance and capabilities while knowing material facts that contradicted those positive statements. See Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 706 (9th Cir. 2016) (" '[O]nce defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information.") (quoting Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987 (9th Cir. 2008)).

### 2. Scienter

Defendants argue that Lead Plaintiff fails to adequately allege that defendants allegedly false or misleading statements were made intentionally or with deliberate recklessness. Mot. at 19. Defendants argue that the accounts of former employees ("FE") do not support scienter because they do not offer any probative insights into any individual defendant's state of mind. Id. at 20. Defendants argue that the FAC does not allege that any FE reported to any individual defendant, attended an individual meeting with an individual defendant, or had a personal conversation with any individual defendant. Id. Defendants contend that the FEs' allegations going to defendants' knowledge are scant and largely consist of defendants receiving "Tableau" spreadsheets with metrics about Kokai, defendants monitoring social media about Kokai, and defendants discussing Kokai during all-hands meetings. Id. Defendants argue that none of these indicate scienter. Id. Defendants argue that, when considering the small percentages of defendants' shares sold during the Class Period, defendants' individual stock sales do not support scienter. Id. at 25. Defendants also contend that scienter is undermined because both Schenkein and Jacobson held more stock at the end of the Class Period than at the beginning. Id. at 26. Defendants also argue that the FAC ignores that Class Period sales were made pursuant to 10b5-l plans, which weighs against scienter. Id. Defendants also dispute Lead Plaintiff's "Additional Scienter Allegations," FAC 242-268. Id. at 27. Specifically, defendants argue that Green never admitted that Kokai adoption was not as publicly reported; that Kokai's importance does not speak to knowledge of defects; and that Schenkein's departure was not sudden or unusual. Id. Defendants argue that competing inferences undermine scienter. Id. at 28.

**\*12** In opposition, Lead Plaintiff argues that the FAC raises a strong inference of scienter. Opp. at 19. Lead Plaintiff argues that the FAC alleges data available to defendants that contradicts their alleged misrepresentations. Id. at 20. Lead Plaintiff argues that this allegation of access to reports contradicting public statements is sufficient to raise a strong inference of scienter. Id. Lead Plaintiff also argues that the FAC alleges defendants attended internal meetings where Kokai's lagging adoption and defects were discussed. Id. at 21. Lead Plaintiff argues that the timing of defendants' stock sales is highly suspicious, with multiple sales occurring on or shortly after issuance of false and misleading statements. Id. at 22. Lead Plaintiff also argues that in this case it would

be absurd to suggest that TTD's management did not know the true Kokai adoption rate or about its defects. Id. at 23. Lead Plaintiff argues that Schenkein's abrupt departure supports scienter. Id. Lead Plaintiff argues that the FAC adequately alleges facts that support the credibility of the FEs accounts, including that some FEs attended all-hands meetings led by Green and attended by Schenkein and Jacobson, and that some FEs were told by other employees about defendants' communications. Id. at 25. Lead Plaintiff argues that defendants stock sales amounting to $465 million were not small, regardless of size in percentage terms, and that stock holdings at the end of the Class Period do not rebut scienter. Id. at 26-27. Lead Plaintiff argues that defendants' stock sales made pursuant to 10b5-l plans strengthen rather than negate the scienter inference because those plans were adopted during the Class Period. Id. at 27.

In reply, defendants argue that the FEs lack reliability and personal knowledge, and the FEs' statements are themselves not indicative of scienter. Reply at 13. Defendants argue that defendants' access to Tableau reports and social media cannot support scienter because the reports and social media did not contradict defendants' public statements. Id. at 14. Defendants argue that according to the FAC, the weekly spreadsheets received by the executive defendants merely showed which customers moved to Kokai and which did not. Id. Defendants argue that FE7's report confirms the accuracy of defendants' alleged adoption statements. Id. Defendants argue that Lead Plaintiff does not contest the percentage sizes of Green and Schenkein's Class Period stock sales. Id. at 16. Defendants maintain that scienter is undermined by the fact that Schenkein and Jacobson held more stock at the end of the Class Period than at the beginning. Id. Defendants argue that Lead Plaintiff seeks to presume without factual support the executive defendants' knowledge of defects and non-adoption. Finally, defendants maintain that Schenkein's departure was not suspicious or unusual. Id. at 17-18.

