UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-01596-FWS-KES Date: May 21, 2026
Title: In re RxSight, Inc. Securities Litigation

Present: **HONORABLE FRED W. SLAUGHTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| Rolls Royce Paschal | N/A |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
| Not Present | Not Present |

**PROCEEDINGS: ORDER DENYING DEFENDANTS' MOTION TO DISMISS [47]**

"This is a class action brought on behalf of purchasers of RxSight common stock between November 9, 2023 and July 8, 2025" against Defendants RxSight, Inc. ("RxSight"), its co-founder and Chief Executive Officer Ron Kurtz and its Chief Financial Officer Shelley Thunen "for violations of the Exchange Act and SEC Rule 10b-5 promulgated thereunder." (Dkt. 46 (Amended Complaint, "AC") ¶ 4.) Before the court is Defendants' Motion to Dismiss. (Dkt. 47 ("Motion" or "Mot.").) Lead Plaintiff Michigan Laborers' Pension Fund opposes the Motion. (Dkt. 50 ("Opposition" or "Opp.").) Defendants filed a reply in support of the Motion. (Dkt. 53 ("Reply").) The court finds this matter appropriate for resolution without oral argument. *See* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."); C.D. Cal. L.R. 7-15 (authorizing courts to "dispense with oral argument on any motion except where an oral hearing is required by statute"). Accordingly, the **hearing** set for **May 28, 2026**, is **VACATED** and **OFF CALENDAR**. Based on the record, as applied to the relevant law, the Motion is **DENIED.**

## I. Background

### A. The RxSight Business Model

"RxSight is a medical technology company that develops and sells products to treat cataracts and improve vision following cataract surgery." (AC ¶ 6.) "A cataract is the clouding

of the eye's natural lens that can lead to blindness if left untreated." (*Id.* ¶ 29.) "Cataract surgery involves removing the eye's natural cloudy lens and replacing it by implanting a clear" intraocular lens ("IOL"). (*Id.* ¶ 30.) "IOLs are classified as either 'conventional' or 'premium.'" (*Id.* ¶ 31.) Conventional IOLs, which are "typically covered by Medicare or insurance . . . and represent the majority of cataract surgeries performed in the United States," are "'monofocal,' providing vision at a single, predefined distance, but not correcting other problems often affecting cataract patients such as astigmatism and presbyopia," meaning most "patients receiving conventional IOLs require glasses following surgery." (*Id.*) Premium IOLs, which "represent about one-fifth of the cataract surgeries performed in the United States" and can cost between $1,000 and $4,000 not covered by insurance, "are intended to achieve superior results compared to conventional IOLs by providing one or more of the following benefits: vision at multiple distances including far, intermediate, and near ('multifocal'), correction of other conditions such as astigmatism and presbyopia, and reducing or eliminating the need for glasses." (*Id.* ¶ 32.) However, premium multifocal lenses "often produce side effects such as halos or glares, leading to patient dissatisfaction." (*Id.*)

Enter RxSight. Approved by the FDA in 2017, "RxSight's principal product is the RxSight Light Adjustable Lens system ('RxSight System'), which . . . is designed to address the shortcomings of existing premium [IOL] technologies and provide a solution that enables a treating physician to customize and optimize a patient's visual acuity after surgery." (*Id.* ¶¶ 6, 33, 35.) "To use the RxSight System, a doctor first performs a standard cataract procedure to implant an [intraocular, monofocal light adjustable lens ('LAL' and 'LAL+,' together 'LALs')] within a patient's eye. (*Id.* ¶¶ 6, 34.) Two to four weeks later, "the patient returns to the doctor's office and receives a diagnostic eye exam to determine the appropriate lens prescription. Using ultra-violet light generated by [a light delivery device ('LDD')], the doctor customizes or 'adjusts' the shape of the implanted LAL within the patient's eye to optimize the patient's vision." (*Id.* ¶¶ 6, 34.) After "up to three adjustments to the LAL . . . , the LAL is 'locked-in,' which prevents the LAL from being further adjusted" and may "require up to two additional visits." (*Id.* ¶ 3.)

In practice, then, to grow its business, RxSight needed two things. First, it needed "adoption," "mean[ing] that a customer such as a clinic or ophthalmology practice had

purchased an LDD," which had "an average selling price of $130,000," and "its staff had undergone all training and other education and preparation needed to begin offering LAL procedures to patients." (*Id.* ¶¶ 38-39, 46.) Second, it needed "utilization," meaning that physicians actually began providing the LAL procedures to patients. (*Id.* ¶¶ 38-39.) Surgeons paid RxSight $1,000 per LAL. (*Id.* ¶ 47.) Both adoption and utilization required "substantial field support from RxSight," including to educate and train surgeons and their staffs. (*Id.* ¶¶ 39, 52.)