" 'Scienter' as used in the federal securities laws means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.' " Glazer, 63 F.4th at 765 (quoting In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1053 (9th Cir. 2014)). "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322-23. A defendant can prevail on a motion to dismiss only if a reasonable person could not draw an inference of scienter from the pleaded facts. Id. at 323.

Here, the Court finds that Lead Plaintiff's allegations, taken collectively, give rise to a strong inference of scienter with respect to the alleged misrepresentations about Kokai's adoption. For example, FAC alleges that defendants knew of Kokai's actual "lagging adoption" by clients based on their access to data and reports that allegedly showed as much. Id. ¶¶ 52-55; Nursing Home Pension Fund, Loc. 144 v. Oracle Corp., 380 F.3d 1226, 1230 (9th Cir. 2004) ("The most direct way to show ... that the party making the statement knew that it was false is via contemporaneous reports or data, available to the party, which contradict the statement."). Furthermore, "defendants' sale of stocks helps contribute to an inference of scienter." In re BioMarin Pharm. Inc. Sec. Litig., No. 3:20-CV-06719-WHO, 2022 WL 164299, at *14 (N.D. Cal. Jan. 6, 2022). Here, Green sold approximately $48 million worth of TTD shares just one day before the alleged corrective disclosure regarding Kokai adoption. See FAC ¶¶ 152-158. [8]

**\*13** The Court also finds that Lead Plaintiff alleges facts giving rise to a strong inference of scienter with respect to defendants' alleged misrepresentations about Kokai's performance and capabilities. The FAC alleges that Green was directly informed about the Relevance metric issues and that the executive defendants requested and had access to KPI data that showed the alleged performance issues. FAC ¶ 81. The FAC also alleges that defendants knew as early as June 2023 that its clients were dissatisfied with Kokai's interface, Id. ¶ 108. The FAC also alleges that defendants attended weekly meetings where it was discussed that clients were regularly reporting that they thought that Kokai's interface and design was hugely problematic and difficult to use, that its efficacy and performance were poor, and that many of its features were undeveloped. Id. ¶ 249. "[T]aken collectively," the pleaded facts give rise to a strong inference that defendants knew their alleged positive statements touting Kokai's performance and capabilities were misleading. Tellabs, 551 U.S. at 322.

### 3. Loss Causation

Defendants argue that Lead Plaintiff fails to plausibly allege it suffered a loss proximately caused by the revelation of fraudulent activity. Mot. at 28. Defendants argue that TTD's February 12, 2025 announcement of missing its 2024 fourth quarter revenue guidance, in which Green mentioned that "Kokai rolled out slower than we anticipated," FAC ¶ 129, did not mention any wrongdoing. Mot. at 28. Defendants argue

that the lack of a revelation of fraud forecloses loss causation based on this disclosure. Id. at 28-29. Next, defendants argue that the March 11, 2025 *AdWeek* "expose" should be read with skepticism given its reliance on anonymous "industry insiders." Id. at 29. Defendants argue that the *AdWeek* article also does not reveal or even suggest fraud. Id. Finally, defendants argue that TTD's August 7, 2025 announcement of financial results, which Lead Plaintiff claims raised "concern that TTD's growth rate had slowed as a result of poor Kokai adoption," FAC ¶ 240, does not suffice for loss causation. Mot. at 29-30. Defendants argue that analysts did not attribute the downturn to Kokai but rather to increasing competition risks. Id. (citing Mot. Ex. 11, Ex. 12).