"Defendants and analysts considered utilization to be a key performance metric indicating RxSight's adoption and penetration of the IOL market." (*Id.* ¶ 40.) "RxSight defined utilization as the number of LAL procedures per LDD per month, calculated by dividing the number of LAL procedures in a quarter by the total number of LDDs installed at the end of the prior quarter, divided by three." (*Id.*) "RxSight did not report utilization in its SEC filings but disclosed it in conference calls with analysts, who calculated utilization based on RxSight's reported LDD and LAL sales." (*Id.*) "In the years leading up to the Class Period, Defendants said they focused sales efforts on high volume cataract surgeons who performed 70%-80% of all premium IOL procedures in the United States. Defendants referred to each year's new RxSight customers as a 'cohort.'" (*Id.* ¶ 41.)

**B. The Alleged Misrepresentations**

The Amended Complaint alleges three categories of misrepresentations, summarized as follows:

> <u>Category 1:</u> Almost all people who get RxSight's LALs will not need glasses, and will not get glare or halos; in truth, most people still needed glasses and many complained of "waxy" vision, glare, and halos. (*Id.* ¶¶ 7, 42-45; *see, e.g.*, *id.* ¶ 78 (alleging Kurtz and Thunen made these misleading statements at a March 13, 2024 Oppenheimer Healthcare MedTech & Services Conference); *id.* ¶ 75 (alleging Kurtz and Thunen made these statements at January 10, 2024 JPMorgan Healthcare Conference).)

> Category 2: Doctors like the RxSight System, including because the customization possibilities increase surgeons' confidence in cataract surgery outcomes, increasing LAL utilization and quick returns on the LDD investment; actually, it turned out surgeons were finding post-surgical adjustments and lock-ins, which required up to five additional clinical hours, reduced profits and made LALs less economical than other premium procedures. (*Id.* ¶¶ 46-49.)
>
> Category 3: Defendants "repeatedly misrepresented after that in 2024 and 2025 that all cohorts were 'growing' and increasing utilization, and that newer cohorts were adopting more quickly than older cohorts." (*Id.* ¶ 53; *see, e.g.*, *id.* ¶ 85 (alleging Kurtz and Thunen made such statements at the May 15, 2024 Bank of America Health Care Conference); *id.* ¶ 86 (alleging Thunen made such statements at a June 18, 2024 Truist Securities MedTech Conference); *id.* ¶¶ 91-92 (alleging Kurtz and Thunen made similar stateents on a post-market earnings call in connection with RxSight's press release of its 2Q24 results).) In reality, by mid-2023, older cohorts had realized outcomes weren't superior enough to justify the increased time and cost, and newer cohorts were adopting more slowly as knowledge of limitations spread. (*Id.* ¶¶ 50-53.) Compounding the issue, "RxSight lacked adequate field support in 2024 and 2025 to continue to drive adoption and utilization in its new and existing cohorts." (*Id.* ¶ 52.)

Defendants conducted a secondary offering in May 2024 when there was "misplaced confidence" in RxSight, and Defendants and other insiders also sold $60 million of their own shares at the "artificially inflated" price. (*Id.* ¶¶ 54-58.)

"The truth was gradually revealed in a series of partial disclosures beginning in July 2024 and continuing through July 2025." (*Id.* ¶ 59.) "On July 10, 2024, Wells Fargo published results of its own survey of 50 cataract surgeons revealing that many surgeons believed that RxSight's adjustable lens technology 'increases costs without a significant improvement in

clinical outcomes' and was 'inefficient,' 'cost prohibitive,' and 'too expensive for the patients and extremely time consuming.'" "RxSight's stock price fell from $56.99 per share on July 9, 2024 to $51.11 per share on July 10, 2024 losing almost 13% of its value." (*Id.* ¶ 60.) "Defendants assuaged investor concerns, including by continuing to misrepresent on RxSight's August 5, 2024 earnings call that utilization was growing in all cohorts and newer cohorts were adopting faster" and "denied that the concerns raised in the [Wells Fargo] survey were affecting adoption, and said that all cohorts were continuing to grow and that newer customers were adopting faster." (*Id.* ¶ 61.)

## II. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). To withstand a motion to dismiss brought under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action" such that the factual allegations "raise a right to relief above the speculative level." *Id.* at 555 (citations and internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (reiterating that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). "A Rule 12(b)(6) dismissal 'can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"Establishing the plausibility of a complaint's allegations is a two-step process that is 'context-specific' and 'requires the reviewing court to draw on its judicial experience and

common sense.'" *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995-96 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679). "First, to be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Id.* at 996 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). "Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Starr*, 652 F.3d at 1216); *see also Iqbal*, 556 U.S. at 681.

Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). On one hand, "[g]enerally, when a plaintiff alleges facts consistent with both the plaintiff's and the defendant's explanation, and both explanations are plausible, the plaintiff survives a motion to dismiss under Rule 12(b)(6)." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) (citing *Starr*, 652 F.3d at 1216). But, on the other, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Eclectic Props. E.*, 751 F.3d at 996 (quoting *Iqbal*, 556 at U.S. 678). Ultimately, a claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 at 556); *accord Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

"Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014); *see* 15 U.S.C. § 78u-4(b)(2)(A). "Congress enacted the PSLRA to put an end to the practice of pleading 'fraud by hindsight.'" *See In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999). Accordingly, in securities fraud cases, plaintiffs are required to plead both falsity and scienter with particularity. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). This means that "a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement

is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This corresponds with Rule 9(b), which requires "that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong," *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (citation modified); in shorthand, allegations of fraud "must be accompanied by 'the who, what, when, where, and how' of the misconduct alleged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation modified).

## III. Discussion

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Under this rulemaking authority, the SEC promulgated Rule 10b-5, which makes it unlawful "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5. To state a claim for a violation of Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

In this case, Defendants argue dismissal is warranted because the Amended Complaint fails to adequately allege (A) falsity and (B) scienter. (Mot. at 6-23.)

### A. Material Misstatement or Omission (Falsity)

A statement is false if it "directly contradict[s] what the defendant knew at that time" and misleading if it "omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). Courts "apply the objective standard of a 'reasonable investor' to

determine whether a statement is misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021) (citation omitted). The PSLRA requires private securities fraud complaints to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *Tellabs*, 551 U.S. at 321 (quoting 15 U.S.C. § 78u-4(b)(1)). "Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). "In setting forth the reasons why they contend that each challenged statement is misleading, securities plaintiffs may rely on either an affirmative misrepresentation theory or an omission theory." *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021) (citing 17 C.F.R. § 240.10b-5(b)).

A misrepresentation or omission is material where there is "'a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available' for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Materiality is a "fact-specific" inquiry, *In re Alphabet*, 1 F.4th at 700 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011)), but may be resolved as a matter of law "if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ," *id.* (quoting *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)) (citation omitted). Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information"; disclosure is required "when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)); *see also Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016) ("'[O]nce defendants choose to tout' positive information to the market, 'they are bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information.") (alterations adopted) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008)).

In this case, beginning in paragraph 72, the Amended Complaint describes in chronological order statements Defendants made regarding adoption, cohorts, and utilization

that the Amended Complaint alleges were false (because the statements directly contradicted what Defendants knew at the time) or misleading (because the statements omitted material information). (*See* AC ¶¶ 72-120.) The Amended Complaint then alleges why the statements were false or misleading when made, including what information Defendants allegedly had that they did not reveal. (*See id.*) "Accepting these allegations as true and in the light most favorable to [Lead Plaintiff], the Court finds [the Amended Complaint] sufficiently plead[s] falsity to survive the motion to dismiss stage because the statements created an impression of a state of affairs that differed in a material way from what actually existed." *Indiana Pub. Ret. Sys. v. Rivian Auto., Inc.*, 2025 WL 2426714, at *2 (C.D. Cal. Aug. 20, 2025) (collecting cases); *see also, e.g.*, *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *9 (C.D. Cal. Jan. 17, 2020), *order clarified,* 472 F. Supp. 3d 747 (C.D. Cal. 2020) ("[T]he Court determines that Plaintiff has pled with sufficient specificity to meet the PSLRA standard. The Complaint quotes specific statements and then explains in the subsequent paragraphs why they are allegedly false and misleading. As Plaintiff notes, at least one other district court has concluded that similar allegations meet the PSLRA specificity requirement. *See Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *9 (C.D. Cal. June 9, 2016) ('The Court does not find the allegations to present such a difficult 'puzzle' that dismissal is warranted on this ground alone' in part because 'Plaintiffs highlight in bold and italics the particular statements in these filings that they shortly thereafter contend to be false or misleading.')) (citation modified). The court is not persuaded by Defendants' arguments that the statements involved accurate data and therefore cannot be false or misleading, (Mot. at 7-8); that the Amended Complaint's allegations regarding patient results and doctor complaints insufficiently allege falsity, including because it "does not identify or enumerate the surgeons Plaintiff purportedly interviewed," (*id.* at 9-10); that the cost and burden allegations are insufficiently alleged, (*id.* at 10-11); or that the market saturation, field support, and rebate allegations are too conclusory to be sufficient, (*id.* at 11-12).