In opposition, Lead Plaintiff argues that loss causation is generally a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss. Opp. at 28. Lead Plaintiff argues that it need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied, and that corrective disclosures need not be a mirror image of the alleged misrepresentation. Id. Lead Plaintiff argues that the FAC meets these standards. Id. Lead Plaintiff argues that no specific admission of fraud is required for a corrective disclosure. Id. at 28-29. Lead Plaintiff also argues that it need not show the alleged fraud was the only cause of the stock drop. Id. at 29.

In reply, defendants argue that Lead Plaintiff ignores cases holding that loss causation can be inadequately pled. Reply at 18.

Lead Plaintiff must allege loss causation. Dura Pharms. Inc. v. Broudo, 544 U.S. 336, 347 (2005). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1210 (9th Cir. 2016) (internal citation omitted). "To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." In re Bofl Holding, Inc. Sec. Litig., 977 F.3d 781, 789 (9th Cir. 2020) (quoting Dura Pharms., 544 U.S. at 342).

Here, the FAC adequately alleges that the allegedly concealed truths—that Kokai adoption was actually lagging and that Kokai's performance and capabilities were plagued with issues—became known and caused TTD's stock price to be

reduced. The FAC alleges that Green's disclosure on February 12, 2025, revealed that Kokai adoption was slow, that some clients were still transitioning to Kokai from Solimar, and that TTD's revenue target was missed because of "small execution missteps." FAC ¶ 129. Upon these disclosures, TTD's stock decreased in value by over 30%. Id. ¶ 130. The FAC also alleges that an *AdWeek* article further revealed the allegedly concealed truth regarding Kokai's adoption and performance issues on March 11, 2025. Id. ¶¶ 136-139. Between March 11 and March 13, 2025, TTD's stock decreased in value another 11%. Id. ¶ 140. After more alleged misrepresentations relating to Kokai's adoption and performance, the FAC alleges that, on August 7, 2025, investors learned the full extent of Kokai's allegedly concealed adoption and performance issues. Id. ¶ 142. After this alleged disclosure, TTD's stock decreased in value by nearly 40%. Id. ¶ 43.

 **\*14**  To the extent that defendants contend that these disclosures did not disclose a true state of affairs that contradicted defendants' prior statements such that the disclosures did not reveal fraud, that is a question of fact. See In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate."). Defendants' argument that other factors, such as increasing competition, were the actual alternative causes of the decreases in TTD's share prices does not defeat Lead Plaintiff's adequately pled FAC. See In re Daou Sys., Inc., 411 F.3d 1006, 1025 (9th Cir. 2005) (" '[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.' ") (quoting Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 n.5 (11th Cir.1997)).

### C. Remaining Claims

Defendants argue that Lead Plaintiff's remaining claims, for violations of Section 20(a) and 20A of the Exchange Act, should be dismissed for lack of an adequately pled Section 10(b) claim. Mot. at 30. Defendants argue that the Section 20(a) claim also fails for not pleading that the executive defendants exercised the requisite control over anyone else, and the Section 20A claim also fails for not adequately alleging that the executive defendants had material nonpublic information at the times of their trades and/or 10b5-1 plan adoptions applicable to those trades. Id.

In opposition, Lead Plaintiff argues that defendants do not and cannot offer any serious challenge to the allegations that the executive defendants were controlling persons at TTD and thus are liable under Section 20(a). Opp. at 30. Lead Plaintiff also argues that the FAC's allegations as to the Section 20A claim are well-pled. Id.

In reply, defendants argue that the individual defendants cannot be liable for statements they did not allegedly personally make, nor for TTD's June 3, 2024 video. Reply at 19. Defendants also argue that Lead Plaintiff's opposition does not point to any well-pled, non-conclusory allegations that defendants possessed material nonpublic information to support the Section 20A claim. Id.