The court turns, then, to Defendants' argument that "many of the statements are non-actionable as a matter of law," either because they are "non actionable opinions" or "non-actionable puffery." (Mot. at 12-14 (headings).) "Corporate 'puffing' involves 'expressing an opinion' that is not 'capable of objective verification'" and is accordingly not actionable under Section 10(b) or Rule 10b-5. *See Macomb Cnty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1097-98 (9th Cir. 2022) (quoting *Retail Wholesale*, 845 F.3d at 1275). While "mildly

optimistic, subjective assessment[s]" such as "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers" are generally inactionable puffery, *see Apollo*, 774 F.3d at 606 (quoting *In re Cutera*, 610 F.3d at 1111), "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations," *id.* (citing *S.E.C. v. Todd*, 642 F.3d 1207, 1216-17 (9th Cir. 2011)). In some circumstances, however, "general statements of optimism, when taken in context, may form a basis for a securities fraud claim." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 770 (9th Cir. 2023) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). Because "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives," *In re Alphabet*, 1 F.4th at 700 (quoting *Intuitive Surgical*, 759 F.3d at 1060), such statements "rise to the level of materially misleading statements only if they provide 'concrete description of the past and present' that affirmatively create[s] a plausibly misleading impression of a 'state of affairs that differed in a material way from the one that actually existed,'" *id.* (quoting *Quality Sys.*, 865 F.3d at 1144).

When predicated on an opinion statement—"a belief, a view, or a sentiment which the mind forms of persons or things"—there are three standards for pleading falsity. *Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*, 575 U.S. 175, 183 (2015) (cleaned up); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-17 (9th Cir. 2017) (applying *Omnicare*'s standards to Section 10(b) and Rule 10b-5 claims). These standards depend on the plaintiff's underlying theory of falsity:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue. Third, when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the basis for the issuer's opinion whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Dearborn Heights*, 856 F.3d at 615-16 (cleaned up).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No. 8:25-cv-01596-FWS-KES Date: May 21, 2026
Title: In re RxSight, Inc. Securities Litigation

In this case, the court does not find at this stage of the proceedings that the Amended Complaint insufficiently alleges that the challenged statements are actionable. It is an "uncontroversial proposition that 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim,'" *Intuitive Surgical*, 759 F.3d at 1060 (quoting *Warshaw*, 74 F.3d at 959), and "the context in which the statements were made is key," *id.* Here, the court finds the Amended Complaint sufficiently alleges the challenged statements "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed," *Quality Systems*, 865 F.3d at 1144 (alterations adopted) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)); addressed measurable or objectively verifiable metrics; professed beliefs Defendants did not hold or which were objectively untrue; supplied supporting facts that were untrue; or omitted facts going to the basis for Defendants' opinion whose omission made the opinion statement misleading to a reasonable person reading the statement fairly and in context, *Dearborn Heights*, 856 F.3d at 615-16; *Rivian Auto., Inc.*, 2025 WL 2426714, at *5 (C.D. Cal. Aug. 20, 2025).

For similar reasons, the court is not persuaded by Defendants' argument that the Amended Complaint fails to adequately allege an Item 303 claim. Item 303 requires disclosure of "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(b)(2)(ii). "The failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim only if the omission renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 258 (2024). Here, the court finds the Amended Complaint adequately alleges facts supporting the contention that Defendants' omissions rendered their affirmative statements misleading. *See id.*; *see, e.g.*, *In re Fastly, Inc. Sec. Litig.*, 801 F. Supp. 3d 880, 906 (N.D. Cal. 2025) (denying motion to dismiss Item 303 claim for similar reasons)

### B. Scienter

Defendants next argue that the Amended Complaint does not adequately plead a strong inference of scienter. (Mot. at 15-23.) Scienter is a "a mental state embracing intent to deceive,

manipulate, or defraud." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quoting *Tellabs*, 551 U.S. at 319). "To satisfy the requisite state of mind element, a complaint must allege that the defendant made false or misleading statements either intentionally or with deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (cleaned up); *see also* 15 U.S.C. § 78u-4(b)(2). "[D]eliberate recklessness is an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Schueneman*, 840 F.3d at 705 (cleaned up). That is, recklessness "only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 977 (9th Cir. 1999)).