"Section 20(a) provides joint and several liability for controlling persons and requires a plaintiff to prove '(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator.' " HRSA-ILA Funds v. adidas AG, No. 24-6655, 2025 WL 3471703, at \*3 (9th Cir. Dec. 3, 2025) (quoting No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 945 (9th Cir. 2003)). "In general, the determination of who is a controlling person for purposes of liability under [Section 20(a)] is an intensely factual question." Arthur Children's Tr. v. Keim, 994 F.2d 1390, 1396 (9th Cir. 1993). Here, the FAC adequately pleads a Section 20(a) claim because the FAC adequately pled an underlying violation of Section 10(b) of the Exchange Act, and while "[a] director is not automatically liable as a controlling person," id., the FAC also alleges that each of the executive defendants signed LTD's Forms 10-K and spoke publicly on behalf of TTD.

"Section 20A provides a private right of action to any person who traded 'securities of the same class' 'contemporaneously' with an insider trader." Turocy v. El Pollo Loco Holdings, Inc., No. SA CV 15-1343-DOC-KESX, 2018 WL 3343493, at \*8 (C.D. Cal. July 3, 2018) (quoting 15 U.S.C. § 78t-l). Section 20A "focuses upon a specific problem, namely, the 'purchasing or selling [of] a security while in possession of material, nonpublic information.' " Lampf. Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 361 (1991) (quoting 15 U.S.C. § 78t-l(a)). "To plead possession" of material, non-public information, as an element of Section 20A, with the particularity required under the rule governing claims of fraud or mistake and the Private Securities Litigation Reform Act (PSLRA), "a plaintiff must allege specifically what information [a defendant] obtained,

when and from whom he obtained it, and how he used it for his own advantage." In re Silver Lake Grp., LLC Sec. Litig., 108 F.4th 1178, 1191 (9th Cir. 2024) (citation omitted) (cleaned up). Here, the FAC adequately pleads an underlying violation of Section 10(b) that is based on defendants' alleged possession of the material non-public data that allegedly demonstrated that Kokai's adoption was lagging and that Kokai had performance issues. Thus, the Court finds that Lead Plaintiff adequately alleges a Section 20A claim.

## V. CONCLUSION

**\*15** In accordance with the foregoing, the Court **DENIES** defendants' motion to dismiss.

IT IS SO ORDERED.

00 : 00

Initials of Preparer CMJ

**All Citations**

Slip Copy, 2026 WL 790911

---

**Footnotes**

1       On January 26, 2026, defendants filed a notice of non-opposition to their request for judicial notice. Dkt. 87.

2       FE5 (unnamed former employee number 5) was a Senior Trading Specialist from late 2022 to mid-2024 in TTD's New York office. FAC ¶ 44 n.9. FE5 was responsible for supporting the accounts of major tech companies in their use of Solimar and Kokai. Id.

3       FE6 was a Senior Director of Client Services at TTD from November 2023 to August 2024. FAC ¶ 44 n. 10. FE6 was responsible for TTD's relationship with a large holding company and engaged with all activities supporting that account. Id.

4       Lead Plaintiff alleges that certain of the Class Period sales by the executive defendants were made pursuant to 10b5-1 plans, but also alleges that those plans provide no safe harbor because the plans were adopted while in possession of material adverse information regarding Kokai and during the Class Period. FAC ¶ 164.

5       All of the exhibits other than Ex. 7, Ex. 26, and Ex. 28. RJN at 8-10.

6       At the hearing, defendants argued that in March 2026, TTD announced that almost one hundred percent of its clients had adopted Kokai. Defendants argued that this fact undermines Lead Plaintiff's claims of fraud. However, TTD's recent statement is not part of the FAC and cannot be considered for the truth of the matter asserted, even if it were judicially noticed.

7       The Court acknowledges that the actionability of some defendants' alleged representations which are not expressly addressed in this order, may be better decided on a more complete record in connection with a motion for summary judgment.

8       To the extent that defendants argue that scienter is undermined because the stock sales were made pursuant to 10b5-l plans, this is better decided on a more complete factual record.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.