The PSLRA requires a plaintiff to plead facts supporting a "strong inference" of scienter. *See Tellabs*, 551 U.S. at 323-324; 15 U.S.C. § 78u-4(b)(2)(A); *see Glazer Cap. Mgmt., L.P.*, 63 F.4th at 766 ("[S]cienter is subject to a particularity requirement and a *strong inference* standard of plausibility."). The court considers "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. A complaint "survive[s]" a defendant's motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *See id.*

"[W]hen determining whether plaintiffs have shown a strong inference of scienter, the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). "District courts should consider all the allegations in their entirety, together with any reasonable inferences that can be drawn therefrom, in concluding whether, on balance, the plaintiffs' complaint gives rise to the requisite inference of scienter." *Id*. "However, the inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun' genre, or even the most plausible of competing inferences . . . . [T]he inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations." *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1179 (C.D. Cal. 2007) (citation and internal quotation marks omitted). "Thus, a

complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Id*. (emphasis added in original).

Where a plaintiff "seek[s] to hold individuals and a company liable on a securities fraud theory," the plaintiff must "allege scienter with respect to each of the individual defendants." *Apollo*, 774 F.3d at 607. However, courts may "impute scienter to individual defendants in some situations." *Id.* For instance, "there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (citation omitted).

Where no "individual allegation" establishes a strong inference of scienter, a complaint sufficiently pleads scienter if "the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness" under a "holistic" review. *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (quoting *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)).

In this case, the court finds the Amended Complaint adequately alleges facts that, under a holistic review, create a strong inference of scienter. First, the Amended Complaint sufficiently alleges facts creating a strong inference that Defendants had actual contemporaneous knowledge of facts either contradicting the statements they made or facts which made their omissions material, and deliberately deceived or misled investors. (*See* Opp. at 17-20.) For example, the Amended Complaint alleges that once RxSight's poor performance became public, Defendants made statements about utilization and adoption being poorer than they had previously indicated, and admitted that the basis for the later poor assessment was data and documents Defendants had access to during the time period they were saying utilization and adoption was better than it was.[1] (*See* AC ¶¶ 148-59.) Second, the Amended Complaint's allegations that Defendants instituted a "Study Patient" reward system that "masked

[1] The court finds Defendants' argument that these later statements "do not constitute 'admissions'," (*e.g.* Mot. at 21-22), are better addressed at a later stage on a more developed record.

dissatisfaction with LALs and propped up revenues and adoption temporarily by incentivizing surgeons and clinics to utilize LALs in greater volumes than they would have without the incentive"; and that Kurtz and Thunen "s[old] over $16 million of their own RxSight shares at artificially inflated prices," conducted a secondary public offering, and executed SOX certifications further support the strong inference of scienter. (*See, e.g.*, AC ¶¶ 56, 101, 164-68.)

The core operations doctrine lends further support under a holistic review for the court's conclusion that scienter is adequately alleged. "The core operations theory of scienter relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Intuitive Surgical*, 759 F.3d at 1062 (citation and internal quotation marks omitted). The "core-operations inference can be one relevant part of a complaint that raises a strong inference of scienter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *see In re NVIDIA*, 768 F.3d at 1063 (the core operations inference may be considered "when weighing a complaint's allegations of scienter holistically"). Core operations allegations may support a strong inference of scienter in three situations:

> (1) when they, along with other allegations, support a cogent and compelling inference of scienter, (2) when they are themselves particular and suggest that the defendants had actual access to the disputed information, and (3) in the rare circumstances when they are not particularized, but the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1111 (9th Cir. 2021) (citations and internal quotation marks omitted). Here, the Amended Complaint alleges that "[t]he RxSight System was the Company's sole product" and "represented nearly 100% of the Company's business"; that adoption and utilization were crucial to the RxSight System's success, and that Kurtz and Thunen "were top executives at [RxSight] and led its day-to-day operations," "monitored and/or oversaw the overall business strategy, which hinged entirely upon the RxSight System, and driving sales of the high-priced LDDs to advance recurring, higher-margin

LAL procedures." (AC ¶¶ 38-39, 46-67, 160-63.) In sum, taken holistically, the court finds the Amended Complaint's allegations sufficiently allege that Defendants acting with scienter is "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *See Tellabs*, 551 U.S. at 322-24.

Finally, because the court finds the Amended Complaint adequately alleges a 10(b) and Rule 10b-5 claims, the court does not find dismissal under Section 20(a) appropriate. *See Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) (explaining that a Section 20(a) violation consists of "(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator"); *Zucco Partners*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b)."); (*see also* Mot. at 23 ("Because the Section 10(b) claims fail, the Section 20(a) claim should be dismissed.").

## IV. Disposition

For the reasons set forth above, the Motion is **DENIED**. Defendants shall file an Answer to the Amended Complaint on or before **June 9, 2026.**